UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

EBEN ALEXANDER, III, M.D.

        Plaintiff,

v.

BRIGHAM AND WOMEN'S PHYSICIANS
ORGANIZATION, INC., successor to
Brigham Surgical Group Foundation, Inc.,
BOSTON NEUROSURGICAL FOUNDATION
INC., BRIGHAM SURGICAL GROUP
FOUNDATION, INC. DEFERRED
COMPENSATION PLAN, BRIGHAM
SURGICAL GROUP FOUNDATION, INC.
FACULTY RETIREMENT BENEFIT
PLAN, COMMITTEE ON COMPENSATION
OF THE BRIGHAM SURGICAL GROUP
FOUNDATION, INC., FIDELITY
INVESTMENTS INSTITUTIONAL
OPERATIONS CO., INC., FIDELTY
MANAGEMENT TRUST CO., and
PETER BLACK, M.D.

        Defendants.

Case No.

04-10738 PBS

MAGISTRATE JUDGE Collings

RECEIPT # _____
AMOUNT $ 150
SUMMONS ISSUED 10
LOCAL RULE 4.1 _____
WAIVER FORM _____
MCF ISSUED _____
BY DPTY CLK. _____
DATE 4-12-04

## COMPLAINT

### INTRODUCTION

After thirteen years as a neurosurgeon with the Brigham Surgical Group Foundation, Inc. ("BSG"), located at Brigham & Women's Hospital, the plaintiff, Eben Alexander, III, M.D. ("Dr. Alexander"), was wrongfully terminated in bad faith by BSG's successor in interest in a calculated effort to deprive him of the benefits he accrued in two deferred compensation plans. Peter Black, M.D. ("Dr. Black"), chief neurosurgeon of the Brigham & Women's Hospital during

Dr. Alexander's employment and founder of defendant Boston Neurosurgical Foundation, Inc. ("BNF"), orchestrated the scheme to fire Dr. Alexander and reap the benefits of his firing. Through improper accounting, commingling of funds and expenses of the BSG and BNF, and failure to provide accounting detail, Dr. Black started "cooking the books" in 1998 and manipulating expenses attributable to Dr. Alexander, all of which resulted in significantly decreasing Dr. Alexander's compensation. To make matters worse, Dr. Alexander was terminated, and with no justification was assessed a deficit of over $440,000, half of which purportedly accrued during the last six months of Dr. Alexander's employment. Dr. Black's motivations were purely selfish: as a result of efforts culminating in 2001, Dr. Black would finally head a department of neurosurgery at the hospital, and he schemed to use the money from Dr. Alexander's benefit plans to decrease his BNF liabilities with BSG.

Using the purported deficit as a means of taking Dr. Alexander's deferred compensation funds, BSG's successor unilaterally withdrew over $440,000 from Dr. Alexander's two deferred compensation plans. Dr. Alexander brings this action against the defendants for, among other claims, breach of contractual and fiduciary duties, breach of the implied covenant of good faith and fair dealing, conversion, violations of Massachusetts General Laws Chapter 93A, §§ 2 and 11, negligence, ERISA violations, and for an accounting. Dr. Alexander also seeks full recovery of his benefits, attorneys' fees and other damages resulting from defendants' actions.

## JURISDICTION

1. This Court has jurisdiction over this matter pursuant to 29 U.S.C. § 1132(e)(1) and 28 U.S.C. § 1331, in that this action arises under ERISA, which is a law of the United States.

2. This Court has subject matter jurisdiction over those allegations made under common law and state statutory law pursuant to the principles of supplementary jurisdiction.

3. Venue is proper in this district pursuant to 28 U.S.C. § 1391 and 29 U.S.C. § 1132(e)(2), in that each defendant resides, or may be found in this district and is subject to personal jurisdiction in this district, and the events giving rise to the claims alleged occurred in this district.

## PARTIES

4. Plaintiff, Eben Alexander, III, M.D., is an individual residing in Needham, Massachusetts.

5. Defendant, Brigham and Women's Physicians Organization, Inc. ("BWPO"), is a nonprofit corporation and public charity organized under the laws of the Commonwealth of Massachusetts with a principal place of business located at 75 Francis Street, Boston, Massachusetts. BWPO is the successor through statutory merger to Brigham Surgical Group Foundation, Inc. and, as such, assumed all of BSG's obligations and contractual commitments, including fiduciary responsibilities.

