UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

2004 JUN -7 P 5: 23

| | |
|---|---|
| EBEN ALEXANDER, III, M.D. | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| BRIGHAM AND WOMEN'S PHYSICIANS | ) |
| ORGANIZATION, INC., successor to | ) |
| Brigham Surgical Group Foundation, Inc., | ) |
| BOSTON NEUROSURGICAL FOUNDATION | ) |
| INC., BRIGHAM SURGICAL GROUP | ) |
| FOUNDATION, INC. DEFERRED | ) |
| COMPENSATION PLAN, BRIGHAM | ) |
| SURGICAL GROUP FOUNDATION, INC. | ) |
| FACULTY RETIREMENT BENEFIT | ) |
| PLAN, COMMITTEE ON COMPENSATION | ) |
| OF THE BRIGHAM SURGICAL GROUP | ) |
| FOUNDATION, INC., FIDELITY | ) |
| INVESTMENTS INSTITUTIONAL | ) |
| OPERATIONS CO., INC., FIDELTY | ) |
| MANAGEMENT TRUST CO., and | ) |
| PETER BLACK, M.D. | ) |
| | ) |
| Defendants. | ) |

Case No. 04-10738-PBS

## PLAINTIFF'S OPPOSITION
## TO DEFENDANTS' MOTION TO DISMISS

I.    INTRODUCTION

In this action, the plaintiff, Dr. Eben Alexander, III ("Dr. Alexander") seeks damages as a
result of the defendants' conduct which intentionally and unfairly deprived him of income due
him under an employment agreement. Dr. Alexander has asserted common law and ERISA
claims against the defendants arising out of certain accounting improprieties, breaches of an
employment agreement and so-called shared agreement with a non-employer third party.

Despite the fact that the common law claims asserted against defendants, Boston Neurological Foundation, Inc. ("BNF") and Dr. Peter Black are unrelated to the ERISA causes of action against the plan sponsor, the defendants mischaracterize and lump together all of Dr. Alexander's claims seeking to dismiss all of the common law claims against all of the defendants on the grounds of preemption. The defendants further seek to dismiss the ERISA claims contending that Dr. Alexander failed to exhaust his administrative remedies.

The defendants' motion must be denied because (i) the common law claims seek redress for certain of the defendants' financial manipulations pursuant to employment and other non-plan related agreements that establish Dr. Alexander's compensation and are therefore not preempted by ERISA; and (ii) exhaustion of administrative remedies in this case would be futile as Dr. Alexander has made repeated and unsuccessful efforts since 1998 to obtain information regarding the defendants' illegal and inappropriate actions, and there is no requirement to exhaust administrative remedies for certain of the statutory claims asserted.

II.    <u>FACTS</u>[1]

In 1988, Dr. Alexander was hired by Brigham Surgical Group Foundation, Inc. ("BSG").[2] At or around the time of his hiring, Dr. Alexander entered into an Employment Agreement ("Employment Agreement") with BSG. (Complaint ¶ 15). Among other things, the Employment Agreement provided that Dr. Alexander's compensation - - salary and bonus - - would be determined in accordance with the terms of BSG's Professional Staff Compensation Policy ("BSG Comp. Policy"). (Complaint ¶ 15). Pursuant to the BSG Comp. Policy, Dr. Alexander's

---

[1] These facts are taken from the Complaint and must be taken as true for purposes of the Defendants' motion.

[2] In 2001, BSG merged with defendant Brigham and Women's Physicians Organization, Inc. ("BWPO") and became successor by merger to BSG. (Complaint ¶ 5). BWPO and BSG will be referred to collectively as "BSG."

salary was comprised of two components: (i) "OR-TEACHING," which is essentially salary for billable and operative services and (ii) "NON-OR TEACHING," which constituted non-billable activities. (Complaint ¶ 16). The BSG Comp. Policy further provided that the OR-TEACHING component would be based upon the:

> OR-TEACHING salary for the previous Academic Year (AY) plus 0-50% of any net practice surplus for such prior year but within ceiling, as determined by the Surgeon-in-chief. The calculation of net practice surplus or deficit and Net Practice Income (NPI) for each member will be determined as defined in Appendix A. (Complaint ¶ 16).

