UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
                                    )
EBEN ALEXANDER, III, M.D.           )
                                    )
              Plaintiff,            )        Case No. 04-10738-MLW
                                    )
       v.                           )
                                    )
BRIGHAM AND WOMEN'S PHYSICIANS      )
  ORGANIZATION, INC., successor to  )
  Brigham Surgical Group Foundation, Inc., )
  BOSTON NEUROSURGICAL FOUNDATION )
  INC., BRIGHAM SURGICAL GROUP      )
  FOUNDATION, INC. DEFERRED         )
  COMPENSATION PLAN, BRIGHAM        )
  SURGICAL GROUP FOUNDATION, INC.   )
  FACULTY RETIREMENT BENEFIT        )
  PLAN, COMMITTEE ON COMPENSATION   )
  OF THE BRIGHAM SURGICAL GROUP     )
  FOUNDATION, INC., and             )
  PETER BLACK, M.D.                 )
                                    )
              Defendants.           )
                                    )
```

## MEMORANDUM OF LAW IN SUPPORT OF
## PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

### INTRODUCTION

One of the hallmark protections afforded by ERISA is that an employee's pension funds

are irrevocably vested and non-forfeitable. In April 2001, however, Brigham and Women's

Physician's Organization, Inc. ("BWPO") terminated the plaintiff, Dr. Eben Alexander, and took

from him $441,000 in pension funds that Dr. Alexander had earned and accrued in two separate

deferred compensation plans. BWPO claims that the two plans, which held Dr. Alexander's

funds, were "top hat" plans, and therefore, Dr. Alexander was not entitled to ERISA's vesting

protections.

BWPO's top hat defense fails as a matter of law because the plans were not restricted to a "select group of management or highly compensated employees." See 29 U.S.C. §§ 1051(2), 1081(a)(3) and 1101(a)(1). Instead, the plans covered virtually <u>all</u> surgeons employed by BWPO, constituting approximately thirty (30) percent of all BWPO employees for the period 1997 through 1999 which is quantitatively too large to satisfy the "select group" requirement to qualify for "top hat" status. See <u>Demery v. Extebank Deferred Comp. Plan (B)</u>, 216 F.3d 283, 289 (2d Cir. 2000) (15.34% of workforce covered by plan was "upper limit" for valid top hat plan); <u>Darden v. Nationwide Mut. Ins. Co.</u>, 717 F. Supp. 388, 396-97 (E.D.N.C. 1989) (18.7%, or one-fifth, of workforce covered by plan too large for top hat status), *aff'd,* 922 F.2d 203 (4th Cir. 1991), *rev'd on other grounds*, 503 U.S. 318 (1992). In addition, the primary purpose of the BWPO pension plans was not to provide deferred compensation -- an essential requirement for top hat status -- but rather to comply with Harvard Medical School's limitations on salary for BWPO's surgeons. See DOL Advisory Op. No. 90-14A n.1 (May 8,1990) (top hat plans maintained by employer must be primarily for purpose of providing deferred compensation).

Because the deferred compensation plans do not qualify for "top hat" status, BWPO had no right to any of Dr. Alexander's pension funds. Accordingly, Dr. Alexander is entitled to summary judgment on Count IX of the Complaint for violating ERISA and on Count XII of the Complaint for an award of attorneys' fees.

## UNDISPUTED MATERIAL FACTS[1]

### The BSG Compensation Scheme

Dr. Alexander was hired in 1988 as a neurosurgeon by the Brigham Surgical Group Foundation, Inc. ("BSG")[2] (Ag. Facts ¶ 1).  BSG was a non-profit, tax-exempt corporation organized to carry out the purposes of Harvard Medical School relating to the education and training of undergraduates in the field of surgery and to teach surgery to surgical residents, by acting as and conducting the Department of Surgery at the Brigham and Women's Hospital (Ag. Facts ¶ 2 & Ex. B to Ag. Facts at § 1.01).[3]  Like all BSG surgeons, Dr. Alexander's compensation was determined in accordance with BSG's Professional Staff Compensation Policy ("Compensation Policy") (Ag. Facts ¶ 3 & Ex. A to Ag. Facts).  The stated objective of the BSG Compensation Policy was "[t]o provide a system of compensation that will enable the acquisition and retention of a professional staff of national and international stature and assure a balanced program of care, teaching and research." (Ex. A to Ag. Facts at p. 1).  Compensation paid to members of BSG's professional staff was subject to the limitations set forth in the Harvard System of Titles, Appointments and Compensation Arrangements for the Faculty of Medicine of Harvard University (Ex. A to Ag. Facts at p. 1).

Under the Compensation Policy, BSG surgeons received two salary components: (i) "OR-TEACHING" for billable and operative related services and (ii) "NON-OR TEACHING" for activities that are non-billable (Ex. A to Ag. Facts, *passim*).  The surgeons' OR-TEACHING

---

[1] In support of his motion, Dr. Alexander relies upon the Agreed Statement of Facts for Cross Summary Judgment Motions ("Ag. Facts"), L. R. 56.1 Statement in Support of Plaintiff's Motion for Summary Judgment, and Appendix of Selected Authorities in Support of Plaintiff's Motion for Summary Judgment ("Appendix").

