UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| EBEN ALEXANDER, III, M.D. | ) |
| | ) |
| Plaintiff, | ) Case No. 04-10738 MLW |
| | ) |
| v. | ) |
| | ) |
| BRIGHAM AND WOMEN'S PHYSICIANS | ) |
| ORGANIZATION, INC., successor to | ) |
| Brigham Surgical Group Foundation, Inc., | ) |
| BOSTON NEUROSURGICAL FOUNDATION | ) |
| INC., BRIGHAM SURGICAL GROUP | ) |
| FOUNDATION, INC. DEFERRED | ) |
| COMPENSATION PLAN, BRIGHAM | ) |
| SURGICAL GROUP FOUNDATION, INC. | ) |
| FACULTY RETIREMENT BENEFIT | ) |
| PLAN, COMMITTEE ON COMPENSATION | ) |
| OF THE BRIGHAM SURGICAL GROUP | ) |
| FOUNDATION, INC., and | ) |
| PETER BLACK, M.D. | ) |
| | ) |
| Defendants. | ) |

## DEFENDANTS' MEMORANDUM OF LAW
## IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

### INTRODUCTION

While employed by the Brigham Surgical Group ("BSG"), Dr. Eben Alexander

III ("plaintiff") enjoyed the benefits of two tax-deferred compensation plans, the *bona*

*fides* of which he now challenges. Claiming that participation in the plans was not

restricted to a sufficiently "select group" of employees, he argues that they did not satisfy

ERISA's "top hat" criteria. Plaintiff mounts this challenge because his financial interest

in the plans was reduced at the time of his termination to cover an accumulated practice

deficit.   While the plans expressly provide for such an offset, ERISA's vesting

protections prohibit same unless the plans fall under the "top hat" exemption.

In fact, the only BSG employees eligible to participate in these plans were surgeons and full-time members of the Harvard Medical School faculty whose individual practices also met a certain – and very high – profitability threshold.   Few BSG employees ever satisfied this eligibility criteria.  Indeed, during the relevant time period, only 4.6 to 7.1 % of BSG's workforce participated in the plans.   Thus, under the controlling case law, the plans satisfy the "select group" top hat criteria, and plaintiff's claims for benefits and breach of fiduciary duty must be dismissed.

## PROCEDURAL HISTORY

Plaintiff filed this case on April 13, 2004, and the Court granted defendants' motion to dismiss his common law claims as preempted by ERISA in November of that year.  Because plaintiff's remaining claims require proof that the unfunded, deferred compensation plans are not valid "top hat" plans under ERISA, and no material facts are in dispute, the parties have agreed to submit cross-motions for summary judgment on this issue.

## STATEMENT OF FACTS

BSG employed plaintiff from 1988 to 2001.[1]   (Defendants' Local Rule 56.1 Statement of Undisputed Facts ("Rule 56.1 Stmt.") ¶ 1; Agreed Statement of Facts for Cross Summary Judgment Motions ("Ag. Facts") ¶ 1)   A neurosurgeon, plaintiff was both a member of BSG's professional staff and a full-time member of the Harvard Medical School Faculty.   (*Id.*)   Throughout his employment, BSG maintained two

---

[1]   In January 2001, Brigham and Women's Physician's Organization ("BWPO") became the successor in interest to BSG.

unfunded deferred compensation plans for certain of its surgeons, the Unfunded Deferred Compensation Plan ("UDC") and the Faculty Benefit Retirement Plan ("FRBP") (collectively, the "Plans"). (Rule 56.1 Stmt. ¶ 6; Ag. Facts ¶ 4, Exhibits B & C) The Plans provided a means for BSG's most highly compensated surgeons to defer compensation. (Rule 56.1 Stmt ¶ 5; Ag. Facts ¶ 5) As such, they provided BSG with a tax-deferred compensation vehicle which enhanced its ability to recruit and retain preeminent surgeons. (*See id.*)

