UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

RECEIVED
Clerk's Office
USDC, Mass.
Date ͞/9/05
By M.P.
Deputy Clerk

EBEN ALEXANDER, III, M.D.   )
                            )
        Plaintiff,          )     Case No. 04-10738-MLW
                            )
    v.                      )
                            )
BRIGHAM AND WOMEN'S PHYSICIANS )
ORGANIZATION, INC., successor to )
Brigham Surgical Group Foundation, Inc., )
BOSTON NEUROSURGICAL FOUNDATION )
INC., BRIGHAM SURGICAL GROUP )
FOUNDATION, INC. DEFERRED   )
COMPENSATION PLAN, BRIGHAM  )
SURGICAL GROUP FOUNDATION, INC. )
FACULTY RETIREMENT BENEFIT  )
PLAN, COMMITTEE ON COMPENSATION )
OF THE BRIGHAM SURGICAL GROUP )
FOUNDATION, INC., and       )
PETER BLACK, M.D.           )
                            )
        Defendants.         )
                            )

**PLAINTIFF'S REPLY BRIEF IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO
<u>DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT</u>**

<u>INTRODUCTION</u>

The central issue for this Court to decide on summary judgment is whether the FRBP and UDC (collectively, the "Plans") are restricted to a "select group" of employees to qualify as "top hat" plans under ERISA. Plaintiff contends that the "select group" is determined by looking to the group of surgeons who *may* earn enough compensation over the Harvard salary cap to trigger a contribution into the Plans. Defendants, on the other hand, contend that - - despite ERISA's language that defines a participant as someone who "may become eligible" - - only

those surgeons who *actually* received contributions into the Plans should be counted for the "select group" analysis. Defendants' position must be rejected because:

- defendants ignore the BSG Compensation Policy which <u>requires</u> contributions to the Plans for <u>all</u> surgeons who generate sufficient compensation <u>without limiting</u> the number of surgeons who may surpass the Harvard salary cap and receive a contribution;[1]

- the <u>Firestone</u> decision, upon which defendants' argument is predicated, does not address the issue before this Court and is therefore inapposite;

- the Internal Revenue Code's ("IRC") treatment of "participant" in the qualified plan context provides no relevant guidance in determining "select group" status; and,

- the UDC -- unlike the FRBP -- does not even recite the self-serving primary purpose language to evidence that it intended to provide deferred compensation to a "select group."

For these reasons, and for the reasons set forth in his moving papers, the Court should enter summary judgment in Dr. Alexander's favor on Count IX, award him attorneys' fees under Count XII, and deny defendants' cross-motion for summary judgment.

## ARGUMENT

**I.     Actual Satisfaction of Eligibility Criteria Is Not the Relevant Standard to Determine Whether the UDC and FRBP Are Limited to a "Select Group"**

Relying on the Supreme Court's decision in <u>Firestone Tire and Rubber Co. v. Bruch</u>, 489 U.S. 101 (1989), defendants contend that "only those BSG employees *who actually satisfied* the eligibility criteria are 'participants' for purposes of determining whether the Plans satisfy the 'select group' requirement." (Cross-Motion at 11) (emphasis added). Defendants' analysis of <u>Firestone</u> and their position that <u>actual</u> satisfaction of the eligibility criteria determines "select group" is wrong for several reasons:

---

[1] Defendants likewise ignore the Plans' language which defines "employees" as BSG surgeons who are full-time members of Harvard Medical School faculty without regard to whether contributions into the Plans are made. (<u>See</u> Dr. Alexander's initial brief at pp. 12-13).