6. Defendant, Boston Neurosurgical Foundation, Inc., is a nonprofit corporation and public charity organized under the laws of the Commonwealth of Massachusetts with a principal place of business at 300 Longwood Avenue, Boston, Massachusetts.

7. Defendant, Brigham Surgical Group Foundation, Inc. Deferred Compensation Plan ("UDC"), is an employee benefit plan within the meaning of 29 U.S.C. § 1002(2)(A) by virtue of the fact that it is a plan, fund, or program which was established or maintained by an employer to provide retirement income to employees, or to provide for a deferral of income by employees for periods extending to the termination of covered employment or beyond.

8. Defendant, Brigham Surgical Group Foundation, Inc. Faculty Retirement Benefit Plan ("FRBP"), is an employee benefit plan within the meaning of 29 U.S.C. § 1002(2)(A) by virtue

of the fact that it is a plan, fund, or program which was established or maintained by an employer to provide retirement income to employees, or to provide for a deferral of income by employees for periods extending to the termination of covered employment or beyond.

9. Defendant, Committee on Compensation of the Brigham Surgical Group Foundation, Inc. (the "Committee"), is, upon information and belief, the plan administrator and fiduciary for the UDC and FRBP.

10. Defendant, Fidelity Investments Institutional Operations Company, Inc. ("Fidelity"), is a corporation organized under the laws of the Commonwealth of Massachusetts with a principal place of business at 82 Devonshire Street, Boston, Massachusetts. Upon information and belief, Fidelity is the organization or group designated to serve as the administrator of both the UDC and FRBP, pursuant to 29 U.S.C. § 1002(14).

11. Defendant, Fidelity Management Trust Company ("FMTC"), is, upon information and belief, a Massachusetts corporation with a place of business in Boston, Massachusetts and the "Rabbi Trustee" for the UDC and FRBP.

12. Defendant, Peter Black, M.D., is an individual residing, upon information and belief, at 13 Louisburg Square, Boston, Massachusetts. At all relevant times, Dr. Black was the Neurosurgeon-in-Chief at the Brigham & Women's Hospital and a member of BSG. After the merger with BWPO, Dr. Black became a trustee of BWPO. In addition, Dr. Black was the founder, president, and a director of BNF.

## FACTS

### Dr. Alexander's Employment with BSG

13. Dr. Alexander is a world-renowned neurosurgeon. After completing his postdoctoral training at Duke University School of Medicine, Massachusetts General Hospital, and Newcastle

General Hospital in Newcastle-Upon-Tyne in England, Dr. Alexander began a meteoric career as one of the preeminent neurosurgeons in the world. During his career, he has been invited and has lectured on hundreds of occasions throughout the world, and has published voluminous articles, books, and letters relating to neurosurgery. Dr. Alexander has been recognized as one of the "Best Doctors in America – Northeast Region."

14. In 1988, Dr. Alexander was hired by BSG. At the time, BSG was a tax-exempt corporation whose purpose was to educate and train students enrolled in the Harvard Medical School and to teach surgery to surgical residents, all of which was done through the Department of Surgery at the Brigham & Women's Hospital. Performing surgery was BSG's principal means of instruction, and interestingly, generated the primary source of revenue that was then used to support its educational activities.

15. At or around the time of his hiring in 1988, Dr. Alexander entered into an Employment Agreement with BSG. A copy of the Employment Agreement is attached as Exhibit A. Pursuant to the Employment Agreement, BSG was to pay Dr. Alexander "compensation which may consist of an annual salary and/or incentive bonus which shall be determined annually in accordance with the terms of the Professional Staff Compensation Policy" of BSG.

**BSG's Compensation Policy and Benefit Plans**

16. The Professional Staff Compensation Policy ("Compensation Policy") referenced in the Employment Agreement set forth the compensation structure for BSG surgeons. A copy of the Compensation Policy is attached as Exhibit B. Under the Compensation Policy, BSG surgeons received two salary components: (i) "OR-TEACHING" for billable and operative related services and (ii) "NON-OR TEACHING" for activities that are non-billable. With

respect to the OR-TEACHING component, the Compensation Policy specifically provided that:

> Members shall have an OR-TEACHING salary based on their OR-TEACHING salary for the previous Academic Year (AY) plus 0-50% of any net practice surplus for such prior year but within ceiling, as determined by the Surgeon-in-Chief. The calculation of net practice surplus or deficit and Net Practice Income (NPI) for each Member will be determined as defined in Appendix A.