Appendix A to the BSG Comp. Policy provided as follows:

> The Net Practice Income (NPI) for each Member of the [BSG] shall be determined annually based on financial transactions occurring during the Academic Year (AY) (July 1 – June 30). This determination will be made by finding the difference between the income resulting from Member OR-TEACHING activity and Member expenses during the AY. Member expenses include all direct and allocated expenses incurred by or on behalf of the Member involved plus a Departmental Charge equal to a percentage of Net Receipts attributable to the Member's OR-TEACHING during the AY.

In short, Dr. Alexander was eligible to receive a salary plus a percentage equal to as much as 50% of any net practice surplus, as defined in Appendix A, within an academic year. (Complaint ¶ 17). BSG practice deficits resulted only when net practice income - - <u>BSG</u> income less <u>BSG</u> expenses - - exceeded a surgeon's salary in a particular year. (Complaint ¶ 17).

<u>BSG Deferred Compensation Plans</u>

BSG sponsored and maintained two deferred compensation plans: the Unfunded Deferred Compensation Plan ("UDC") and the Faculty Retirement Benefit Plan ("FRBP"). (Complaint ¶¶ 19, 22). When an employee's total compensation exceeded the maximum permissible amount of compensation payable under limits imposed by Harvard Medical School, an employee could direct up to 50% of the surplus to the UDC and another 25% to the FRBP as a means of deferring compensation. (Complaint ¶¶ 19, 22).

Both the BSG sponsored UDC and the FRBP Plan documents contained setoff provisions

which allowed BSG to set-off BSG practice deficits against monies directed to the UDC and FRBP. (Complaint ¶¶ 20, 23). The BSG Comp. Policy specifically authorized the UDC to be used to offset any Net Practice Income deficit "to avoid financial hardship to BSG." (Complaint ¶ 21).

### Affiliation with the Boston Neurological Foundation, Inc.

Although the Employment Agreement made clear that Dr. Alexander was a BSG employee, Dr. Peter Black ("Dr. Black"), the Chairman of the Division of Neurosurgery within the BSG, required that Dr. Alexander be affiliated with the Boston Neurological Foundation, Inc. ("BNF"), a separate and distinct entity for which Dr. Black was also president (Complaint ¶¶ 25 - 26). However, Dr. Alexander had no employment relationship with BNF.[3] (Complaint ¶ 28). Purportedly in return for privileges at Children's Hospital, Dr. Black required Dr. Alexander to pay a percentage of BNF's expenses. (Complaint ¶ 27). The BNF expenses were not set forth in the Employment Agreement or BSG Comp. Policy, did not constitute BSG expenses, and should not have affected the calculation of Net Practice Income or practice surpluses or deficits under the Employment Agreement or BSG Comp. Policy. (Complaint ¶ 27).

Dr. Black specifically required neurosurgeons affiliated with BNF, but not members of the BNF, to sign a "Shared Agreement" which detailed the percentage of expenses attributable to each neurosurgeon and BNF, respectively, but which provided no hard dollar amounts to give the neurosurgeons an idea of actual amount of expenses they should anticipate. (Complaint ¶ 29).

At all relevant times, Dr. Black controlled the amount of expenses charged to BSG employees, but never provided specific details about the expenses charged. (Complaint ¶ 28). Likewise, Dr. Black controlled the books and records of BNF and despite requests by

---

[3] Moreover, the BNF did not maintain or sponsor the UDC or FRBP and had no affiliation with these plans.

neurosurgeons to review the purported BNF expenses, Dr. Black refused to provide that information. (Id.)  In fact, Dr. Black never provided an explanation of the charges included in the calculation of Net Practice Income.  (Id.).

In or around 1998, BSG and BNF neurosurgeons including Dr. Alexander were concerned about the unexplained BNF accounting discrepancies and requested, both verbally and in writing, that Dr. Black allow an outside audit. (Complaint ¶ 30).  Dr. Black initially agreed to the audit but never allowed it to take place despite the repeated requests. (Complaint ¶ 30).

Notably, the Shared Agreement - - a separate and distinct agreement between Dr. Alexander and the BNF - - contained no setoff provision, which would in any way authorize BSG to offset BNF expenses against the deferred compensation held in the BSG sponsored UDC or the FRBP plans. (Complaint ¶ 20, 23, 33).  Moreover, neither of the UDC or FRBP plan documents authorized the BSG, the UDC, or FRBP plan administrators or its fiduciaries to offset BNF expenses. (Complaint ¶ 20, 23).