[2] The Brigham and Women's Physician's Organization, Inc. is the successor in interest to the Brigham Surgical Group Foundation, Inc. The terms "BWPO" and "BSG" are used interchangeably herein.

[3] As a tax-exempt, non-profit organization, the BSG is subject to restrictions on excessive compensation pursuant to Internal Revenue Code § 4958 and Treasury Regulations § 53.4958-1 (Appendix Tabs 2 & 3).

salary was "based on their OR-TEACHING salary for the previous Academic Year (AY) plus 0-50% of any net practice surplus for such prior year but within [Harvard] ceiling, as determined by the Surgeon-in-Chief." (Ex. A to Ag. Facts at ¶ 1). A practice surplus was calculated on each surgeon's net practice income "by finding the difference between the income resulting from Member OR-TEACHING activity and Member expenses during the [academic year]." (Ex. A to Ag. Facts at Appendix A). Pursuant to the Compensation Policy, Dr. Alexander was therefore eligible to receive a salary plus a percentage equal to as much as 50% of any surplus within an academic year (Ex. A to Ag. Facts at ¶ 1). A practice deficit resulted when a surgeon's net practice income (total income less expenses) exceeded a surgeon's salary for a particular year (Ex. A to Ag. Facts at Appendix A).

**The BSG Deferred Compensation Plans: the UDC and FRBP**

Integral to BSG's compensation scheme were two unfunded deferred compensation plans for its employees: the Unfunded Deferred Compensation Plan ("UDC") and the Faculty Retirement Benefit Plan ("FRBP") (Ex. A to Ag. Facts at ¶¶ 5, 6). It is critical to point out that contributions to the UDC and FRBP were **mandatory** pursuant to the BSG Compensation Policy if a surgeon's net practice income exceeded the Harvard salary cap (Ex. A to Ag. Facts at ¶¶ 5, 6). Specifically, surgeons with a practice surplus would receive contributions equal to 25% of their total salary in their FRBP account first and then receive a contribution equal to 50% of their remaining surplus in their UDC account (Ex. A to Ag. Facts at ¶¶ 5, 6).[4]

---

[4] With respect to the FRBP, the Compensation Policy stated:

> The [net practice income] that is excess after full Harvard ceiling for current case compensation for a Member has been reached plus any pension plan contributions thereon (or such lesser amount as may result from any applicable IRS cap), will be credited to the Group's Faculty Retirement Benefit Plan (FRBP) for eligible Members up to the full Harvard ceiling for retirement plans of 25% of Total salary (including NON-OR TEACHING salary and any OR TEACHING incentive bonus amounts as in paragraph 4.)

The specific terms of the UDC and FRBP concerning contributions to these plans were both consistent with and in accord with the Compensation Policy.[5]  Specifically, section 2.01 of the UDC entitled "Amount Credited" provides that "[i]f the total compensation of an Employee established by the Committee exceeds the maximum permissible amount of compensation payable currently in cash or fringe benefits under the limitations imposed by Harvard Medical School, 50% of the excess . . . shall be credited by the Employer to a deferred compensation liability account payable to such Employee." (Ex. B to Ag. Facts at § 2.01).  Likewise, Section 3.01 of the FRBP entitled "Benefits" provided, "the Employer shall credit to each Participant an amount equal to 25% of the Participant's compensation for the Plan Year, reduced by [certain other contributions]..." (Ex. C to Ag. Facts at § 3.01).[6]

**Eligibility to Participate in UDC and FRBP**

Pursuant to both the UDC and FRBP, all BSG surgeons who are full-time faculty of Harvard Medical School may become eligible for participation in the plans.  Specifically, the UDC provides that the following BSG employees are covered by the UDC:

---

Similarly, with respect to the UDC, the Compensation Policy provided:

> When there remains excess [net practice income] after the deductions described in paragraphs 4., 5. and 5a. above, an amount equal to 50% of the excess will be credited to an eligible Member's account as an Unfunded Deferred Compensation (UDC) allocation.  The amount credited to a UDC allocation for a given year shall not exceed 75% of full Harvard ceiling...

(Ex. A to Ag. Facts at ¶¶ 5, 6).

[5] Notably, the FRBP specifically references the Compensation Policy (Ex. C to Ag. Facts at § 3.01).

[6] The term "Employer" under both the UDC and FRBP is the Brigham Surgical Group Foundation, Inc.  (See Ex. B to Ag. Facts at §1.01 and Ex. C at §1.01).

The "Employees" are surgeons who are members of the full-time faculty of the Harvard Medical School and are employed by the Employer to perform and teach surgery in the clinical setting of the Brigham and Women's Hospital by collaborating with students and residents in the practice of surgery, in research, and in the development of theory. The Employees are paid by the Employer which (with few exceptions) is their only source of earned income and which is required to observe certain limitations imposed by the Harvard Medical School on total compensation which may be earned by members of its full-time faculty.

(Ex. B to Ag. Facts at § 1.02).