Only BSG surgeons who were full-time members of the Harvard Medical School faculty could participate in the Plans. (Rule 56.1 Stmt. ¶ 7; Ag. Facts ¶ 13) Those two factors, however, were not enough. To participate, a surgeon also had to generate a net practice income ("NPI") in excess of the Harvard Medical School salary cap. (*Id.*) Pursuant to BSG's Professional Staff Compensation Policy, NPI is calculated annually by finding the difference between the income resulting from a BSG surgeon's operating room teaching activity and his expenses during the academic year.[2] (Rule 56.1 Stmt. ¶ 5, Ag. Facts, Appendix A to Exhibit A) If a surgeon generated NPI in excess of the Harvard salary cap, an amount up to 25% of his total salary would be credited to the FRBP. (Rule 56.1 Stmt. ¶ 8; Ag. Facts ¶ 15, Exhibit A ¶¶ 5-6) If any NPI remained, certain 401(a) qualified pension plan contributions would be deducted, and 50% of the remainder would be credited to the UDC. (*Id.*)

Few BSG employees satisfied the eligibility criteria necessary to participate in the Plans. In fiscal year 1997, 17 of BSG's 241 employees, or 7.1 % of the total workforce, participated in the Plans. (Rule 56.1 Stmt. ¶ 9; Ag. Facts ¶ 16) In fiscal year 1998, 14 of

---

[2]    BSG member expenses include all direct and allocated expenses incurred by or on behalf of a member plus a departmental charge equal to a percentage of net receipts attributable to the member's operating room teaching during the academic year. (Ag. Facts, Appendix A to Exhibit A)

BSG's 274 employees, or 5.1 % of the total workforce, participated in the Plans. (Rule 56.1 Stmt. ¶ 10; Ag. Facts ¶ 17)  In fiscal year 1999, 15 of BSG's 324 employees, or 4.6 % of the total workforce, participated in the Plans. (Rule 56.1 Stmt. ¶ 11; Ag. Facts ¶ 18)  Additional facts will be set forth in the context of the arguments which follow.

**ARGUMENT**

## I.    THE UDC AND FRBP SATISFY THE STATUTORY CRITERIA FOR TOP HAT PLANS.

Because the UDC and FRBP are unfunded[3] plans maintained by BSG to provide deferred compensation for its most highly valued surgeons, who comprise only 4.6 to 7.1 % of its workforce, they satisfy the statutory criteria for top hat plans under ERISA. *See, e.g., Demery v. Extebank Deferred Compensation Plan*, 216 F.3d 283, 287 (2d Cir. 2000).

### A.    Top Hats Are Unfunded, Deferred Compensation Plans Exclusively for Highly Compensated Employees and Are Exempt From Many of ERISA's Statutory Protections.

ERISA defines a top hat plan as one "which is unfunded and is maintained by an employer primarily for the purpose of providing deferred compensation for a select group of management or highly compensated employees." 29 U.S.C. §§ 1051(2); 1081(a)(3); 1101(a)(1). Top hat plans are used as supplemental compensation vehicles to recruit and retain particularly valuable employees. *See, e.g., Demery*, 216 F.3d at 287. Such employees, because of their economic leverage, require less statutory protection than their lesser paid counterparts. Thus, in designing ERISA's remedial scheme, Congress recognized that highly compensated employees and "top-level management, unlike most