First, Firestone's explanation of the phrase "may become eligible" in ERISA's definition of "participant" does not squarely address or even relate to the central issue before this Court; that is, which surgeons should be included for purposes of determining whether the Plans are limited to a "select group" in the top hat context. Rather, in Firestone, the Supreme Court interpreted "participant" in the context of whether former employees who were terminated and rehired by a successor corporation were entitled to information concerning benefit plans. Firestone Tire and Rubber Co., 489 U.S. at 105. Indeed, the First Circuit has acknowledged that Firestone has limited application because it does not define all of the scenarios under which an individual may be considered a "participant." See Vartanian v. Monsanto Co., 14 F.3d 697, 701 (1st Cir. 1994) (discussing limited application of Firestone in the standing context). In particular, the First Circuit held that an individual "has standing to assert his claims under ERISA even though he has already received his benefits . . ." Vartanian, 14 F.3d at 703. Thus, although the Firestone decision may serve as a guide concerning who may be considered a "participant" under a plan, "it is not necessarily dispositive" in a different context, like the top hat context. Swinney v. General Motors Corp., 46 F.3d 512, 518 (6th Cir. 1995), citing Vartanian, 14 F.3d at 701.

In addition, the "will be fulfilled in the future" language in Firestone, which defendants highlight (Cross-Motion at 10), is not necessarily at odds with Dr. Alexander's position because it is conceivable that all or a large number of surgeons will fulfill the compensation requirement in the future and trigger contributions in the Plans. Defendants do not contend otherwise, nor could they. Precisely because it is impossible to determine the number of surgeons who will fulfill the eligibility requirements means that the Plans are not limited to a "select group" and not valid top hat plans. Defendants' proposed method of defining "select group" requires a retrospective, after-the-fact analysis that is entirely inconsistent with the policy underlying top

hat plans - - which is to limit participation to certain individuals who do not require all of ERISA's protections. See e.g. Gallione v. Flaherty, 70 F.3d 724, 727 (2d Cir. 1995).

Defendants' position makes no practical sense. Indeed, taken to its logical conclusion, defendants' "actual participation" test could result in the FRBP and/or UDC being considered a valid top hat plan in one year and invalid the next year depending upon the compensation earned by the surgeons in those years. Put another way, the FRBP and UDC impose no limitations on the number of surgeons who may be eligible to participate in the Plans, and therefore, by definition the Plans are not limited to a select group.

Second, defendants' "actual satisfaction" test completely disregards the Demery case wherein the Second Circuit specifically focused on the individuals to whom the plan was *offered* as opposed to who actually participated in the plan in determining the size of the "select group." Demery v. Extebank Deferred Comp. Plan (B), 216 F.3d 283, 285 (2d Cir. 2000). Notably, defendants ignore this key aspect of Demery in their papers and instead spend pages erroneously arguing that Darden v. Nationwide Mut. Ins. Co., 717 F. Supp. 388 (E.D.N.C. 1989) is the only case which supports Dr. Alexander's position. Yet, the holding in Darden – that employees who *may become eligible* for benefits must be included in defining the "select group" – is further supported by Simpson v. Ernst & Young (cited by Dr. Alexander's initial brief at p. 16). In Simpson, the Court held that one need not be "presently eligible" for benefits to be a "participant" under ERISA:

> Thus, an ERISA plan participant <u>does not have to be presently eligible</u> to receive plan benefits. The fact that Simpson had not yet attained the age or years of service requirements does not mean that he was not a participant. To hold otherwise would limit ERISA protection only to those who have already vested or have obtained nonforfeitable rights to pension benefits.

Simpson v. Ernst & Young, 879 F. Supp. 802, 816 (S.D. Ohio 1994).

Third, the cases cited by defendants at p. 14 of the Cross-Motion do not stand for the proposition that only those employees who actually satisfy eligibility criteria are counted in defining the "select group." In fact, none of defendants' cases even address the issue of potential versus actual participation as a factor in defining the "select group." See e.g. Belka v. Rowe Furniture Corp., 571 F. Supp. 1249, 1252 (D. Md. 1983) (discussing percentage of workforce "covered" by deferred compensation agreement with no reference to actual contributions in plans).