17. Appendix A to the Compensation Policy provided that Net Practice Income ("NPI") would be calculated as follows:

> The Net Practice Income (NPI) for each Member of the [BSG] shall be determined annually based on financial transactions occurring during the Academic Year (AY) (July 1 – June 30). This determination will be made by finding the difference between the income resulting from Member OR-TEACHING activity and Member expenses during the AY. Member expenses include all direct and allocated expenses incurred by or on behalf of the Member involved plus a Departmental Charge equal to a percentage of Net Receipts attributable to the Member's OR-TEACHING during the AY.

Thus, Dr. Alexander was eligible to receive a salary plus a percentage equal to as much as 50% of any surplus, as defined in Appendix A, within an academic year. Deficits resulted only when the net practice income (total income less expenses) exceeded a surgeon's salary for a particular year.

18. New BSG members were essentially provided a one-year grace period. Specifically, the Compensation Policy provided that BSG "will absorb a new member deficit in Year 1 limited to salary, benefits, liability and an expense cap as determined by the Surgeon-in-Chief ... Deficits in Years 2-3 will be absorbed by the new member of the new member's Division."

### The UDC

19. BSG sponsored and maintained an Unfunded Deferred Compensation Plan ("UDC") for its employees. In or about 1988, Dr. Alexander became a participant in the UDC. A copy of the UDC plan is attached hereto as Exhibit C. Under the terms of the UDC Plan, BSG employees who earned in excess of the total amount allowable by the Harvard Medical School

were entitled to defer 50% of the excess compensation into the employee's UDC account. The UDC specifically provided that:

> **Amount Credited.** If the total compensation of an Employee established by the Committee exceeds the maximum permissible amount of compensation payable currently in cash or fringe benefits under the limitations imposed by Harvard Medical School, 50% of the excess (but not more than the maximum permissible amount of deferred compensation under said limitations) shall be credited by the Employer to a deferred compensation liability account payable to such Employee. The credit shall be recorded as of the last day of the Employer's fiscal year or as of such other date or dates as the Committee may decide.

20. Section 2.05 of the BSG's sponsored UDC contains a set-off provision which provided that "the Employer [BSG] shall have the right to set off its liability to an Employee hereunder against any debt or other liability of the Employee to the **Employer**" (emphasis added).

21. The BSG Compensation Policy also provided that UDC may be used to offset a salary deficit "to avoid financial hardship" **to BSG**.

### The FRBP

22. In addition to the UDC, BSG sponsored a *second* deferred compensation plan known as the Faculty Retirement Benefit Plan ("FRBP") for its employees. In or about 1988, Dr. Alexander became a participant in the FRBP. A copy of the FRBP is attached as Exhibit D. Pursuant to the FRBP, a BSG employee was entitled to a credit of 25% of the employee's compensation, reduced by certain contributions, to the extent the employee had a practice surplus in a given year. Specifically, the FRBP provides, in pertinent part:

> Subject to the practice surplus requirements of the next following sentence, the Employer shall credit to each Participant an amount equal to 25% of the Participant's compensation for the Plan Year, reduced by the amount of any contribution for the Participant for such Plan Year to (i) any defined contribution plan qualified under Section 401(a) of the Internal Revenue Code of 1986 as amended (the "Code"), and (ii) any arrangement under Section 403(b) of said Code. All such contributions shall be made only to the extent a

-7-

Participant has a practice surplus as determined under the Employer's Professional Staff Compensation Policy, with [certain] exceptions...

23. Like the UDC, the FRBP contained a set-off provision in Section 3.03:

The Employer may set-off prior to payment of benefits to a Participant hereunder any amounts due from the Participant to the **Employer**, including without limitation any current or prior practice deficits as determined under the Employer's Professional Staff Compensation Policy and amounts loaned to the Participant (whether or not such loan is secured by a mortgage) (emphasis added).