In or around 1998, Dr. Black began to manipulate BNF expenses attributable to Dr. Alexander, allegedly in violation of the Shared Agreement which had the net effect of increasing Dr. Alexander's BSG practice deficit. (Complaint ¶ 34).  Dr. Black's calculated efforts to drive up BNF expenses included:

- Hiring four new junior surgeons from 1998-1999 even though the six attending surgeons believed no new hires would be necessary.  (Complaint ¶ 35);

- Salary increases in December 2000 to two junior doctors who already had practice deficits.  (Complaint ¶ 36); and

- Bonuses paid to two junior doctors at a time in the year when bonuses had never been paid which increased practice deficits just in time for the half fiscal year report, upon which final BSG deficit calculation was based.  (Complaint ¶ 36).

As a result, in 1998 - - for the first time since he began his employment with BSG - - Dr. Alexander was assessed a practice deficit. (Complaint ¶ 34).

Interestingly, from 1994 through 1997, Dr. Alexander had surpluses of $77,941, $105,730, $355,381, and $64,009 respectively. (Complaint ¶37). In contrast, from 1998 through 2000, BSG's accounting records show annual deficits of $6,590, $111,665 and $95,453 for a total deficit of $213,707. (Complaint ¶ 37). By December 31, 2000, half way through FY '01, Dr. Black's financial manipulations resulted in an incredulous deficit of an additional $228,182 for FY '01 alone - - a deficit that was equal to more than all of the previous years combined (FY '98 – FY '00). To clarify this huge discrepancy, Dr. Alexander repeatedly requested information about both BSG and BNF expenses and accounting methodologies but his requests were ignored. (Complaint ¶ 38).

<u>Termination of Dr. Alexander</u>

Over the years, the relationship between Drs. Black and Alexander soured. Moreover, Dr. Black took efforts to increase Dr. Alexander's deficit by manipulating the BNF expenses as rapidly as possible in the first six months of fiscal year 2001 (June 2000 through December 2000). Although Dr. Black represented to the neurosurgeons that the expenses for 2001 would be flat, expenses from 2000 to 2001 increased by over 23%. In fact, the total expenses in 2001 were the highest in over four years, including the highest non-professional salaries and non-professional fringe benefits ever, the highest office expenses in five years, the highest miscellaneous expenses in seven years, and the highest "Shared" expenses ever. All this at a time when the BNF had fewer non-professional staff members than in recent years. (Complaint ¶ 41).

On April 13, 2001, Dr. Alexander was given a 90-day notice of termination by BSG.

(Complaint, ¶ 42). That very same day, Kenneth Holmes ("Holmes"), Chief Financial Officer of the BSG, notified Dr. Alexander that a practice deficit of $441,887.16 was assessed to Dr. Alexander and would be offset by amounts in Dr. Alexander's UDC and FRBP accounts. (Complaint ¶ 43). By email to Holmes on April 19, 2001, Dr. Alexander protested the withdrawal of any funds from his UDC and FRBP accounts and requested yet again an accounting, an examination of the books, and an explanation of the accounting principles applied to the purported offset. (Complaint ¶ 44).

Despite Dr. Alexander's protest, Holmes directed Fidelity, the administrator of the plans, by letter dated April 23, 2001 to process a partial distribution in the amount of $190,000.00 from Dr. Alexander's FRBP account and a partial distribution of $251,887.16 from Dr. Alexander's UDC account. Holmes instructed Fidelity to send the check payable to BWPO and noted that these were "a payment to the Plan Sponsor under section 2.05 and 3.03 [i.e., the set off provisions] of the Deferred Compensation Plan and the Faculty Retirement Benefit Plan, respectively and in accordance to Section 2 of the Trust Agreement." (Complaint ¶ 45).

Upon information and belief, the funds were withdrawn from Dr. Alexander's UDC and FRBP accounts soon after Holmes' instruction -- even though Dr. Alexander's termination would not be effective until three months later on July 13, 2001. Conceivably, Dr. Alexander's deficit could have decreased in those three months, but the Defendants did not want to take that chance and grabbed the most they could by withdrawing the funds immediately. (Complaint ¶ 46).