Likewise, Section 2.01 of the FRBP defined "Eligibility" as follows: "Participants hereunder shall all be employees of the Employer who are members of the full-time faculty of the Harvard Medical School; provided, that the Committee on Compensation of the Employer (the "Committee") may limit participation in order to fulfill the intent set forth in Section 5.02." (Ex. C to Ag. Facts at § 2.01).[7]

From 1997 through 1999, BSG professional staff principally included surgeons, almost all of whom were members of the full-time faculty of the Harvard Medical School (Ag. Facts ¶¶ 7-10). In contrast, from 1997 through 1999, BSG non-professional staff principally included non physician staff such as: billing specialists, billing supervisors, coders, reimbursement managers, billing managers, accountant, financial analysts, and managers, human resource personnel, physician assistants, division administrator, RN/nurse practitioners, research assistants, information systems personnel, and administrators (Ag. Facts ¶ 11).

**The Hospital's Setoff from Dr. Alexander's UDC and FRBP Accounts**

After thirteen years of employment, BWPO (BSG's successor) terminated Dr. Alexander

---

[7] Section 5.02 of the FRBP parrots ERISA's top hat language (Ex. C to Ag. Facts at § 5.02). But, the mere inclusion of the statutory language does not create a top hat plan and the substance of the plan must be examined. See Dullea v. Massachusetts Bay Transp. Auth., 12 Mass. App. Ct. 82, 88-89 (1981) ("The characterization of the payments as deferred compensation is of no more than peripheral interest because we must be concerned with their substance and not the label put on them by the parties"); Serapion v. Martinez, 119 F.3d 982, 987 (1st Cir. 1997) (noting in Title VII context, court had to "peer beneath the label and probe the actual circumstances" to determine substance of matter). Cf. Cogan v. Phoenix Life Ins. Co., 310 F.3d 238, 242 (1st Cir. 2002) (deciding, without analyzing, top hat plan where parties did not dispute validity). Indeed, if the top hat analysis ended with whether the plan included the relevant statutory language, then the UDC would not be considered a top hat plan because it contains no similar language as Section 5.02 of the FRBP (see Ex. B to Ag. Facts).

on April 13, 2001 without cause (Ag. Facts ¶ 20 & Ex. D).  That same day, the BWPO notified

Dr. Alexander that it intended to offset a practice deficit assessed to Dr. Alexander against

monies held in his UDC and FRBP accounts:

> As you are aware, both the FRBP and UDC plans provide that upon termination of a faculty
> member's employment with BSG, the amounts owed to the faculty member under these deferred
> compensation plans will be offset by the amount of the member's practice deficit.  Accordingly, as
> of April 20, 2001, the BWPO as successor to the BSG, will reduce your FRBP plan by
> $177,187.22 and your UDC plan by the remaining existing practice deficit of $264,699.94.

(Ag. Facts ¶ 20 & Ex. E).[8]  Ten days later, on April 23, 2001, the BWPO instructed the plan

administrator to reduce Dr. Alexander's FRBP account by $190,000 and his UDC account by

$251,887.16 and pay the combined amount of $441,887.16 to the BWPO, over Dr. Alexander's

protest (Ag. Facts ¶ 21).[9]

## Additional Relevant Facts Concerning BSG Employees for 1997-1999

In 1997, BSG employed 241 total employees, which consisted of 157 non-professional

staff and 84 professional staff (Ag. Facts ¶ 7).  In 1998, BSG employed 274 total employees,

which consisted of 180 non-professional staff and 94 professional staff (Ag. Facts ¶ 8).  In 1999,

BSG employed 324 total employees, which consisted of 224 non-professional staff and 100

professional staff (Ag. Facts ¶ 9).

In 1999, BSG professional staff salary ranged from $22,000 to $665,109 while the

nonprofessional staff salary ranged from $700 to $169,143 (Ag. Facts ¶ 12).  In 1998, BSG

professional staff compensation ranged from $28,599 to $1,397,567 while BSG non-professional

---

[8] Dr. Alexander disputes his termination and the deficit assessed to him, but those disputes are immaterial to the
narrow issue to be decided on summary judgment, i.e., the invalidity of the UDC and FRBP as top hat plans.

[9] Both the UDC and FRBP contained specific set-off provisions pursuant to which the BWPO contends it had the
right to take funds from Dr. Alexander's deferred compensation accounts (Ex. B to Ag. Facts at § 2.05).  ("the
Employer [BSG] shall have the right to set off its liability to an Employee hereunder against any debt or other
liability of the Employee to the Employer.") (Ex. C to Ag. Facts at § 3.03).  "The Employer may set-off prior to
payment of benefits to a Participant hereunder any amounts due from the Participant to the Employer, including
without limitation any current or prior practice deficits as determined under the Employer's Professional Staff
Compensation Policy and amounts loaned to the Participant (whether or not such loan is secured by a mortgage).").

staff compensation ranged from $84 to $142,058 (Ag. Facts ¶ 12).  In 1997, BSG professional

staff compensation ranged from $39,305 to $1,499,807 while BSG non-professional staff

compensation ranged from $119 to $109,587 (Ag. Facts ¶ 12).  In 1997, 78 surgeons in the BSG

were members of the full-time faculty of the Harvard Medical School (Ag. Facts ¶ 10).  In 1998,

84 surgeons in the BSG were members of the full-time faculty of the Harvard Medical School

(Ag. Facts ¶ 10).  In 1999, 88 surgeons in the BSG were members of the full-time faculty of the

Harvard Medical School (Ag. Facts ¶ 10).

## ARGUMENT

### I.    The UDC and FRBP Are Not Valid Top Hat Plans Under ERISA

Summary judgment is appropriate where there are no genuine issues of material fact and

the moving party is entitled to judgment as a matter of law.  Fed.R.Civ.P. 56(c); Celotex Corp. v.