---

[3]        The Parties agree that the UDC and FRBP were unfunded, as required by ERISA. (Ag. Facts ¶ 4)

employees, [are] capable of protecting their own pension expectations." *Gallione v. Flaherty*, 70 F.3d 724, 727 (2d Cir. 1995). As a result, top hat plans are not subject to much of ERISA's regulatory scheme, including its vesting, participation and fiduciary requirements. 29 U.S.C. §§ 1051(2); 1081(a)(3); 1101(a)(1); *see also* Dep't of Labor Opinion Letter 90-14A, 1990 LEXIS 12 (May 8, 1990) ("in providing relief for 'top hat' plans from the broad remedial provisions of ERISA, Congress recognized that certain individuals, by virtue of their position or compensation level, have the ability to affect or substantially influence, through negotiation or otherwise, the design and operation of their deferred compensation plan"). As one court has explained, "[t]he top hat is a rare subspecies of ERISA plan, and Congress created a special regime to cover it. This special regime exempts top hat plans from most of ERISA's substantive requirements." *Virta v. DeSantis Enterp., Inc.*, 1996 WL 663970, at * 2 (N.D.N.Y. 1996).

### B. The UDC and FRBP Meet the Definition of Valid Top Hat Plans.

#### 1. The Plans' Primary Purpose Was to Provide Deferred Compensation.

The Plans' language makes plain that their primary purpose,

> . . . is to provide an opportunity to earn an incentive retirement contribution . . . The Plan is . . . maintained by the Employer primarily for the purpose of providing deferred compensation for a select group of management or highly compensated employees.

(Ag. Facts, Exhibit C (FRBP), §§ 1.01, 5.02). Accordingly, the principal benefit provided by the FRBP is deferred compensation. A review of the UDC similarly reveals that the principal benefit it provides to participants is deferred compensation. As such, both Plans satisfy the requirement that they be maintained primarily for the purpose of providing deferred compensation. *See, e.g., Cogan v. Phoenix Life Ins. Co.*, 310 F.3d

238, 242 (1st Cir. 2002) ("The Plan itself echoes [ERISA's] statutory definition. . .
plaintiffs cannot dispute . . . that the Plan is a top hat plan within the meaning of
ERISA."); *Virta*, 1996 WL 339470, at * 3 ("the issue at hand is . . . whether the plan was
***administered in a manner*** designed to provide benefits for a select group of management
or highly compensated employees.") (emphasis added).

Plaintiff's argument that the Plans' primary purpose was to avoid the Harvard
salary cap misses the mark. First, plaintiff makes no showing that but for the Harvard
salary cap, BSG's 501(c)(3) status would be jeopardized. Indeed, he advances no
evidence regarding the cap's origins or purpose. To be sure, compensation to employees
of tax-exempt institutions must be "reasonable," but that is an elastic and market-driven
concept. *See, e.g.,* I.R.C. § 4958; Treas. Reg. § 53.4953-4(a), (b). Plaintiff has not
produced any evidence that, if BSG increased compensation to a relatively small number
of its most highly valued surgeons by 25-50%, that same would be unreasonable in light
of competition from such institutions as, for example, Columbia or Stanford universities'
medical schools. Nor has he shown that doing so would result in loss, without more, of
the institution's 501(c)(3) status. Second, the Internal Revenue Code (the "Code") and
treasury regulations plaintiff cites concern payments to a very small class of top
executives ("disqualified persons") who can directly affect their own compensation, and
they prohibit payments which exceed the value of services provided. As such, plaintiff's
interpretation of these regulations have no application here. Beyond conclusory factual
assertions and undeveloped references to the Code, plaintiff provides no support for his
argument that the Plans had an illegitimate purpose.

What is more, the Department of Labor has explained that, "the term primarily, as

- 6 -

used in the phrase 'primarily for the purpose of providing deferred compensation for a select group of management or highly compensated employees[,]' refers to the purpose of the plan (*i.e. the benefits provided*)." Dep't of Labor Opinion Letter 90-14A, 1990 ERISA LEXIS 12 (emphasis added). Here, it is undisputed that the Plans' principal if not sole benefit to the participating surgeons was tax-deferred compensation. That the Plans also allowed BSG to compensate certain physicians in excess of the Harvard salary cap is irrelevant. *See, e.g., Demery*, 216 F.3d at 287 (deferred compensation plan satisfied top hat criteria where employer admitted that it was "established to retain valuable employees"); *In re Battram*, 214 B.R. 621, 625 (Bankr. C.D. Cal. 1997) ("a top hat plan need only be primarily for the purpose of providing deferred compensation, not exclusively for that purpose."). In all, plaintiff cites no case or regulatory ruling disqualifying a top hat plan because it provided a benefit beyond deferred compensation, because there are none.