Moreover, all of the cases relied upon by defendants are factually distinguishable from this case. For example, in both Duggan v. Hobbs and In re Battram, plaintiff was the *only employee* ever to enter into agreements with the defendant for retirement benefits in settlement of a dispute. Duggan v. Hobbs, 99 F.3d 307, 309 (9th Cir. 1996) (severance agreement); In re Battram, 214 B.R. 621, 625 (C.D.Cal. 1997) ("Disability Agreement and General and Special Release"). Based on that fact, coupled with each plaintiff's obvious ability to influence the design and operation of the agreements, the Courts in those two cases had no trouble determining that *one employee* constituted a "select group." Duggan, 99 F.3d at 312-13; In re Battram, 214 B.R. at 325-26. In this case, the Court is faced with the opposite scenario: a compensation policy that covers all surgeons employed by the BSG.

Likewise, the Gallione case is distinguishable. There, the Second Circuit held that a supplemental pension plan which *limited* participation in the plan to a union's full-time officers - - whom the Court found to be the "upper echelon of Union management" -- was a valid top hat plan. Gallione, 70 F.3d at 725. Here, the Plans fail to limit participation to upper echelon's of management and instead permit participation by all surgeons whose salary exceeds the Harvard ceiling.

Defendants' reliance on Carrabba, moreover, is misplaced because the pension plan in that case differed from the Plans here in several respects, including that (i) employees could *elect* to become participants in the plan and had a *choice* concerning the portion of his or her annual compensation that would be deferred; (ii) the employer annually *invited* certain employees to become participants in the plan; (iii) there were "a significant number of persons eligible to participate who did not actually participate"; and (iv) persons who did not meet newly adopted eligibility criteria were "grandfathered" into the plan. Carrabba v. Randalls Food Markets Inc., 38 F. Supp.2d 468, 471-78 (N.D.Tex. 1999) (pension plan was not a valid top hat plan). In contrast, participation in the Plans in this case is *mandatory*. Once an employee reaches the salary ceiling, contributions to the Plans are mandated.

In short, the cases relied upon by defendants do not undermine Dr. Alexander's position that *potential* participation is the relevant inquiry in analyzing the "select group" requirement.

## II. The Internal Revenue Code's Treatment of Qualified Plans Offers No Relevant Guidance in Determining the Issue Presented

Due to the admitted lack of regulatory guidance for interpretation of top hat plans, defendants urge the Court to look to the IRC's treatment of "qualified plans" to decide who are "participants" in the FRBP and UDC in this case. (See Cross-Motion at 12-14). To this end, defendants assert that the IRC and Treasury Regulations include only employees who "receive a contribution allocation or a benefit accrual" or "those who are eligible to defer compensation but have chosen not to do so" as "participants" under the IRC's tests for minimum coverage and minimum participation. (Cross-Motion at 12-13). As the treatise cited by defendants recognizes, however, the IRC carves out exceptions to this general rule for "[e]mployees who have the age and service to begin participation in contributory plans, but who have *not* made the employee

contributions required for participation . . ." STEVEN R. BRUCE, PENSION CLAIMS: RIGHTS AND OBLIGATIONS 26 n.2 (2d ed.) (BNA 1993) (emphasis in original). The IRC, therefore, permits individuals to be included as "participants" even if they have not actually received a contribution or accrual but have satisfied other statutory criteria, which reinforces Dr. Alexander's position.

Defendants also take the liberty of substituting the critical word in a quote from the Department of Labor's 90-14A Opinion Letter ("90-14A Letter") in support of its argument that the Court should look to the Internal Revenue Service for guidance in deciding this case. The issue presented in 90-14A Letter was whether a top hat plan was "unfunded" -- an issue not before the Court here. In opining on the "unfunded" issue, the DOL stated that "positions adopted by the [Internal Revenue] Service with respect to deferred compensation arrangements should be accorded weight in determining whether a 'top hat' plan is '**unfunded**' for purposes of Title I." DOL 90-14A Letter. (emphasis added). Defendants substituted the word "unfunded" with "bona fides" in their brief. (Cross-Motion at 13). This distinction is significant, however, because several commentators have noted that the IRC is not instructive in analyzing top hat status criteria such as whether employees are "highly compensated."