24. As of April 11, 2001, Dr. Alexander's UDC account balance was $588,470 (of which Dr. Alexander had contributed $359,328) and his FRBP account balance was $384,928 (of which he had contributed $207,741). Together, as of April 11, 2001, Dr. Alexander had deferred compensation totaling $973,399 in his UDC and FRBP accounts.

**Commingling Expenses and Accounting Issues: The BNF and Shared Agreement**

25. Although under contract as an employee of the BSG, Dr. Black required Dr. Alexander to have an affiliation with BNF, which was headed by Dr. Black out of Children's Hospital. BNF is described as a multi-institutional team from Brigham & Women's Hospital, Children's Hospital, Dana Farber Cancer Institute, and Harvard Medical School that offers numerous clinical programs and services for all types of neurosurgical conditions.

26. In addition to his role as member of BSG, Dr. Black was also the founder and president of BNF. As such, Dr. Black controlled all BNF hospital affiliations and privileges, but more importantly its finances.

27. Purportedly in return for privileges at Children's Hospital and to practice with the academic neurosurgeons at the Brigham & Women's Hospital, Dr. Black required neurosurgeons employed by BSG, including Dr. Alexander, to pay a percentage of BNF expenses. These BNF expenses, however, were not an expense of BSG and, therefore, should not have affected the

calculation of NPI under BSG's Compensation Policy.

28. At no time was Dr. Alexander an employee of BNF. Dr. Black exerted complete control over the amount of expenses charged to BSG neurosurgeons, but kept the books and records relating to expenses charged to BSG neurosurgeons a secret. Indeed, in response to numerous requests by neurosurgeons to review the books and records of BNF, Dr. Black refused to share the books and records and gave no explanation for the charges that Dr. Black claimed were to be included in calculating NPI. Consequently, the accounting of BNF expenses remained a mystery and, in turn, the BSG practice surpluses and deficits could never be verified or challenged.

29. Beginning in or about 1992, Dr. Black required neurosurgeons affiliated with BNF, including Dr. Alexander, to sign a "Shared Agreement" with BNF concerning the percentage of expenses attributable to each neurosurgeon and the BNF, respectively. The Shared Agreements listed categories of expenses for "Department Salaries" and "Non-Personnel Expenses" and a table of percentages to be paid by each professional BSG staff member toward those expenses. But, the Shared Agreements provided no hard dollar amounts, thus allowing for inexplicable fluctuations in expenses.

30. Dr. Alexander had reservations about signing the Shared Agreements, however, because he noticed dramatic increases in BNF expenditures during the 1997 fiscal year. By January 1998, all of the BSG and BNF neurosurgeons were concerned enough about unexplained accounting discrepancies to request in writing that Dr. Black open the accounting books for an outside audit. Dr. Black initially agreed to an audit, but never followed through despite many subsequent requests and reminders.

31. Yet, Dr. Black coerced neurosurgeons like Dr. Alexander to sign a shared agreement.

Dr. Alexander had resisted signing such agreements several times in 1996 and 1997, and had been verbally threatened by Dr. Black. In fact, by letter dated March 6, 1998, Dr. Black threatened Dr. Alexander with withdrawal of privileges if he refused to sign the Shared Agreement:

> I must tell you that your ongoing refusal to sign the agreement is a clear statement about your unwillingness to be a part of the Neurosurgical Service. If you refuse to sign the agreement by March 20, 1998, we will not allow you to have residents in the operating room to assist with your cases. As time goes on and you continue to refuse to sign, we will consider withdrawing other privileges shared by the staff on the Service.

A copy of the letter dated March 6, 1998 is attached hereto as Exhibit E.

32. In a telephone call on or about March 17, 1998, Dr. Black specifically threatened to terminate Dr. Alexander unless Dr. Alexander signed the Shared Agreement by March 20, 1998.

33. Under duress and having expressed repeated protest, Dr. Alexander signed the Shared Agreement on March 19, 1998. A copy of the Shared Agreement dated March 19, 1998 is attached hereto as Exhibit F.