As detailed above, Dr. Black ensured that Dr. Alexander's BNF expenses increased to the point where Dr. Alexander was assessed a significant practice deficit. BSG accounting records, however, show that approximately $417,000 of the $441,000 deficit is attributable to BNF expenses, for which BSG had no right of setoff against the UDC and FRBP, which are both BSG

sponsored plans. (Complaint ¶ 47).

Moreover, the setoffs from the UDC and FRBP were unlawful because neither plan qualifies as a "top hat" plan under ERISA. Only unfunded plans that are "maintained by an employer primarily for the purpose of providing deferred compensation for a select group of management or highly compensated employees" are "top hat" plans and exempt from the substantive requirements of ERISA Title I pertaining to participation, vesting, funding and fiduciary responsibilities. (Complaint ¶ 48). Upon information and belief, participation in the UDC and FRBP was offered to all members of BSG's professional staff, who were not all either management or highly compensated, and who did not have the ability effectively to negotiate for themselves. Put another way, the participants in the UDC and FRBP were not a select group out of a broader group of management employees or a broader group of highly compensated employees. (Complaint ¶ 49). BSG's failure to restrict participation in the UDC and FBRP to a select group of management or highly compensated employees means it is not a "top hat" plan. Accordingly, the UDC and FBRP are subject to, among other things, the vesting and fiduciary requirements Title I of ERISA. (Complaint ¶ 50). In addition to the challenge to the "top hat" nature of the plan, Dr. Alexander has also asserted, among others, ERISA claims for benefits pursuant to ERISA 29 U.S.C. §1132, breach of fiduciary duties under ERISA, and interference with protected pension rights.

Dr. Alexander has also brought common law claims against Dr. Black and BNF for breach of contract, breach of implied covenant of good faith, and from dealing, breach of fiduciary duty, conversion, violation of G.L. 93A and negligence.[4] As a result of Dr. Black and

---

[4] Dr. Alexander has asserted similar common law claims against BSG. Recognizing the duplicative nature and the preemptive effects of ERISA on the common law claims against BSG, Dr. Alexander does not oppose the Defendants' motion as to the common law claims only against BSG.

the BNF's actions, Dr. Alexander lost his employment with BSG, as well as more than $440,000 in deferred compensation. To date, all of the defendants have been unable to and/or refused to provide Dr. Alexander with an adequate detailed accounting of the deficit assessed which included the BNF expenses. By email dated April 19, 2001 and again in or around April 2004, Dr. Alexander made demand for an accounting and benefits in connection with exhausting his administrative remedies with respect to his benefit claims against the UDC and FRBP but those requests were ignored. (Complaint ¶ 53).

III.   ARGUMENT

In reviewing a motion to dismiss, the court must accept as true all the factual allegations set forth in the complaint and draw all reasonable inferences in favor of the plaintiffs. Coyne v. City of Somerville, 972 F.2d 440, 442-3 (1st Cir. 1992); Edes v. Verizon Communications, Inc., 288 F.Supp.2d 55, 58 (D. Mass. 2003); Duncan v. Santaneiello, 900 F. Supp. 547, 550 (D. Mass. 1995). Thus a complaint may not be dismissed, pursuant to Fed. R. Civ. P. 12(b)(6), unless "'it appears beyond a doubt that the plaintiff can prove no set of facts in support of [its] claim which would entitle [it] to relief." Moreover, "[i]f under any theory the complaint is 'sufficient to state a cause of action in accordance with the law, a motion to dismiss the complaint must be denied.'" Duncan, 900 F.Supp. at 550 (quoting Knight v. Mills, 836 F.2d 659, 664 (1st Cir. 1987)).

A.  State Law Claims That Are Independent of the BSG Sponsored ERISA
    Plan Are Not Preempted

While it is well established that ERISA contains a fairly broad preemption provision, it is equally fundamental that state law claims that are independent of an ERISA plan are not preempted. Specifically, ERISA's preemption provision provides, in pertinent part, that "any and all State laws insofar as they now or hereafter relate to any employee benefit plan" are