Catrett, 477 U.S. 317, 320 (1986); August v. Offices Unlimited, Inc., 981 F.2d 576, 580 (1st Cir.

1992); Cooke v. Lynn Sand & Stone Co., 673 F. Supp. 14, 17-18 (D.Mass. 1986); Trustees of

Amalgamated Ins. Fund v. Danin, 648 F. Supp. 1142, 1144 (D.Mass. 1986).  As a matter of law,

the UDC and FRBP do not qualify for ERISA's "top hat" exemption because (i) the plans were

not restricted to a "select group of management or highly compensated employees" and (ii) the

primary purpose of the plans was to comply with Harvard Medical School's limitations on salary,

rather than to provide deferred compensation.  Therefore, the UDC and FRBP are not valid top

hat plans, and summary judgment must enter in Dr. Alexander's favor on Counts IX and XII of

his Complaint.[10]

---

[10] The parties agree that the UDC and FRBP are employee benefit plans within the meaning of 29 U.S.C. §
1002(2)(A), and therefore are subject to ERISA (See Transcript of Motion Hearing held on November 29, 2004 at
49 ("The FRBP, as well as the UDC, the parties agree, are ERISA plans, that is, plans subject to the ERISA law.");
53 ("The parties, as I said, agree that the two plans at issue are ERISA plans."), attached to Appendix at Tab 4.

A. **The Top Hat Exemption**

"ERISA is landmark legislation that subjects a wide variety of employee benefit plans to complex and far-reaching rules designed to protect the integrity of those plans and the expectations of their participants and beneficiaries." Barrowclough v. Kidder, Peabody & Co., Inc., 752 F.2d 923, 929 (3d Cir. 1985) (discussing statutory framework of ERISA and top hat exception) *overruled on other grounds by* Pritzker v. Merrill Lynch, Perce, Fenner & Smith, Inc., 7 F.3d 1110 (1993). ERISA's coverage extends to all employee benefit plans unless a plan falls within an exception to ERISA. Demery, 216 F.3d at 286-87. One exception to certain statutory requirements of ERISA, known as a top hat plan, is defined by ERISA as "a plan which is unfunded and is maintained by an employer primarily for the purpose of providing deferred compensation for a select group of management or highly compensated employees." Id. at 287, citing 29 U.S.C. §§ 1051(2), 1081(a)(3), 1101(a)(1). A top hat plan, if valid, is exempt from ERISA's participation, **vesting**, funding, and fiduciary provisions. Demery, 216 F.3d at 287.[11]

Exceptions to ERISA coverage are to be construed narrowly. See S. Rep. No. 93-127, reprinted in 1974 U.S.C.C.A.N. 4838, 4854 (ERISA "exemptions should be confined to their narrow purpose"); Azzaro v. Harnett, 414 F. Supp. 473, 475 (S.D.N.Y. 1976) (same). Moreover, "[t]he burden of establishing that a plan fits the 'top hat' exclusion is on the party asserting that it is a 'top hat' plan." In re The IT Group, Inc., 305 B.R. 402, 407 (D. Del. 2004); Carabba v. Randalls Food Markets, Inc., 38 F.Supp.2d 468, 470 (N.D.Tex. 1999); Virta v. DeSantis Enterprises, Inc., 1996 WL 663970 *3 (N.D.N.Y. 1996) (defendants bear burden of proof on validity of top hat plan as affirmative defense).

---

[11] ERISA's vesting requirements provide that all benefits under a plan are non-forfeitable after completion of seven years of service. See 29 U.S.C. § 1053(a)(2)(B). Because Dr. Alexander had over thirteen years of service with BSG, he was fully vested in both plans.

**B.    The Legislative History and Department of Labor's
<u>Interpretation of the Top Hat Exemption</u>**

"Congress and the Department of Labor have determined that the management and

highly compensated employees who participate in unfunded deferred compensation plans do not

need the same level of protection" as other workers and are therefore exempted from certain of

ERISA's requirements.  <u>Barrowclough</u>, 752 F.2d at 934, <u>citing</u> Reporting and Disclosure

Requirements, 40 Fed. Reg. p. 34,530 (August 15, 1975) ("The class of employees with respect

to whom this alternative method of compliance applies – highly compensated or management

employees – generally have ready access to information concerning their rights and obligations

and do not need the protections afforded them by Part 1 of Title I of the Act.") (citations

omitted).[12]

Acco·ding to the DOL, the rationale behind the top hat exemption is that employees

covered by such a plan have the ability to influence their employer and do not require the usual

protections afforded by ERISA:

> It is the view of the Department that in providing relief for "top-hat" plans from the broad remedial
> provisions of ERISA, Congress recognized that certain individuals, by virtue of their position or
> compensation level, have the ability to affect or substantially influence, through negotiation or
> otherwise, the design and operation of their deferred compensation plan, taking into consideration
> any risks attendant thereto, and, therefore, would not need the substantive rights and protections of
> Title I.