### 2.    Only A Select Group of Highly Compensated Employees Was Eligible To Participate in the UDC and FRBP.

The requirement that a top hat plan apply only to a "select group of management or highly compensated employees" is both quantitative and qualitative. "In number, the plan must cover relatively few employees. In character, the plan must cover only high level employees." *Senior Executive Benefit Plan Participants v. New Valley Corp.*, 89 F.3d 143, 148 (3rd Cir. 1996). The UDC and FRBP satisfy both requirements.

#### a.    Only BSG's Most Highly Compensated Employees Participated in the Plans.

To satisfy the qualitative test, top hat plan participants must be either management or highly compensated employees. *See, e.g., In re the IT Group, Inc.*, 205 B.R. 402, 410 (Bankr. D. Del. 2004). Here, BSG reserved the Plans for surgeons who, as members of

the professional staff, were among BSG's most highly compensated employees. (Rule 56.1 Stmt. ¶¶ 3, 7-8; Ag. Facts ¶¶ 12-13) What is more, only the most highly compensated surgeons generated NPI in excess of the Harvard salary cap. (*Id.*) Plaintiff does not contest this. Thus, employees who participated in the UDC and FRBP were substantially more highly compensated than those who did not. *See, e.g.*, *Demery*, 216 F.2d at 287-88 (plan satisfied top hat criteria where participating employees were highly compensated in comparison to non-participating employees); *Belka v. Rowe Furniture Corp.*, 571 F. Supp. 1249, 1253 (D. Md. 1983) (noting that the Department of Labor focuses on the salary of participants in comparison to other employees).

Regarding his contention that the Court must void the Plans because the covered surgeons could not negotiate their terms, plaintiff cites neither one case nor any Department of Labor or Internal Revenue Service rulings which actually have done so. Further, the Department of Labor opinion letter which gave rise to this principle spoke broadly in terms of high level employees' "ability to affect . . . through negotiation or otherwise . . . the design and operation" of such plans. Dep't of Labor Opinion Letter 92-13A n.1, 1992 ERISA LEXIS 14 (May 19, 1992) (emphasis added); *see also Duggan v. Hobbs*, 99 F.3d 307, 312-13 (9th Cir. 1996) (same). It said nothing about requiring plan administrators to show that the affected employees actually wielded such power, or did so to any specific end. *See Demery*, 216 F.3d at 290 (focus is on the "absence of bargaining power").[4]

---

[4]     Moreover, Department of Labor officials have disavowed many of its early letter rulings, and have declined to issue regulations or provide guidance that would narrow its opinions contemplating a broad view of the top-hat exemption. *See* Michael S. Sirkin & Lawrence K. Cagney, *Executive Compensation*, § 7.03[2] n.2 (2002) (Plaintiff's Appendix, Tab 8).

### b.    Only A Select Group Of BSG Employees Was Eligible To Participate in the Plans.

To determine whether a top hat plan satisfies the "select group" criteria, courts also examine the percentage of the total workforce that was eligible to participate in the plan. *See, e.g., Demery*, 216 F.3d at 287-88; *Gallione v. Flaherty*, 70 F.3d 724, 728 (2d Cir. 1995); *Belka*, 571 F. Supp. at 1252-53; *In re the IT Group, Inc.*, 205 B.R. at 411. To participate in the UDC and FRBP, a BSG employee had to satisfy three criteria. He had to be (1) a surgeon, (2) a full-time member of the Harvard Medical School faculty, and (3) he had to generate NPI in excess of a certain threshold. Employees who did not satisfy all three requirements were not eligible to participate in the Plans.