In particular, "Treasury Department officials have indicated that the [IRC] section 414(g) definition of 'highly compensated employee' for qualified retirement plan purposes **should not be relied upon, as it is overly broad for purposes of satisfying the policy goals underlying top-hat plans.**" Barry J. Bidjarano, Coping with the Reduced Limitation On "Compensation" Used Under Qualified Retirement Plans, 68 St. John's L. Rev. 357, 388 (1994). See also Kathryn J. Kennedy, A Primer on the Taxation of Executive Deferred Compensation Plans, 35 J. Marshall L. Rev. 487, 501 (2002) ("It appears that the Code's definitions of "key employees" and/or "highly compensated employees" (used for qualified plan purposes) are not necessarily

applicable in determining ERISA's top hat group."); Peter J. Weidenbeck, ERISA's Curious Coverage, 76 Wash. U. L. Q. 311, 344 (1998) ("Some practitioners have assumed that satisfaction of the tax law's quantitative definition of the term 'highly compensated employee' suffices for top hat status, but that definition serves other purposes.").[2]

### III. The UDC's Primary Purpose Is Not Deferred Compensation

In attempting to rebut the argument that the primary purpose of the Plans is to comply with Harvard's salary cap, defendants contend that there is no evidence regarding the salary cap's "origin or purpose." (Cross-Motion at 6). The origin or purpose of the salary cap is irrelevant. Rather, the mere existence of the Harvard salary cap is material because it shows that all compensation paid to BSG surgeons must comply with the cap. The Compensation Policy is replete with references to the Harvard cap on this point. (See e.g. all compensation paid to BSG surgeons must comply with "the provisions and limitations set forth in the Harvard System of Titles . . ." (Compensation Policy p. 1); "the NPI that is excess after full **Harvard ceiling** . . . will be credited to the Group's [FRBP] for eligible members up to the full **Harvard ceiling** for retirement plans of 25% of Total salary . . . (Compensation Policy at ¶ 5); "the amount credited to a UDC allocation for a given year shall not exceed 75% of full **Harvard ceiling**." (Compensation Policy at ¶ 6)).[3] It is evident from the Compensation Policy itself that the **primary** purpose of the Plans is to comply with Harvard's salary cap and not to provide deferred compensation. Accordingly, the Plans are not valid top hat plans.

---

[2] The court in Belka did not apply the IRC standard on "highly compensated employees" exclusively to determine whether the plan in that case met top hat status. Rather, the Belka court enumerated several possible tests in addition to the IRC standard in deciding that the employees were "highly compensated." Belka, 571 F. Supp. at 1253-54 (noting "suggested analyses [in law review article] included a 'facts and circumstances' test, a straight-dollar approach, a functional and dollar test, a percentage test, a percentage test with a dollar floor, and a densest mass test").

[3] The Compensation Policy is attached as Exhibit A to the Agreed Facts submitted by the parties.

Quoting only the FRBP, moreover, defendants contend that the "Plans' language makes plain . . . their primary purpose." (Cross-Motion at 5). However, only the FRBP -- and not the UDC -- contains language that tracks ERISA's definition of a top-hat plan. (FRBP § 5.02, attached as Ex. C to Agreed Facts). Notably, the UDC is silent as to its purpose, providing further evidence that both Plans' principal purpose was the Harvard ceiling rather than deferred compensation, notwithstanding the self-serving language in one of the Plans.

### CONCLUSION

For all of the above reasons, and for the reasons set forth in Dr. Alexander's initial summary judgment papers, this Court should enter summary judgment in Dr. Alexander's favor with respect to Count IX and Count XII of his Complaint, and deny defendants' cross-motion for summary judgment.

Respectfully submitted,

EBEN ALEXANDER, III, M.D.

By his attorneys,

Michael Paris (BBO #556791)
Colleen C. Cook (BBO#636359)
NYSTROM BECKMAN & PARIS LLP
10 St. James Avenue, 16th Floor
Boston, Massachusetts 02116
(617) 778-9100
(617) 778-9110 (fax)

Dated: June 9, 2005

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the above document was served upon all counsel of record by hand on June 9, 2005.

_____
Colleen C. Cook