**Defendants' Manipulation of Dr. Alexander's Compensation**

34. As it turns out, Dr. Alexander's concerns about Dr. Black's secret bookkeeping and suspicions concerning the skyrocketing BNF expenses proved true. In 1998, Dr. Black began manipulating expenses attributable to Dr. Alexander, including BNF expenses, to drive up his BSG practice deficit. As a result of Dr. Black's manipulation, for the first time in his ten years of employment with BSG, Dr. Alexander was assessed a deficit in 1998.

35. Examples of the outrageous BNF expenses included the hiring of four new junior surgeons in 1998 and 1999, despite the fact that the six attending surgeons believed <u>no</u> new hires were necessary.

36. Moreover, in December 2000, Dr. Black approved salary increases and $30,000

- 10 -

bonuses to two junior doctors, Marc Eichler and John Park, both of whom had practice deficits at the time. These compensation increases for underperforming doctors resulted in higher practice expenses and caused Dr. Alexander, and other senior doctors, to incur further deficits. Not surprisingly, the timing of this maneuver was calculated and curious: bonuses had never before been given out in December (they were typically given in June), but doing so in December 2000 increased Dr. Alexander's deficit just in time for the half fiscal year report, upon which his final deficit calculation with BSG would be based. At midnight on December 31, 2000, Dr. Black's Department of Neurosurgery would become a reality, and the BSG would be phased out as the newly created BWPO took over.

37. According to BSG accounting records, Dr. Alexander had a surplus for fiscal years 1994 through 1997 of $77,941, $105,730, $355,381, and $64,009, respectively. For fiscal years 1998 through 2000, however, BSG accounting records showed a deficit for Dr. Alexander of $6,590, $111,665, and $95,453 for a total net deficit forward of $213,707. By mid 2001, however, Dr. Black's financial manipulations resulted in an incredulous deficit of an additional $228,182 for Dr. Alexander, or more than all previous years combined.

38. Dr. Alexander repeatedly questioned the expenses underlying the deficit and expressed his concern about the accounting methodologies by BSG, BNF, and Dr. Black, but his efforts to obtain financial back-up were ignored.

**Bad Faith Termination of Dr. Alexander and Setoffs from the UDC and FRBP**

39. Over the years, the relationship between Drs. Black and Alexander soured. Consequently, Dr. Black had it in for Dr. Alexander. Whether Dr. Black was threatened by Dr. Alexander's talent and success, or simply uncomfortable with Dr. Alexander's requests for backup and explanations concerning BNF expenses and other accounting issues, Dr. Black

determined it was time to get rid of Dr. Alexander. The process was methodical and calculated. Expenses attributable to Dr. Alexander continued to rise.

40. Then Dr. Black stopped referring patients to Dr. Alexander and instead chose new surgeons over Dr. Alexander, which had the effect of decreasing Dr. Alexander's workload and billings.

41. Dr. Black also sought to get rid of Dr. Alexander for his own selfish reasons: he knew that as of January 2001, BSG would merge with BWPO and Dr. Black would finally have a Department of Neurosurgery, as opposed to a division, and that he would need significant resource money to prove he was worthy of a Department. With the merger on the horizon, Dr. Black did his best to increase Dr. Alexander's deficit as rapidly as possible in the first six months of fiscal year 2001 (June 2000 through December 2000) and rid himself of perceived competition from a younger surgeon. Although Dr. Black represented to the neurosurgeons that the expenses for 2001 would be flat, expenses from 2000 to 2001 increased by over 23%. In fact, the total expenses in 2001 were the highest in over four years, including the highest non-professional salaries and non-professional fringe benefits ever, the highest office expenses in five years, the highest miscellaneous expenses in seven years, and the highest "shared" expenses ever. All this at a time when the BNF had fewer non-professional staff members than in recent years.

42. On April 13, 2001, Dr. Black's efforts were realized. At that time, Dr. Black notified Dr. Alexander of his termination. The termination notice was signed by Dr. Black as "Chair – BWPO Department of Neurosurgery" and Dr. Troyen Brennan, President of BWPO. A copy of the termination notice dated April 13, 2001 is attached hereto as Exhibit G.