superseded. 29 U.S.C. § 1144(a). Under ERISA, an employee benefit plan is "any plan, fund, or program which was heretofore or is hereafter established or maintained by an employer or by an employee organization . . . ." 29 U.S.C. § 1002(1). A law or claim "relates to" an employee benefit plan "if it has a connection with or reference to such a plan." Ingersoll v. Rand, Co. v. McClendon, 498 U.S. 133, 139 (1990); Vartanian v. Monsanto Co., 14 F.3d 697, 700 (1st Cir. 1994). The Supreme Court and cases in this Circuit have employed two tests to determine whether a claim is "related to ERISA." Vartanian, 14 F.3d at 700 (citing Ingersoll, 498 U.S. at 139). First, a cause of action is considered related to ERISA in situations where the court is required to find the existence of an ERISA plan in order for plaintiff to prevail or plead its case. Id. McMahon v. Digital Equipment Corp., 162 F.3d 28, 38 (1st Cir. 1998). In other words, a claim is related to ERISA when it is directly relates to a benefits plan. Vartanian, 14 F.3d at 700 (citing Ingersoll, 498 U.S. at 139). Under a second test, a cause of action will be deemed related to ERISA if the state law claim directly conflicts with an ERISA cause of action. Id.

Where claims are unrelated to ERISA, however, state and common law claims are not preempted. See e.g. McMahon, 162 F.3d at 38 (claim based on contractual promise which did not require court to refer to benefit plan did not "relate to" ERISA and was not preempted); Joyce v. RJR Nabisco Holdings, Corp., 126 F.3d 166, 172-173 (3d Cir. 1997) (no preemption where state law claim was based on handicap discrimination) Warner v. Ford Motor Co., 46 F.3d 531, 534 (6th Cir. 1995) (state age discrimination claim not preempted where it was not based upon employee benefit plan); Ethridge v. Harbor House Restaurant, 861 F.2d 1389, 1405 (9th Cir. 1988) (no preemption where loss of pension benefits were a mere consequence of but not a motivating factor behind the termination of plaintiff's benefits).

More specifically, several courts have held that claims based on breach of an employment

contract are not preempted by ERISA where resolution of the claim does not require the court to refer to an ERISA benefits plan. See e.g. Wilcott v. Matlack, Inc., 64 F.3d 1458, 1463 (10th Cir. 1995) (breach of employment contract claim not preempted where it could be "enforceable independently of any additional legal rights plaintiff might have had under ERISA plan."); Watts v. Yellow Technology Services, Inc., 1997 WL 756628 *2 (D. Kan. 1997) (breach of employment contract claim not preempted where existence of ERISA plan was not an element of the claim); See also Seehawer v. Magnecraft Electric Co., 714 F. Supp. 910, 915 (N.D.Ill. 1989).[5]

Despite the broad application of the preemption doctrine, non-employer defendants and those parties who are not directly involved in maintaining or administering a specific ERISA plan, may not claim preemption. Thus, a defendant who is not an employer as defined in ERISA nor an agent of an employer cannot claim ERISA preemption. See Carpenters Local Union No. 26 v. United States Fidelity & Guaranty Co., 215 F.3d 136, 141 (1st Cir. 2000) (state laws which "have no real bearing on the intricate web of relationships among the principal players in the ERISA scenario (e.g., the plan, the administrators, the fiduciaries, the beneficiaries, and the employer) are not subject to preemption on the basis"); Ragan v. Tri-County Excavating, Inc., 62 F.3d 501, 512 (3d Cir. 1995) (no preemption of state law claims where defendant was neither an employer nor an agent of an employer); Swift Electrical Supply Co, Inc. v. Township of Lakewood, 168 F. Supp.2d 298, 306 (D.N.J. 2001) (no conflict preemption where no cause of action asserted against employer).

Claims Against BNF and Dr. Black

Here, the state common law claims against BNF and Dr. Black are unrelated to the

---

[5] Indeed, courts have held that a claim does not "relate to ERISA" when the loss of pension benefits was a *mere consequence of, but not a motivating factor behind,* the termination of benefits." Campbell v. Aerospace Corp. 123 F.3d 1308, 1312 (9th Cir. 1997) (quoting Ethridge, 861 F.2d at 1405) (emphasis not added).

ERISA claims. Moreover, neither BNF nor Dr. Black, in his individual capacity or his capacity as president of BNF, are "principal players" of the BSG sponsored UDC and FRBP plans.