(DOL Advisory Op. No. 90-14A).[13]

The DOL has also stated that the <u>primary purpose </u>of a top hat plan must be to provide

deferred compensation for the plan to be exempt from ERISA's vesting requirements:  "[T]he

---

[12] Part 1 of ERISA relates to reporting requirements and a top hat plan's reporting and disclosure requirements are
rudimentary pursuant to DOL Regulation § 2520.104-23(a).  (<u>See</u> Appendix Tabs 6 and 7).

[13] The DOL is the agency responsible for administering Title I of ERISA, but has published no regulations on top hat
plans since ERISA's enactment in 1974.  Michael Sirkin and Lawrence K. Cagney, <u>Executive Compensation</u>,
§7.03[2] (2002) (Appendix Tab 8).

term 'primarily,' as used in the phrase, 'primarily for the purpose of providing deferred compensation for a select group of management or highly compensated employees' in [ERISA] sections 201(2), 301(a)(3) and 401(a)(1), refers to the purpose of the plan (i.e., the benefits provided) and not the participant composition of the plan." DOL Advisory Op. No. 90-14A.[14]

### C.    The UDC and FRBP Were Not Restricted to a Select Group

In determining the validity of a top hat plan, courts must assess whether (i) the plan was "unfunded"[15] and (ii) the plan was maintained "for a select group of management or highly compensated employees." See Demery, 216 F.3d at 287; Darden, 717 F. Supp. at 394-97. "To satisfy the requirement that a 'top hat' plan be restricted to a 'select group of management or highly compensated employees,' the standard must be met both quantitatively and qualitatively." In re The IT Group, 305 B.R. at 410; Demery, 216 F.3d at 288 ("select group" determination requires "fact-specific inquiry, analyzing quantitative and qualitative factors in conjunction").

Quantitatively, a plan that covers more than 15% of employees will not be deemed a valid top hat plan. In re The IT Group, 305 B.R. at 410, citing Demery, 216 F.3d at 287 (holding deferred compensation plan offered to 15.34% of employees qualified for top hat status but noting "this number [15.34%] is probably at or near the upper limit of acceptable size for a 'select group'..."). See also Darden, 717 F. Supp. at 396-97 (finding that 18.7%, or one-fifth, of total workforce "too large to be considered 'select' for purposes of the top-hat exemption").

---

[14] Commentators have recognized that ERISA offers no guidance as to the meaning of "select group of management or highly compensated employees." See e.g., Thomas P. Clark and Robert S. Forman, Tax and ERISA Considerations Associated With Nonqualified Severance Benefit Plans Sponsored by Professional C Corporations, 78-Jan Fl. B. J. 49, 52 (2004) ("The Department of Labor has not issued regulations on the definitions of "top-hat plans."...Guidance on these issues, therefore, is limited to Department of Labor (DOL) opinion letters and a small body of case law."); David B. Bruckman, Implementing and Exiting Rabbi Trusts, 29 Westchester Bar Journal 43, 57 (2002) (there is a "paucity of statutory guidance as to what constitutes 'a select group'"). Copies of the relevant pages of these articles are attached at Tabs 9 and 10 to the Appendix, respectively.

[15] Dr. Alexander does not challenge that the UDC and FRBP were unfunded plans.

Qualitatively, "the deferred compensation plan participants must all be 'high level' employees, either 'management' or 'highly compensated.'" In re The IT Group, 305 B.R. at 410 (citation omitted). However, a plan that covers **all** management or **all** high level employees is not select and is therefore invalid. See Ridgeley A. Scott, Rabbis and Other Top Hats:  The Great Escape, 43 Cath. U. L. Rev. 1, 9 (1993) ("An adequate group must be select, which means that a group cannot cover all management and highly compensated employees.") (Appendix at Tab 11).

### 1.    The UDC and FRBP Covered All Surgeons and Not a Select Group

The undisputed evidence shows that the UDC and FRBP were mandatory components of the BSG compensation scheme for all professional staff (i.e. surgeons), and therefore, coverage was not - - and could not be - - restricted to a select group.  Specifically, the BSG Compensation Policy provided that if a surgeon had a surplus in any given year that exceeded Harvard's ceiling on salary, then 25% of the surgeon's salary would be credited to the FRBP account  (Ex. A to Ag. Facts at ¶ 5).  If there still remained a surplus after contributions to the FRBP (and other certain contributions), then 50% of the surplus would be credited to the surgeon's UDC account (Ex. A to Ag. Facts at ¶ 6).  Pursuant to the Compensation Policy, all surgeons were required to participate in the UDC and FRBP if their net practice income exceeded Harvard's ceiling.

Moreover, the plain language of both the UDC and FRBP buttresses the fact that all surgeons are covered by the plans.[16]  Specifically, the terms of the UDC extend coverage to

---

[16] Straightforward language in an ERISA-regulated plan must be given its plain, ordinary, and natural meaning. Filiatrault v. Converse Tech., Inc., 275 F.3d 131, 135 (1st Cir. 2001), citing Burnham v. Guardian Life Ins. Co., 873 F.2d 486, 489 (1st Cir. 1989).  A primary purpose of ERISA is to ensure the integrity and primacy of the written plans and, therefore, the plain language of an ERISA plan must be given its literal and natural meaning.  Harris v. Harvard Pilgrim Health Care, Inc., 208 F.3d 274, 279 (1st Cir. 2000) (citation omitted).  Moreover, "where the employer establishes the terms of a pension plan, those terms should be construed in favor of the employee." Atlas Tack Corp. v. Mahoney, 581 F.2d 1, 7 (1st Cir. 1978).