As noted, application of these eligibility criteria resulted in a small number of BSG employees becoming eligible to participate in the Plans during the relevant time period: 7.1 % in 1997; 5.1 % in 1998; and 4.6 % in 1999. In this light, they satisfy the "select group" criteria for top hat plans. *See, e.g., Demery*, 216 F.3d at 288 (select group criteria satisfied where 15.34% of the workforce was eligible to participate in the plans); *Duggan v. Hobbs*, 99 F.3d at 312 ("employees are part of a "select group" . . . where the employer's retirement plan coverage is limited to a small percentage of the employer's total workforce."); *Belka*, 571 F. Supp. at 1252 (select group criteria satisfied where 4.6% of the workforce was eligible to participate); Dep't of Labor Opinion Letter 75-64, 1975 ERISA LEXIS 50 (August 1, 1975) (select group criteria satisfied where fewer than 4% of employees covered by plan).

### 3.    Both Plaintiff's Argument and the Sole Case On Which He Relies Ignore Supreme Court Precedent.

Plaintiff argues that, for purposes of the "select group" analysis, the Court should apply ERISA's definition of "participant" to include a far larger group of BSG employees

than those who ever became eligible to participate in the Plans.[5]  Specifically, Plaintiff

contends that all BSG surgeons who hypothetically might have generated the requisite

NPI should be considered "participants" because they "may [have] become eligible" for

the Plans.  This is nothing more than conjecture in general and it does not satisfy the legal

standard in particular.  The mere possibility of satisfying eligibility criteria is not enough.

### a. The Supreme Court Has Rejected Plaintiff's Broad Construction of "Participant."

In *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101 (1989), the Supreme

Court interpreted ERISA's definition of "participant" as follows:

> In order to establish that he or she "may become eligible"
> for benefits, a claimant must have a colorable claim that (1)
> he or she will prevail in a suit for benefits, or that (2)
> eligibility requirements *will be fulfilled* in the future. This
> view attributes conventional meanings to the statutory
> language since all employees in covered employment and
> former employees with a colorable claim to vested benefits
> "may become eligible."

*Id.* at 117-118 (emphasis added; internal quotations and citations omitted).

Therefore, under *Firestone,* "participants" under the Plans include those BSG

employees who actually satisfied all three of the Plans' eligibility criteria, or those whom

plaintiff could demonstrate would in fact do so.  Given the small percentage of BSG

employees who actually did satisfy the eligibility criteria (never more than 7.1 %), and

where plaintiff has made no showing - never mind a specific affirmative proffer - that

particular BSG surgeons would in fact do so in the future, Plaintiff cannot establish his

claim.  Quite simply, he has not demonstrated, as he must, that the eligibility

requirements *would be fulfilled* for a broader class of surgeons than those who actually

---

[5]      ERISA defines "participant" as "any employee or former employee of an employer . . . who is or
may become eligible to receive a benefit of any type from an employee benefit plan which covers
employees of such employer . . ."  29 U.S.C. § 1002(7).

- 10 -

participated in the Plans. Under *Firestone*, and on these facts, only those BSG employees who actually satisfied the eligibility criteria are "participants" for purposes of determining whether the Plans satisfy the "select group" requirement.

### b. The Only Case Which Arguably Supports Plaintiff's Argument Ignores *Firestone*.

Plaintiff relies on one case from the United States District Court for the Eastern District of North Carolina, *Darden v. Nationwide Mutual Ins. Co.*, 717 F. Supp. 388 (1989), to support his argument that all surgeons who conceivably might have become eligible for the Plans should be included as "participants." *Darden* is the only post-*Firestone* case which applies ERISA's definition of "participant" in the "select group" analysis.[6] It also ignores the Supreme Court's interpretation of same.