43. Notably, that very same day, Kenneth Holmes ("Holmes"), Chief Financial Officer of the BSG, notified Dr. Alexander that the deficit assessed to Dr. Alexander would be offset by amounts in Dr. Alexander's UDC and FRBP accounts:

> As we discussed previously, the [enclosed] report indicates a practice deficit of $228,181.16 for the six months ended December 31, 2000 and a cumulative practice deficit of $441,887.16....
>
> As you are aware, both the FRBP and UDC plans provide that upon termination of a faculty member's employment with BSG, the amounts owed to the faculty member under these deferred compensation plans will be offset by the amount of the member's practice deficit. Accordingly, as of April 20, 2001, the BWPO as successor to the BSG, will reduce your FRBP plan by $177,187.22 and your UDC plan by the remaining existing practice deficit of $264,699.94.

A copy of the Holmes letter dated April 13, 2001 is attached hereto as Exhibit H.

44. By email to Holmes on April 19, 2001, Dr. Alexander protested the withdrawal of any funds from his UDC and FRBP accounts and requested an accounting, an examination of the books, and an explanation of the accounting principles applied to the attempted offset.

45. Despite Dr. Alexander's protest, by letter dated April 23, 2001 Holmes directed Fidelity, the administrator of the plans, to process a partial distribution in the amount of $190,000.00 from Dr. Alexander's FRBP account and a partial distribution of $251,887.16 from Dr. Alexander's UDC account. Holmes instructed Fidelity to send the check payable to BWPO and noted that these were "a payment to the Plan Sponsor under section 2.05 and 3.03 [i.e., the set off provisions] of the Deferred Compensation Plan and the Faculty Retirement Benefit Plan, respectively and in accordance to Section 2 of the Trust Agreement." A copy of the letter dated April 23, 2001 to Fidelity from Holmes is attached hereto as Exhibit I.

46. Upon information and belief, the funds were withdrawn from Dr. Alexander's UDC and FRBP accounts soon after Holmes' instruction -- even though Dr. Alexander's termination

would not be effective until three months later on July 13, 2001. Conceivably, Dr. Alexander's deficit could have decreased in those three months, but defendants did not want to take that chance and grabbed the most they could by withdrawing the funds immediately.

**The Setoffs Were Improper**

47. As detailed above, Dr. Black ensured that Dr. Alexander's BNF expenses increased to the point where Dr. Alexander was assessed a significant practice deficit. BSG accounting records, however, show that approximately $417,000 of the $441,000 deficit is attributable to BNF expenses, for which BSG had no right of setoff against the UDC and FRBP, which are <u>BSG</u> sponsored plans.

48. In addition, the setoffs from the UDC and FRBP were unlawful because neither plan qualifies as a "top hat" plan under ERISA. Only unfunded plans that are "maintained by an employer primarily for the purpose of providing deferred compensation for a <u>select</u> group of management or highly compensated employees" are "top hat" plans and exempt from the substantive requirements of ERISA Title I pertaining to participation, vesting, funding and fiduciary responsibilities.

49. Upon information and belief, participation in the UDC and FRBP was offered to all members of BSG's professional staff, who were not all either management or highly compensated, and who did not have the ability effectively to negotiate for themselves. Put another way, the participants in the UDC and FRBP were not a <u>select</u> group out of a broader group of management employees or a broader group of highly compensated employees.

50. BSG's failure to restrict participation in the UDC and FBRP to a select group of management or highly compensated employees means it is not a "top hat" plan. Accordingly, the UDC and FBRP are subject to, among other things, the vesting and fiduciary requirements Title I

of ERISA.

51. Dr. Alexander's benefits under the UDC and FRBP were fully vested after seven years of employment with BSG and not subject to alienation. Therefore, BWPO had no legal right to setoff the deficit under the UDC or FRBP.

52. As a result of Dr. Black's actions, Dr. Alexander lost his employment with BSG, as well as more than $440,000 owed him as deferred compensation under the UDC and FRBP. To date, defendants have been unable to and/or refused to provide Dr. Alexander with an adequate detailed accounting of the deficit assessed. Moreover, Dr. Alexander has been deprived of his rights under ERISA due to the unlawful setoffs of the deficit against the UDC and FRBP, which do not qualify as "top hat" plans.

53. By email dated April 19, 2001 and again in or around April 2004, Dr. Alexander made demand for an accounting and benefits in connection with exhausting his administrative remedies with respect to his benefit claims against the UDC and FRBP.