Dr. Alexander's claims against BNF and Dr. Black arise out of its improper allocation of expenses pursuant to the so-called BNF Shared Agreement. Specifically, Count II (BNF only) alleges breach of contract for breach of the Shared Agreement and resulting damages. Count IV (BNF only) alleges breach of the implied covenant of good faith and fair dealing implicit in the Shared Agreement. Count V alleges that BNF and Dr. Black had a fiduciary duty to properly account for, allocate, and deduct permissible expenses pursuant to the Shared Agreement. Dr. Black and BNF singularly controlled BNF expenses and allocated them among BNF members and affiliate members. As such, they owed a fiduciary duty to all BNF members and affiliates to do so fairly. Count VI further alleges that to the extent BNF and Dr. Black improperly calculated expenses or misappropriated monies rightfully belonging to Dr. Alexander, they are therefore liable to him for conversion. Count VII alleges that BNF and Dr. Black's conduct was unfair and deceptive in violation of G.L. 93A.[6] Lastly, Count VIII alleges that BNF was negligent in calculating expenses under the Shared Agreement.

All of the claims asserted against BNF and Dr. Black are independent of the ERISA claims asserted against BSG. BNF was not a party to the UDC or FRBP plans. Neither BNF nor Dr. Black were Dr. Alexander's employer. Neither BNF nor Dr. Black as president of BNF were a fiduciary under the UDC or FRBP plans and had served no role with respect to these plans. In fact, this court need not look to the BSG plan to determine whether there was a breach of the Shared Agreement. Quite simply, by improperly calculating expenses and/or permitting

---

[6] Defendants argue that the 93A argument must fail because 93A does not apply to the employer-employee relationship. What the Defendants ignore, however, is that the 93A claims are asserted against BNF and Dr. Black, neither of whom were Dr. Alexander's employers. Consequently, the 93A claim is not improper against the non-employer defendants and therefore states a claim upon which relief may be granted.

unnecessary or impermissible expenses to reduce Dr. Alexander's compensation, BNF and Dr. Black caused harm to Dr. Alexander as alleged in the aforementioned claims against BNF and Dr. Black. Because Dr. Alexander suffered damages as a result of the claims alleged against the BNF and Dr. Black that are independent of the ERISA claims, and neither BNF or Dr. Black are employers for purposes of preemption analysis, the motion to dismiss these claims must be denied.

In sum, Dr. Alexander's common law claims against Dr. Black and BNF do not relate to ERISA, and in no way conflict directly with ERISA causes of action. Accordingly, the common law claims assert in Counts I-VIII are not preempted by ERISA.[7] See McMahon, 162 F.3d 38 (claim based on contractual promise which did not related to ERISA survived preemption).

B. Dr. Alexander is not Required to Exhaust his Administrative Remedies

1.    Exhaustion of Administrative Remedies Would Be Futile in this Case

ERISA requires that "every employee benefit plan shall . . . afford a reasonable opportunity to any participant whose claim for benefits has been denied for a full and review by the appropriate named fiduciary of the decision denying the claim." 29 U.S.C. § 1133. While, in general, courts require plaintiffs to exhaust these administrative remedies prior to commencing an action in court, they do recognize an exception "when resort to the administrative route is futile or the remedy inadequate." Drinkwater v. Metropolitan Life Ins. Co., 846 F.2d 821, 826 (1st Cir. 1988); Amato v. Bernard, 618 F.2d 559 (9th Cir. 1980). See Sibley-Schreiber v. Oxford Health Plans, Inc., 62 F. Supp.2d 979, 986 (E.D.N.Y. 1999) ("exhaustion is excused 'where the claimants make a clear and positive showing' that pursuing available administrative remedies would be futile.'").

---

[7] To the extent that Dr. Alexander's state common law claims survive preemption, Dr. Alexander is entitled to a jury trial on those non-ERISA claims.