"Employees," which are defined to include "**surgeons who are members of the full-time faculty of the Harvard Medical School and are employed by the Employer to perform and teach surgery in the clinical setting of the Brigham and Women's Hospital…**" (Ex. B to Ag. Facts at § 1.02) (emphasis added). Similarly, the "Eligibility" section of the FRBP states that "Participants hereunder shall all be employees of the Employer who **are members of the full-time faculty of the Harvard Medical School**." (Ex. C to Ag. Facts at § 2.01) (emphasis added). The vast majority of the BSG surgeons were members of the full-time faculty of the Harvard Medical School (Ag. Facts ¶¶ 7-10). Thus, the specific unambiguous language of both the UDC and FRBP plans as well as the Compensation Policy demonstrate unequivocally that all surgeons who were full-time Harvard Medical School Faculty – **not a select group** – were covered by the plans. Compare Northwestern Mut. Life Ins. Co. v. Resolution Trust Corp., 848 F. Supp. 1515, 1520 (N.D.Ala. 1994) (plans established for "certain key officers" and "certain executives" were valid top hat plans); Gallione v. Flaherty, 70 F.3d 724, 726 (2d Cir. 1995) (full-time officers of hierarchical union membership were select group because only full-time officers were eligible to participate in plan and were "upper echelon of Union management"); Duggan v. Hobbs, 99 F.3d 307, 312 (9th Cir. 1996) (plaintiff constituted select group as he was sole employee covered by top hat severance agreement). Cf. Hollingshead v. Burford Equip. Co., 747 F. Supp. 1421, 1430 (M.D.Ala. 1990) (plan under which all employees were eligible for consideration "extended coverage beyond a select group of highly compensated employees" and was not valid top hat plan).

Quite simply, there was nothing "select" about the BSG employees who were covered by the UDC and FRBP. All surgeons employed by the BWPO who were full-time Harvard Medical School faculty members were covered by the Plans. Consequently, the UDC and FRBP do not

qualify as top hat plans under ERISA.[17]

### 2.    The UDC and FRBP Covered More Than 15% of BSG Employees and Not a Select Group

In addition to not being restricted to a select group of participants, the *sheer number* of participants in the UDC and FRBP do not - - as a matter of law - - qualify as a valid top hat plan. The undisputed facts show that the UDC and FRBP covered more than 15.34% of the BSG workforce. BSG had 241 total employees for 1997, 274 for 1998, and 324 for 1999 (Ag. Facts ¶¶ 7-9). Of the total number of employees for 1997 through 1999, the number of surgeons who were full-time Harvard Medical School faculty was 78, 84, and 88, respectively (Ag. Facts ¶ 10). Because these surgeons were eligible for - - and in fact had to participate in - - the UDC and FRBP, the percentage of professional staff covered by the UDC and FRBP was 32.4% in 1997, 30.7% in 1998, and 27.2% in 1999:

|  | **1997** | **1998** | **1999** |
|---|---|---|---|
| Nonprofessional Employees | 157 | 180 | 224 |
| Surgeons/Full-Time Harvard Medical School Faculty | 84 | 94 | 100 |
| Total BSG Employees | 241 | 274 | 324 |
| Percentage of Total Employees Covered by UDC and FRBP | **32.4%** | **30.7%** | **27.2%** |

The annual percentage of total employees covered by the UDC and FRBP from 1997 through 1999 -- close to one-third of BSG's total workforce -- far exceeded the "upper limit of

---

[17] Cases analyzing whether a plan qualifies as a top hat plan use the word "covered." See e.g. Duggan, 99 F.3d at, 312 (noting plaintiff "was the only employee covered by the severance Agreement"); Belka v. Rowe Furniture Corp., 571 F. Supp. 1249, 1252 (D.Md. 1983) (giving percentage of work force "covered by the agreements"). See also DOL Advisory Opinion No. 90-14A at n.1 ("a plan which extends coverage beyond 'a select group of management or highly compensated employees' would not constitute a 'top hat' plan for purposes of Parts 2, 3 and 4 of Title I of ERISA").

- 14 -

acceptable size for a 'select group.'" Consequently, both the UDC and FRBP, as a matter of law, are not valid top hat plans. <u>Demery</u>, 216 F.3d at 289 (15.34%); <u>Darden</u>, 717 F. Supp. at 397 (18.7%). Compare <u>Pane v. RCA Corp.</u>, 868 F.2d 631, 637 (3d Cir. 1989) (deferred compensation provided to only sixty-one (61) management employees out of a work force of over 80,000 employees, or one-tenth of one percent, constituted a select group); <u>Belka v. Rowe Furniture Corp.</u>, 571 F. Supp. 1249, 1251 (D.Md. 1983) (deferred compensation agreements that covered only 4.6 percent of employer's work force deemed a select group); DOL Advisory Op. No. 75-64 (August 1, 1975) (plan covered select group where number of key executives and managerial employees" eligible in any single year was **limited** to a preset number covering less than 4% of active employees).