In *Darden*, the court considered whether a deferred compensation plan included in Nationwide's agreements with certain insurance agents qualified as a top hat plan. 643 F. Supp. at 394-97. There, agents were eligible to participate in the plan upon completion of five years' service, without more. *Id.* at 396. In considering whether the plan satisfied the "select group" requirement, the court counted as participants all agents who had executed the agreement, including those who had not yet completed five years' tenure, reasoning that such employees "may become eligible" for benefits upon completion of

---

[6]     Courts generally consider whether an employee "may become eligible" for benefits only to determine whether an individual has standing to bring a claim for benefits under 29 U.S.C. § 1132(a) or for interference with protected pension benefits under 28 U.S.C. § 1140. *See, e.g., Nahigian v. Leonard*, 233 F. Supp. 2d 151, 166-68 (D. Mass. 2002). This comports with ERISA's purpose to protect "employees with long years of employment [from] losing anticipated retirement benefits" when, for example, an employer terminates an employee to prevent him from vesting in a plan. 29 U.S.C. § 1001; *see also Carrabba*, 38 F. Supp. 2d at 477 ("As one method of accomplishing the goal of decreasing the number of lost pensions, ERISA established certain minimum requirements that covered plans must meet, including requirements for nonforfeitability").

five years of service.[7]  *Id.* at 396.  Through this reasoning, the Court concluded that the plan covered too large a percentage of the workforce and did not satisfy the "select group" criteria.  *Id.* at 397.

In reaching this result, the *Darden* court adopted an exceedingly expansive reading of ERISA's definition of "participant" without addressing the Supreme Court's controlling interpretation of same in *Firestone*.  As time has shown, it is an anomaly which has not been followed.  Even at that, *Darden* included as plan "participants" only those who satisfied eligibility criteria, and those who would do so ***merely by the passage of time***.  In this case, status, compensation and profitability are the controlling factors; time of tenure is irrelevant.

### c.    Darden's Interpretation of "Participant" Is Particularly Inappropriate in the Top Hat Context.

The case and regulatory law as a whole makes it plain that an expansive definition of "participant" is particularly inappropriate in deciding whether a plan satisfies top hat criteria.  In the "qualified plan"[8] context, for example, the Internal Revenue Code includes as "participants" only those employees who have satisfied all eligibility criteria, or who are actively participating in a plan, in assessing a plan's annual coverage test

---

[7]    The *Darden* court notably rejected the plaintiff's argument that it should consider as participants insurance agents who were still in training and had not yet executed the agreement. 643 F. Supp. at 397. As the Court explained, "Darden is, of course, correct that those agents may become eligible for deferred compensation benefits by entering into the standard agreement and completing five years service. But that is no less true of any other employee at Nationwide." *Id.*  Thus, the *Darden* court's interpretation of "participant," inappropriately expansive as it is, does not extend as far as Dr. Alexander suggests.

[8]    A "qualified plan" is one which satisfies ERISA's requirements (including but not limited to its vesting, participation, anti-discrimination and fiduciary duty requirements) to become "qualified" for its tax advantages. *See* I.R.C. §§ 401(a), 501(a); *see also* STEVEN R. BRUCE, PENSION CLAIMS: RIGHTS AND OBLIGATIONS 3 (2d ed.) (BNA 1993).  Examples are so-called 401(k) or 401(a) plans which are available to a broad class of employees.  Top hat plans are not considered "qualified plans." *See, e.g., Kemmerer,* 70 F.3d at 286 ("Congress imposed strict regulations over plans whose participants it most desired to protect – employer–funded plans designed to secure employees' financial security upon retirement . . . Top hat plans . . . do not require such scrutiny and are exempted from much of ERISA's regulatory scheme.").

under I.R.C. § 410(b), and the minimum participation test under I.R.C. § 401(a)(26). As

one treatise explains,

> In one sense, a plan's "coverage" describes the employees
> whose job classifications or divisions are covered under the
> terms of a plan – regardless of whether they have met any
> minimum age and service requirements. In a second sense,
> "coverage" requires the plan to do more, namely, to
> actually "benefit" the employees.   The tests in Code
> Sections 401(a)(26) and 410(b) require "coverage" in this
> second sense. An employee *benefits* from a plan within the
> meaning of these sections only when he or she is both
> *covered* by the plan and actually participating in it.