### COUNT I
(Breach of Contract vs. BWPO, as successor to BSG)

54. Dr. Alexander incorporates by reference herein the allegations contained in paragraphs 1 through 53 above.

55. Dr. Alexander and BSG entered into agreements concerning the terms and conditions of Dr. Alexander's employment with BSG, including compensation and benefits.

56. As successor to BSG, BWPO assumed all of BSG's obligations and contractual commitments.

57. As set forth above, BSG breached its agreements with Dr. Alexander.

58. BWPO, as successor to BSG, is liable for BSG's breaches.

59. As a result, Dr. Alexander has suffered damages in an amount to be proven at trial, plus interest, costs, attorneys' fees and further consequential damages.

## COUNT II
(Breach of Contract vs. BNF)

60. Dr. Alexander incorporates by reference herein the allegations contained in paragraphs 1 through 59 above.

61. Dr. Alexander and BNF entered into shared agreements concerning expenses.

62. As set forth above, BNF breached its agreements with Dr. Alexander.

63. As a result, Dr. Alexander has suffered damages in an amount to be proven at trial, plus interest, costs, attorneys' fees and further consequential damages.

## COUNT III
(Breach of Implied Covenant of Good Faith and Fair Dealing vs. BWPO, as successor to BSG)

64. Dr. Alexander incorporates by reference herein the allegations contained in paragraphs 1 through 63 above.

65. The conduct of BWPO, as successor to BSG, set forth above constitutes breaches of the implied covenant of good faith and fair dealing contained in BSG's agreements with Dr. Alexander.

66. As a result, Dr. Alexander has suffered damages in an amount to be proven at trial, plus interest, costs, attorneys' fees and further consequential damages.

## COUNT IV
(Breach of Implied Covenant of Good Faith and Fair Dealing vs. BNF)

67. Dr. Alexander incorporates by reference herein the allegations contained in paragraphs 1 through 66 above.

68. The conduct of BNF set forth above constitutes breaches of the implied covenant of

good faith and fair dealing contained in its agreements with Dr. Alexander.

69. As a result, Dr. Alexander has suffered damages in an amount to be proven at trial, plus interest, costs, attorneys' fees and further consequential damages.

## COUNT V
(Common Law Breach of Fiduciary Duty vs. BWPO, BNF and Dr. Black)

70. Dr. Alexander incorporates by reference herein the allegations contained in paragraphs 1 through 69 above.

71. Defendants BWPO, on its own and as successor to BSG, BNF, and Dr. Black owed fiduciary duties to Dr. Alexander as a result of, among other things, their roles in BSG's compensation scheme and control over Dr. Alexander's compensation and benefits, including allocation of expenses.

72. As set forth above, defendants BWPO, BNF and Dr. Black breached fiduciary duties owed to Dr. Alexander.

73. As a result, Dr. Alexander has suffered damages in an amount to be proven at trial, plus interest, costs, attorneys' fees and further consequential damages.

## COUNT VI
(Conversion vs. BWPO, BNF, and Dr. Black)

74. Dr. Alexander incorporates by reference herein the allegations contained in paragraphs 1 through 73 above.

75. As set forth above, BWPO, on its own and as successor to BSG, BNF, and Dr. Black have intentionally and wrongfully exercised ownership, control or dominion over Dr. Alexander's property and funds, and converted those funds to their own use.

76. As a result, Dr. Alexander has suffered damages in an amount to be proven at trial, plus interest, costs, attorneys' fees and further consequential damages.

## COUNT VII
(Violation of M.G.L. c. 93A, §§ 2 and 11 vs. BNF and Dr. Black)

77. Dr. Alexander incorporates by reference herein the allegations contained in paragraphs 1 through 76 above.

78. At all relevant times, BNF and Dr. Alexander, and Dr. Black and Dr. Alexander, were engaged in trade or commerce within the meaning of M.G.L. c. 93A.

79. As set forth above, BNF and Dr. Black have committed knowing and willful violations of M.G.L. c. 93A against Dr. Alexander.

80. BNF's and Dr. Black's unfair and deceptive acts or practices conduct occurred in the Commonwealth of Massachusetts.

81. As a result, Dr. Alexander has suffered damages in an amount to be proven at trial, plus interest, costs, attorneys' fees and further consequential damages.