To fall within the futility exception, a plaintiff must demonstrate that his claim would be denied upon administrative appeal. Sibley-Schreiber, 62 F. Supp.2d at 986; Communications Workers of America v. American Telephone and Telephone Co., 40 F.3d 426, 432 (D.C.Cir. 1994). In other words, there must be evidence that plaintiff sincerely attempted to resolve the dispute extrajudicially. See e.g. Sibley-Schreiber, 62 F. Supp.2d at 986 (motion to dismiss denied for failure to exhaust administrative remedies where plaintiffs had made numerous telephone calls and submitted numerous letters of request); Ludwig v. Nynex Service Co., 838 F. Supp. 769, 781 (S.D.N.Y. 1993) (futility demonstrated when employee made inquiries to management on four different occasions about reinstatement of his pension and was never informed of his right to appeal the administrative denial); Lieske v. Morlock, 570 F.Supp. 1426, 1429 (N.D.Ill 1983) (where allegations indicated numerous refusals by defendants to reply to plaintiff's request for information during two year period, complaint alleged sufficient facts to fall within futility exception). Compare Kennedy v. Empire Blue Cross and Blue Shield, 989 F.2d 588, 589-595 (2d Cir. 1993) (rejecting plaintiff's claim of futility where there was no evidence that plaintiff even notified defendant of disputed claim). While plaintiff must provide a factual basis to demonstrate that an administrative appeal would be futile, however, plaintiff need not "engage in meaningless acts or . . . needlessly squander resources as a prerequisite to commencing litigation." Sibley-Schreiber, 62 F. Supp.2d at 986; Corsini v. United Healthcare Corp., 965 F. Supp. 265, 268 (D.R.I. 1997).

Defendants argue that Dr. Alexander's ERISA claims, alleged in Counts IX through XII, must be dismissed on the grounds that he failed to exhaust administrative remedies available under the UDC and the FRBP. The complaint, however, is replete with allegations that detail the efforts taken by Dr. Alexander and provide a factual basis for him to fall within the futility

exception.

In response to the growing practice deficit, Dr. Alexander repeatedly requested information about the accounting methodologies used by defendants (Complaint ¶ 38, 53). In 1998, Dr. Alexander, with the other neurosurgeons in BSG and BNF, made a written request for accounting information (Complaint ¶ 30). Dr. Black, while initially agreeing to an audit, ultimately disregarded this request as he did Dr. Alexander's other requests for information (Complaint ¶ 30). Finally, on April 19, 2001 Dr. Alexander, by email, wrote to Holmes, BSG's Chief Financial Officer, to protest the application of $441,887.16 of Dr. Alexander's compensation to offset BSG's practice deficit (Complaint ¶ 44). Instead of responding to Dr. Alexander's email, however, on April 23, 2001, Holmes directed Fidelity, the administrator of the UDC and FRBP plans, to withdraw $441,887.16 of Dr. Alexander's earned compensation and send a check in that amount to BWPO (Complaint ¶ 45).[8]

In short, the allegations of the Complaint indicate that Dr. Alexander made several requests for information from at least 1998 through 2004 and that defendants have responded to none of these requests.[9]  Accepting all reasonable inferences in favor of the plaintiff, defendants' motion to dismiss Dr. Alexander's ERISA claims alleged in Counts IX through XII for failure to exhaust administrative remedies must be denied. See Lieske, 570 F. Supp. at 1429 (futility

---

[8] Between July 2001 and April 2004, Dr. Alexander made multiple efforts to meet with the defendants to discuss these matters. He was successful in organizing at least two meetings (in February 2003 and June 2003) which included the Plan Administrator, Ken Holmes, and his legal counsel, in an effort to come to an administrative remedy. At both meetings, very specific requests were made by Dr. Alexander for explanatory information, and in spite of promises of forthcoming answers, none have yet been obtained from Ken Holmes or his representatives.

[9] The Defendants further argue that they never had an opportunity to respond to the April 2004 letter making the claim for benefits. Interestingly, the time frame within which the Defendants were to respond has passed with no specific basis for the denial being offered to date, which further evidences the futility of seeking to exhaust such remedies. Moreover, numerous efforts were undertaken to obtain an accounting and understanding of the calculation of the setoff to no avail for three years. While the Defendants argument disingenuously seeks to suggest that the Defendants would have responded, their action subsequent to the April 2004 letter demonstrates their repeated pattern of ignoring Dr. Alexander's efforts and obfuscating the issues.

- 15 -

exception satisfied where allegations indicated refusals by defendants to reply to plaintiff's request for information during two year period).