It is important to point out that all surgeons who ***may* become eligible** for contributions to the UDC and FRBP must be counted in determining the select group. <u>Darden</u>, 717 F.Supp. at 396. In <u>Darden</u>, the parties disagreed as to which insurance agents should be counted as participants in the plan for purposes of determining whether they comprise a "select group" for top hat exemption analysis. The defendant, Nationwide, argued that only those agents who had completed five years of service should be counted as plan participants. <u>Id.</u> Rejecting Nationwide's method, the Court noted that ERISA's definition of "participant" must include employees who "may become eligible:"

> [T]he distinction between vesting and eligibility requirements is irrelevant for determining who is a plan participant under ERISA, since included within the statutory definition of "participant" are employees who "**may become eligible to receive a benefit**." Thus, those employees who have not satisfied the eligibility requirements for the plan must still be counted as "plan participants" if they *may* satisfy those requirements. In other words, the relevant question is not whether the employee *has* satisfied the eligibility requirements, but whether he is *eligible* to satisfy the eligibility requirements. Since all [defendant's] agents who have entered into the standard agent's agreement "may become eligible" for deferred compensation benefits by completing five years of service, they should all be counted as participants in the plan (emphasis added).

Darden, 717 F. Supp. at 396 (emphasis in original). See also Simpson v. Ernst & Young, 879 F.

Supp. 802, 816 (S.D.Ohio 1994), citing 29 U.S.C. § 1002(7) ("term 'participant' means any

employee or former employee of an employer…who is or *may become eligible* to receive a

benefit of any type from an employee benefit plan …"). Accordingly, the Darden Court held that

those agents who had entered into the standard agent's agreement, even if they had not completed

five years of service, must be counted for select group analysis. Id. at 397.

In Demery, moreover, the Second Circuit focused specifically on the percentage of

employees to whom the deferred compensation plan was *offered* -- 15.34% -- as opposed to those

who actually participated in the deferred compensation plan in determining the "select group":

> The Plan was offered to assistant vice-presidents, managers, and other senior officers, representing
> approximately 15% of the workforce of Extebank. Approximately 7 to 10% of Extebank
> employees actually participated in the Plan, which allowed participants to defer up to 25% of their
> salary as contributions to the Plan.

Demery, 216 F.3d at 28.

Based on the Compensation Policy, the mandatory nature of the deferred compensation

plans, and the language of the UDC and FRBP, all surgeons **may become eligible** to participate

in the plans and therefore must be counted in determining the "select group." Darden, 717 F.

Supp. at 396; Demery, 216 F.3d at 28. Every BSG surgeon is thus a participant in the UDC and

FRBP regardless of whether they received an allocation of funds in any particular year.

Moreover, given the Hospital's world-renowned status, which attracts the nation's best and

brightest physicians, it is more than likely that all of its highly educated and acclaimed surgeons

strive to become and in fact may become eligible to participate in the plans. In fact, the stated

objective of the Compensation Policy was to attract and retain "a professional staff of national

and international stature" (Ex. A to Ag. Facts at p. 1 ("Objective"); see also Ag. Facts ¶ 5).

Consequently, all surgeons, or approximately one-third of BSG's workforce, may very well

become eligible for UDC and FRBP benefits. Under all of the existing top hat case law and

guidance, such a large percentage cannot constitute a select group as a matter of law.

### 3.      The Plan Members Were Not All Highly Compensated

To fall within the top hat exception, a plan must cover management or highly

compensated employees. In re The IT Group, 305 B.R. at 410. Here, the UDC and FRBP

covered surgeons who were not management, and therefore, all surgeons had to be "highly

compensated" for the top hat exception to apply. The undisputed evidence shows, however, that

not all surgeons were highly compensated in relation to the non-professional staff. In fact, in

1999, for example, the non-professional staff salary ranged from $700 to $169,143 while the

professional staff salary ranged from $22,000 to $665,169 (Ag. Facts ¶ 12). In other words, some

of the employees covered by the UDC and FRBP earned less than employees who were not

covered by the plans. As such, the UDC and FRBP were not restricted to a select group of

management or highly compensated employees and must fail as valid top hat plans. See Starr v.

JCI Data Processing, Inc., 757 F. Supp. 390, 394 (D.N.J. 1991) (top hat exemption inapplicable

where group covered by plan had salaries ranging from $12,000 to $336,000); Duggan v. Hobbs,

1995 WL 150535 *4 (N.D.Cal. 1995) ("Employees appear to be highly compensated for

purposes of qualifying the plan that covers them as a Top Hat plan where they earn substantially

– approximately two to three times – more than employees not covered by the plan."), aff'd 99

F.3d 307 (9th Cir. 1996).

### 4.      The Primary Purpose of the UDC and FRBP Was To Comply with Harvard's Salary Limitation, Not Provide Deferred Compensation

The primary purpose of a top hat plan must be to provide deferred compensation. DOL

Advisory Op. No. 90-14A (interpreting term "primarily" in the phrase "primarily for the purpose

of providing deferred compensation for a select group…" as referring "to the purpose of the plan (i.e., the benefits provided)."). Moreover, the policy reason behind the top hat exception is that the so-called "select group" has the ability to affect or substantially influence the design and operation of the deferred compensation plan at issue. Id.