STEVEN R. BRUCE, PENSION CLAIMS: RIGHTS AND OBLIGATIONS 26 (2d ed.) (BNA 1993).

Thus, the numerator for each of the above tests includes only those employees actually

"benefiting" under the plan, which treasury regulations define as those who receive a

contribution allocation or a benefit accrual for the year under the plan, or those who are

eligible to defer compensation under the plan but have chosen not to do so. *See* Treas.

Reg. §§ 1.401(a)(26)–5; 1.410(b)–3. The numerator excludes all individuals who are not

participating in the plan or who have not yet fully satisfied the plan's eligibility criteria.

*See* Treas. Reg. §§ 1.401(a)(25)–6; 1.410(b)–6.

In light of ERISA's far greater protection of "qualified plan" beneficiaries, a

different and more expansive definition of "participant" cannot be used to determine

whether a top hat plan satisfies the "select group" requirement than the one which is used

to determine a qualified plan's *bona fides*. As the Department of Labor has explained,

"in the absence of an ERISA regulation defining a 'top hat' plan, it is the view of the

Department that the positions adopted by the [Internal Revenue] Service with respect to

deferred compensation arrangements should be accorded weight in determining whether a

'top hat' plan is '[*bona fide*].'" Dep't of Labor Opinion Letter 90-14A, 1990 ERISA

LEXIS 12. Similarly, in *Belka*, the Court referred to the Code to determine whether employees were highly compensated or in managerial positions. There, the Court noted that, "it is difficult to know, without guidance of courts or the Department of Labor, what standards to apply in determining whether all the individuals are highly compensated or in managerial positions. But one commentary suggests that the courts should apply the same standard applied by the Internal Revenue Service under the tax code." *Belka*, 571 F. Supp. at 1253 (applying I.R.S. standard).

Thus, all courts, with the exception of *Darden*, and the regulators, track the Code's *qualified* plan approach. They count as "participants" only those employees who have satisfied plan eligibility criteria, or who actually participate in a plan, in determining whether it satisfies the "select group" requirement. *See, e.g., Duggan*, 99 F.3d at 310 (only employees who received benefits under plan included in top hat analysis); *Gallione*, 70 F.3d at 728 (only employees eligible to participate in plan included in top hat analysis); *Carrabba v. Randall's Food Markets, Inc.*, 38 F. Supp. 2d 468, 473 (N.D. Tex. 1999) (court considered only those employees to whom participation in the plan was available "*in actual operation of the plan*") (emphasis added); *Belka*, 571 F. Supp. at 1252 (only employees party to deferred compensation agreement and entitled to receive benefits thereunder included in top hat analysis); *In re Battram*, 214 B.R. at 625 (only employees who were party to plan agreement (i.e. "covered" by the plan) included in top hat analysis); *cf.* Dep't of Labor Opinion Letter 90-14A, 1990 ERISA LEXIS 12 (top hat plan must "limit[] *participation* to a select group of management or highly compensated employees") (emphasis added).

Plaintiff's argument that Plan "participants" must include all surgeons who

conceivably might have satisfied the Plan's eligibility criteria but never did should be rejected. It strains logic and is at odds with the manner in which ERISA has been interpreted across the spectrum of plan compliance cases. *See id.*

## II.    BECAUSE THE UDC AND FRBP ARE VALID TOP HAT PLANS, PLAINTIFF'S CLAIMS FOR BENEFITS UNDER 29 U.S.C. § 1132 AND BREACH OF FIDUCIARY DUTY UNDER ERISA MUST BE DISMISSED.