## COUNT VIII
(Negligence vs. BWPO, BNF, and Dr. Black)

82. Dr. Alexander incorporates by reference herein the allegations contained in paragraphs 1 through 81 above.

83. As set forth above, BWPO, on its own and as successor to BSG, BNF, and Dr. Black owed Dr. Alexander a duty to exercise care in, among other things, calculating compensation due and expenses attributable to Dr. Alexander.

84. BWPO, BNF, and Dr. Black breached that duty of care by, among other actions, improper accounting and/or failing to account for compensation due Dr. Alexander, and withdrawing funds from Dr. Alexander's UDC and FRBP accounts without authority.

85. As a result, Dr. Alexander has suffered damages in an amount to be proven at trial, plus interest, costs, attorneys' fees and further consequential damages.

## COUNT IX
(Claim for Benefits Under 29 U.S.C. §1132(a)(1)(B) vs. BWPO, UDC, FRBP, Committee, Fidelity, and FMTC)

86. Dr. Alexander incorporates by reference herein the allegations contained in paragraphs 1 through 85 above.

87. Dr. Alexander is a participant in the UDC and FRBP.

88. Under ERISA, 29 U.S.C. §§1051(2), 1081(a)(3), and 1101(a)(1), only unfunded plans that are "maintained by an employer primarily for the purpose of providing deferred compensation for a select group of management or highly compensated employees" are "top hat" plans and are thus exempt from the substantive requirements of ERISA Title I pertaining to participation, vesting, funding and fiduciary responsibilities.

89. Upon information and belief, participation in the UDC and FRBP was offered to all professional staff members of BSG, the participants were not all either management or highly compensated, and the participants did not have the ability effectively to negotiate for themselves. As such, the participants in the UDC and FRBP were not a select group out of a broader group of management employees or a broader group of highly compensated employees.

90. BSG's failure to restrict participation in the UDC and FBRP to a select group of management or highly compensated employees means it is not a "top hat" plan. Accordingly, the UDC and FBRP are subject to the participation, vesting, funding and fiduciary requirements of Parts 2, 3 and 4 of Title I of ERISA, respectively.

91. Under 29 U.S.C. § 1053(a) (1), Part 2 of ERISA, Dr. Alexander's right under UDC and FRBP benefits are non-forfeitable.

92. Dr. Alexander's benefits under the UDC and FRBP were fully vested after seven years of employment with BSG and not subject to alienation. Therefore, BWPO had no right to

setoff the deficit assessed to Dr. Alexander under the UDC or FRBP.

93. Nevertheless, on or about April 23, 2001, Holmes instructed Fidelity to disburse to BWPO $190,000.00 from Dr. Alexander's FRBP account and $251,887.16 from Dr. Alexander's UDC account, which funds, upon information and belief, were disbursed to BWPO soon after Holmes' instruction.

94. As a result, Dr. Alexander has suffered damages in an amount to be proven at trial, plus interest, costs, attorneys' fees and further consequential damages.

## COUNT X
(Breach of Fiduciary Duties Under ERISA vs. BWPO, UDC, FRBP, Committee, Fidelity, and FMTC)

95. Dr. Alexander incorporates by reference herein the allegations contained in paragraphs 1 through 94 above.

96. Defendants BWPO, UDC, FRBP, the Committee, Fidelity, and FMTC are fiduciaries within the meaning of 29 U.S.C. §1002(21).

97. As fiduciaries, BWPO, UDC, FRBP, the Committee, Fidelity, and FMTC are required to administer the UDC and FRBP for the exclusive benefit of its participants and beneficiaries and are prohibited from acting in the interests of, or representing, a party whose interests are adverse to the interests of the UDC and FRBP and their participants.

98. BWPO, UDC, FRBP, the Committee, Fidelity, and FMTC breached their fiduciary duties by, among other things:

   a. failing to maintain adequate pension records relating to Dr. Alexander's employment, earnings and proper pension benefits;

   b. attempting to shift the burden to Dr. Alexander of proving the benefits owed Dr. Alexander as a result of their own failure to maintain proper records;

   c. engaging in, and perpetuating, a scheme to deny Dr. Alexander his pension