2. The Statutory Based Claims do not Require Exhaustion of Administrative Remedies

In evaluating a request to dismiss ERISA claims based on a failure to exhaust administrative remedies, courts distinguish between plan-based claims, which seek specific benefits pursuant to the plan, and statute-based claims, including those pursuant to 29 U.S.C. §1140. Treadwell v. John Hancock Mutual Life Ins. Co., 666 F.Supp 278, 284 (D.Mass. 1997); Alexander v. Fujitsu Business Communication, 818 F. Supp. 462, 471 (D.N.H. 1993); Zipf v. American Telephone and Telegraph Co., 799 F.2d 889, 894 (3d Cir. 1986); Amaro v. Continental Can Co., 724 F.2d 747, 752 (9th Cir. 1984). Courts have historically distinguished these claims because while a claim for benefits is considered a matter of contractual interpretation by the plan administrators, a statutory claim under 29 U.S.C. §1140, for example, seeks redress pursuant to a right provided by Congress and is therefore appropriately interpreted by the judiciary. Treadwell, 666 F. Supp at 284; Zipf, 799 F.2d at 894; Amaro, 724 F.2d 747 at 752. Based on this direction, a plaintiff is not required to exhaust administrative remedies before bringing a claim based on 29 U.S.C. §1140 to court. Treadwell, 666 F. Supp at 284 (ERISA claim not dismissed for failure to exhaust administrative remedies); Alexander, 818 F. Supp. at 471 ("exhaustion of administrative remedies is unnecessary when plaintiff's claim is based on a statutory violation"); Zipf, 799 F.2d at 894 (plaintiff was not required to exhaust benefit plan internal procedures prior to bringing claim under 29 U.S.C. §1140); Amaro, 724 F.2d at 752 (exhaustion of administrative remedies was not required to pursue claim pursuant to 29 U.S.C. §1140). Moreover, to the extent that a claim is closely related to interpretation of the plan's contract, Zipf and Amaro courts condone staying the statutory action pending resolution of the issue by the plan fiduciaries. Zipf, 799 F.2d

- 16 -

at 894 n.6; Amaro, 724 F.2d at 752.

Count XI of the Complaint seeks damages for defendants' violation of 29 U.S.C. §1140. As a "statutory-based" ERISA claim, Dr. Alexander may pursue it without exhausting administrative remedies under the UDC and FRBP plans. Treadwell, 666 F.Supp at 284; Alexander, 818 F. Supp. at 471; Zipf, 799 F.2d at 894; Amaro, 724 F.2d at 752. To the extent that resolution of this claim will require the Court to make a contract-based evaluation, Dr. Alexander requests that the Court, as Zipf and Amaro courts suggest, stay proceedings on this claim to allow Dr. Alexander to pursue his administrative remedies. Accordingly, Count XI should not be dismissed. Id.[10]

IV.    **CONCLUSION**

For the foregoing reasons, Dr. Alexander respectfully requests that the Court deny defendant's motion to dismiss.

---

[10] Moreover, should the Court find that Dr. Alexander has not exhausted his administrative remedies and dismisses the ERISA claims, dismissal should be without prejudice. See Donnelly v. Yellow Freight Sys., Inc., 874 F.2d 402, 410 n. 11 (7th Cir. 1989); Kobleur v. Group Hospitalization and Medical Services Inc., 787 F. Supp. 1444, 1453 (S.D. Georgia 1991); Greene v. Meese, III, 875 F.2d 639, 643 (7th Cir. 1989); Communications Workers of America v. American Telephone and Telegraph Company, 40 F.3d 426, 434 (U.S. App. D.C. 1994); Makar v. Health Care Corporation of Mid-Atlantic (Carefirst), 872 F.2d 80, 83 (4th Cir. 1989). See also Rivera-Diaz v. American Airlines, Inc., 229 F.3d 1133 (1st Cir. 2000) (Unpublished opinion).

## REQUEST FOR ORAL ARGUMENT

The plaintiff respectfully requests a hearing to oppose the Motion to Dismiss and believes that oral argument will assist the Court in deciding this matter.

EBEN ALEXANDER, III, M.D.

By his attorneys,

Michael Paris (BBO #556791)
Colleen Cook (BBO #636359)
NYSTROM BECKMAN & PARIS LLP
10 St. James Avenue, 16th Floor
Boston, Massachusetts 02116
(617) 778-9100
(617) 778-9110 (fax)

DATED: June 7, 2004

- 18 -

## **CERTIFICATE OF SERVICE**

I hereby certify that a true copy of the above document was served upon all counsel of record by first class mail, postage prepaid, on June 7, 2004.

Michael Paris