Neither the primary purpose nor the policy reasons underlying top hat plans is satisfied in this case. On the contrary, the UDC and FRBP were maintained to satisfy the various compensation restrictions imposed by Harvard University regarding the annual compensation of its faculty and the fluctuating finances of a related medical practice at the Brigham and Women's Hospital, and not primarily for the purpose of providing deferred compensation. In years in which a surgeon's net practice income exceeds Harvard compensation limits, contributions are made into the UDC and FRBP (Ex. A to Ag. Facts at ¶¶ 5, 6). In years in which net practice income falls below the level in prior years, contributions are not made and a surgeon, in theory, must repay the practice (Ex. B to Ag. Facts at ¶ 3). The Compensation Policy permits only modest annual adjustments in current annual compensation to repay deficits, but the FRBP and UDC each include provisions for offsets against such deficits, even before termination of employment (Ag. Facts Ex. B at § 2.05 & Ex. C at § 3.03). Moreover, the Compensation Policy permits the UDC assets to be used to pay current salary when usual compensation falls below the Harvard ceiling (Ex. A to Ag. Facts at ¶ 6). The FRBP can also be offset to repay the BSG for loans, including home loans secured by a mortgage (Ex. C to Ag. Facts at § 3.03). Thus, the UDC and FRBP were not designed primarily to provide deferred compensation, but rather to balance the see-sawing finances of a medical practice with the requirements of Harvard's limits on current annual compensation. Likewise, it is apparent that the Compensation Policy was structured to protect BSG's status as a public charity under IRC § 501(c)(3) by limiting the

amount of compensation paid to its faculty members.  See IRC § 4958 and Treasury Regulation 53.4958-1.

In addition, neither the UDC nor the FRBP provide employees with an opportunity to negotiate for adequate security of benefits and other protections.  The Compensation Policy is established by a committee of directors of the BSG, who (under an agreement that the BSG entered with the IRS in settlement of a tax dispute) must be outside directors of the BSG who represent the public interest (Ex. B to Ag. Facts at § 1.03).  There is no real opportunity for surgeons to negotiate with the Committee on the terms of their deferred compensation.  Moreover, because the amount of annual take-home compensation must conform to limits set by Harvard University, there is no opportunity for surgeons to negotiate a different mix of take-home and deferred compensation.  The compensation structure itself demonstrates that surgeons lack the ability to negotiate to shape the terms of their deferred compensation.  In effect, a surgeon who is offered a position on the Harvard Medical School faculty through the BSG must agree to deferred compensation into the UDC and FRBP upon realizing certain income levels.  Accordingly, the policy reasons underlying the top hat plans are absent in this case and the plans cannot be treated as top hat plans.  Compare Duggan, 99 F.3d at 312 (plan created for one employee showed bargaining power of that employee); Prior v. Innovative Communication Corp., 2005 WL 567458, *8 (D. VI 2005) ("An important factor in determining that an unfunded plan constitutes a 'top hat' plan is whether an executive has the power to negotiate the terms of an individualized pension benefit.").

## II.    Dr. Alexander is Entitled to Attorneys' Fees Under ERISA

A prevailing party may receive attorneys' fees under ERISA for meritorious claims.  Cook v. Liberty Life Assurance Co. of Boston, 334 F.3d 122, 123 (1st Cir. 2003); 29 U.S.C.

1132(g). Courts employ a five factor balancing test in determining whether attorneys' fees are warranted: '(i) the degree of culpability or bad faith attributable to the losing party; (ii) the depth of the losing party's pocket, i.e., his or her capacity to pay an award; (iii) the extent (if at all) to which such an award would deter other persons acting under similar circumstances; (iv) the benefit (if any) that the successful suit confers on plan participants or beneficiaries generally; and (v) the relative merit of the parties' position." Cottrill v. Sparrow, Johnson & Ursillo, Inc., 100 F.3d 220, 225 (1st Cir. 1996). These factors, however, are not considered exclusive and none are deemed dispositive. Twomey v. Delta Airlines Pilots Pension Plan, 328 F.3d 27, 33 (1st Cir. 2003), citing Gray v. New England Tel. and Tel. Co., 792 F.2d 251 (1st Cir. 1986).

The circumstances of this case warrant an attorneys' fee award. BSG structured the plans and is entirely responsible for their invalidity as top hat plans. Moreover, BWPO has the ability to pay for Dr. Alexander's fees, and given its reputation, such an award would deter other types of institutions from implementing invalid top hat plans. A fee award is also warranted here because of the potential benefit to other physicians whose deficits may have been improperly setoff under the plans. Finally, BWPO's position that the plans are valid top hat plans – in the face of the plain language of the Compensation Policy and the UDC and FRBP – lacks merit. Balancing these factors, Dr. Alexander is entitled to his attorneys' fees for prevailing on Count IX of the Complaint.

## CONCLUSION

For all of the above reasons, this Court should enter summary judgment in Dr.

Alexander's favor with respect to Count IX and Count XII of his Complaint.

Respectfully submitted,

EBEN ALEXANDER, III, M.D.

By his attorneys,

Michael Paris (BBO #556791)
Colleen C. Cook (BBO#636359)
NYSTROM BECKMAN & PARIS LLP
10 St. James Avenue, 16th Floor
Boston, Massachusetts 02116
(617) 778-9100
(617) 778-9110 (fax)

Dated: April 8, 2005


## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the above document was served upon all counsel of
record by hand on April 8, 2005.

Colleen C. Cook

- 21 -