### A.    Plaintiff Cannot State a Claim for Vested Benefits Under 29 U.S.C. § 1132(a)(1)(B).

As valid top hat plans, the UDC and FRBP are not subject to ERISA's vesting requirements, which provide that all benefits under a plan are non-forfeitable after completion of seven years of service. 29 U.S.C. § 1053(a)(2)(B). Top hat plans are expressly excluded from this requirement. 29 U.S.C. § 1051(2); *see also Cogan*, 310 F.3d at 242; *Gallione*, 70 F.3d at 727.

In Count IX, plaintiff alleges that his "benefits under the UDC and FRBP were fully vested after seven years of employment with BSG . . . [t]herefore, BWPO had no right to setoff the deficit assessed to Dr. Alexander under the UDC or FRBP." Complaint, ¶ 92. Because the UDC and FRBP are valid top hat plans, plaintiff had no vested right to benefits under either. His claim for vested benefits fails as a matter of law and must be dismissed. *See, e.g. Cogan*, 310 F.3d at 242 ("[ERISA's] anti-cutback provision does not apply here, however, as the Plan is unquestionably a 'top hat' employee benefit plan"); *In re E.L. Carlyle*, 242 B.R. 881, 889, 891 (Bankr. E.D. Va. 1999) (set-off permissible under top hat plan because plan not subject to ERISA's vesting requirements); *Northwest Mutual Life Ins. Co. v. Resolution Trust Corp.*, 848 F. Supp. 1515, 1520-21 (N.D. Ala. 1994) (holding claim for vested benefits against top hat plan failed because "plaintiffs may not enforce rights that they do not have under ERISA");

*Belka*, 571 F. Supp. at 1253 (ERISA's vesting requirements do not apply to benefits under top hat plan).

### B.    Plaintiff Cannot State a Claim for Breach of Fiduciary Duty Under ERISA.

Because top hat plan participants are "capable of protecting their own pension expectations," top hat plans are expressly exempted from ERISA's fiduciary responsibility requirements. 29 U.S.C. § 1101(a)(1); *see also New Valley Corp. Center Exec. Benefits Plan Participants v. New Valley Corp.*, 89 F.3d 143, 149 (3rd Cir. 1996); *Duggan,* 99 F.3d at 313; *Gallione*, 70 F.3d at 727. As a result, plaintiff cannot state a claim for breach of fiduciary duty under the UDC and FRBP, and Count X must be dismissed. *See, e.g., Demery*, 216 F.3d at 290 (affirming dismissal of fiduciary duty claim against top hat plan); *Duggan*, 99 F.3d at 313-14 (plaintiff could not state breach of fiduciary duty claim against top hat plan).

## CONCLUSION

For the foregoing reasons, defendants respectfully request that the Court issue a

ruling that the UDC and FRBP constitute valid top hat plans under ERISA and dismiss

Counts IX and X of the Complaint.

Respectfully submitted,

BRIGHAM AND WOMEN'S
PHYSICIANS ORGANIZATION, INC.,
BOSTON NEUROSURGICAL
FOUNDATION INC., BRIGHAM
SURGICAL GROUP FOUNDATION, INC.
DEFERRED COMPENSATION PLAN,
BRIGHAM SURGICAL GROUP
FOUNDATION, INC. FACULTY
RETIREMENT BENEFIT PLAN,
COMMITTEE ON COMPENSATION OF
THE BRIGHAM SURGICAL GROUP
FOUNDATION, INC., and PETER
BLACK, M.D.,

By their attorneys,

David C. Casey (BBO No. 077760)
Gregory C. Keating (BBO No. 564523)
Laurie Drew Hubbard (BBO No. 651109)
LITTLER MENDELSON, PC
One International Place, Suite 2700
Boston, MA 02110
(617) 378-6000

Dated: May 16, 2005

- 17 -

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the foregoing document was served upon the attorney of record for each other party by hand on May 16, 2005.

Laurie Drew Hubbard

Firmwide:32208124.

- 18 -