UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                    )
EBEN ALEXANDER, III, M.D.           )
                                    )
         Plaintiff,                 )   Case No. 04-10738-MLW
                                    )
    v.                              )
                                    )
BRIGHAM AND WOMEN'S PHYSICIANS      )
  ORGANIZATION, INC., successor to  )
  Brigham Surgical Group Foundation, Inc., )
  BOSTON NEUROSURGICAL FOUNDATION )
  INC., BRIGHAM SURGICAL GROUP      )
  FOUNDATION, INC. DEFERRED         )
  COMPENSATION PLAN, BRIGHAM        )
  SURGICAL GROUP FOUNDATION, INC.   )
  FACULTY RETIREMENT BENEFIT        )
  PLAN, COMMITTEE ON COMPENSATION   )
  OF THE BRIGHAM SURGICAL GROUP     )
  FOUNDATION, INC., and             )
  PETER BLACK, M.D.                 )
                                    )
         Defendants.                )
_____)

## JOINT PRETRIAL MEMORANDUM

Pursuant to LR 16.5(D) and the pretrial conference scheduled for September 7, 2006, the parties respectfully submit this Joint Pretrial Memorandum, which they reserve the right to supplement or modify prior to trial.

**(1)    Concise Summary of the Evidence**

**Plaintiff**

Plaintiff expects the evidence at trial to show the following: In 1988, Dr. Eben Alexander was hired as a neurosurgeon by the Brigham Surgical Group Foundation, Inc. ("BSG"), predecessor to defendant Brigham and Women's Physician's Organization, Inc.

("BWPO"). After 13 years of employment, the BWPO terminated Dr. Alexander in April 2001 and took from him $441,887 in pension funds that Dr. Alexander had earned and accrued in two separate deferred compensation plans, the Faculty Retirement Benefit Plan ("FRBP") and the Unfunded Deferred Compensation plan ("UDC"). More specifically, on or about April 23, 2001, the BWPO offset a practice deficit that had been assessed to Dr. Alexander by reducing Dr. Alexander's UDC account by $251,887.16 and his FRBP account by $190,000.

The evidence will show that the BWPO had no right to offset the practice deficit assessed to Dr. Alexander because the UDC and FRBP are not valid "top hat" plans under ERISA, and therefore, the funds were vested. In particular, the evidence will show that the plans were not restricted to a "select group of management or highly compensated employees" within the meaning of 29 U.S.C. §§ 1051(2), 1081(a)(3) and 1101(a)(1). Instead, the plans were a mandatory component of the BSG surgeons' compensation scheme and, therefore, covered approximately thirty (30) percent of all BSG employees, which is quantitatively too large to satisfy the "select group" requirement to qualify for "top hat" status.

In addition, the evidence will show that the primary purpose of the UDC and FRBP was not to provide deferred compensation -- an essential requirement for top hat status -- but rather to comply with Harvard Medical School's limitations on salary for BSG surgeons. In years in which a physician's net practice income exceeds Harvard compensation limits, contributions are made into the UDC and FRBP. And in years in which net practice income falls below the level in prior years, contributions are not made and the physician must repay the practice. Moreover, the compensation policy permits the UDC assets to be used to pay current salary when usual compensation falls below the Harvard ceiling. The FRBP can also be offset to repay the BSG for loans, including home loans secured by a mortgage. Thus, the UDC and FRBP were not

- 2 -

designed primarily to provide deferred compensation, but rather to balance the fluctuating finances of a medical practice with the requirements of Harvard's limits on current annual compensation.

The evidence will further show that an underlying policy reason for the top-hat exception -- that certain employees do not require all of the substantive protections afforded by ERISA because they have the ability to bargain for themselves -- is absent in this case. Indeed, the evidence will show that Dr. Alexander had no real opportunity to negotiate the terms of his deferred compensation.

In short, the evidence will show that the UDC and FRBP do not qualify for "top hat" status, and the BWPO had no right to any of Dr. Alexander's pension funds. Accordingly, Dr. Alexander is entitled to return of the funds taken from his UDC and FRBP accounts, plus lost earnings on those funds, interest, and attorneys' fees.

### **Defendants**

Defendants will present evidence that proves the following:

1. In design and effect, the primary purpose of the UDC and FRBP was to provide deferred compensation to plan participants;

2. The highly compensated surgeons who participated in the UDC and FRBP had – and exercised – the ability to influence the terms and operation of the plans; and

3. Through the plans, BSG provided deferred compensation to a select group of highly compensated employees only.

*The Origin of BSG's Physician Compensation Program and the Unfunded Deferred Compensation Plan.*

In the late 1970s, a cardiac surgeon threatened to leave BSG because he was not satisfied with its compensation program. To retain this surgeon and others like him, and to improve its overall operation, the BSG instituted a performance-based compensation system. It rewarded the

group's physicians for the "net practice income" ("NPI") generated by each.  In the same vein, the BSG also implemented the UDC.  It allowed the group's most profitable surgeons to defer a portion of their NPI which BSG otherwise would have retained.  Subsequently, the FRBP was created in response to the Tax Reform Act of 1986, which limited the amount of contributions individuals could make to qualified retirement plans.  Like the UDC, BSG designed the FRBP to allow its most profitable surgeons to retain as deferred compensation a portion of their NPI that otherwise belonged to the Group.

To become eligible to participate in the UDC and FRBP, a BSG employee had to (1) be a surgeon; (2) be a full-time member of the Harvard Medical School faculty; and (3) generate NPI in excess of the Harvard salary cap.  These criteria resulted in a very small number of BSG employees becoming eligible to participate in the plans:  during 1997 – 1999, no more than 7.1 % of BSG employees qualified.

As set forth in the plan documents, a plan participant could receive his FRBP or UDC contributions upon retirement or death only.  Further, during the relevant time period, 1997-1999, almost <u>all</u> of the money contributed to the UDC and FRBP was used for deferred compensation only.

### *Physician Compensation at Academic Medical Centers Generally.*

Stephen Sadowski, defendants' expert witness, will testify that BSG's compensation system is similar to those at other academic medical centers, which typically are non-profit institutions with teaching and research as their charitable missions.  Mr. Sadowski, who advises both academic medical centers and individuals physicians on compensation issues, will testify that highly profitable physicians have significant bargaining power.  As a result, academic medical centers typically institute physician compensation programs that (1) provide a means of

recruiting and retaining talented physicians; while also (2) encouraging them to generate clinical revenue and to spend time conducting research, publishing articles and teaching.

Mr. Sadowski will explain that non-qualified deferred compensation plans are an important component of physician compensation because IRS anti-discrimination rules and annual contribution limits restrict how much money highly compensated employees can contribute to traditional qualified retirement plans, such as 401(k) or 403(b) plans. Thus, academic medical centers and physician practice groups implement non-qualified deferred compensation plans to provide highly compensated physicians with a means to supplement their retirement funds and to maximize after-tax compensation. In addition, because "top hat" plans are subject to forfeiture, they help motivate and retain profitable physicians by aligning their economic interests with the group's long-term financial success. The BSG designed the UDC and FRBP with the specific purpose of retaining and providing supplemental retirement funding to the Group's most profitable surgeons.

### *BSG Members' Ability to Affect Change in their Compensation Program.*

As set forth in its Bylaws, BSG operated through a representative system governed by its Board of Directors. All BSG Members had the opportunity to run for election to the Board and to vote to elect its members. The President of BSG selected six Members of the Board to serve on the Executive Committee. BSG also had a Committee on Compensation composed of the President, three Outside Directors and a non-voting Member.

As demonstrated by BSG's meeting minutes and the testimony of Dr. Mannick and Mr. Holmes, BSG Members could propose changes to the UDC and FRBP at any time merely by communicating with a member of the Board of Directors. The Board of Directors could consider any such proposed changes and, if approved, refer them to the physicians on the Executive

Committee. Any changes endorsed by the Executive Committee were then submitted to the Committee on Compensation for final approval.

On several occasions, the Board of Directors, Executive Committee and Committee on Compensation implemented changes to the UDC and FRBP that had been proposed by individual BSG Members. More specifically,

- In 1989 or 1990, a Member successfully proposed revising the eligibility criteria for the UDC so that all academic ranks would be eligible to participate therein. At the time, the only Members who were eligible to participate in the UDC were those who held the rank of Associate Professor and above.

- In 1991, a physician successfully requested that Members be allowed to use FRBP dollars to fund research projects.

- In 1992, Members successfully proposed the following changes to the UDC and FRBP: (i) Members hired after October 31, 1992 at the rank of Instructor or Assistant Professor would not be eligible to participate in the UDC and FRBP during their first full three years of employment; (ii) Members holding the position of Instructor would no longer be eligible to participate in the UDC effective July 1, 1994; and (iii) Members hired before October 31, 1992 would not be affected by these eligibility limitations for the UDC.

**(2)** **The Facts Established by Pleadings or by Stipulations or Admissions of Counsel**

(a) Plaintiff, Eben Alexander, III, M.D. ("Dr. Alexander") was employed by the Brigham Surgical Group Foundation, Inc. ("BSG") from 1988 to 2000. As of January 2001, Brigham & Women's Physician's Organization ("BWPO") became the successor in interest to the BSG and Dr. Alexander's employer until he was terminated on April 13, 2001.

(b) BSG was and BWPO is a non-profit, tax-exempt corporation.

(c) The BSG Professional Compensation Policy set forth the compensation scheme for BSG professional staff, including Dr. Alexander.

(d) Throughout Dr. Alexander's employment, the BSG maintained two unfunded deferred compensation plans, the Unfunded Deferred Compensation plan ("UDC") and the

Faculty Retirement Benefit Plan ("FRBP") (collectively, the "Plans").

(e) The UDC and FRBP were deferred compensation vehicles for BSG surgeons who generated a net practice income ("NPI") in excess of Harvard Medical School's salary cap. As such, they served as a valuable means of recruiting and retaining talented physicians.

(f) The UDC and FRBP were not the sole means of retirement funding for BSG physicians; BSG also offered 401(a) retirement funds to all qualified employees.

(g) For the year 1997, BSG had 241 employees, which consisted of 157 non-professional staff and 84 professional staff.

(h) For the year 1998, BSG had 274 employees, which consisted of 180 non-professional staff and 94 professional staff.

(i) For the year 1999, BSG had 324 employees, which consisted of 224 non-professional staff and 100 professional staff.

(j) From 1997 through 1999, BSG professional staff consisted primarily of surgeons. In 1997, 78 surgeons in the BSG were members of the full-time faculty of the Harvard Medical School. In 1998, 84 surgeons in the BSG were members of the full-time faculty of the Harvard Medical School. In 1999, 88 surgeons in the BSG were members of the full-time faculty of the Harvard Medical School.

(k) From 1997 through 1999, BSG non-professional staff included, among others, the following positions: billing specialists, billing supervisors, coders, coding supervisors, coding and reimbursement managers, internal reviewers, billing managers, accounts payable clerks, payroll accountants, accountants, financial analysts, finance managers, chief financial officers, human resources generalists, human resources managers, receptionists/secretaries, physician assistants, division administrators, RN/nurse practitioners, operations managers, research

- 7 -

assistants, information systems analysts, programmers, networking specialists, information systems managers, and administrators.

(l) For the year 1999, BSG professional staff compensation ranged from $22,000 to $665,169 while BSG non-professional staff compensation ranged from $700 to $169,143. For the year 1998, BSG professional staff compensation ranged from $28,599 to $1,397,567 while BSG non-professional staff compensation ranged from $84 to $142,058. For the year 1997, BSG professional staff compensation ranged from $39,305 to $1,499,807 while BSG non-professional staff compensation ranged from $119 to $109,587.

(m) Pursuant to Section 1.02 of the UDC and Section 2.01 of the FRBP, compensation was deferred to the UDC or FRBP only if a physician was employed by the BSG, a member of the full-time faculty of the Harvard Medical School and generated an NPI in excess of the Harvard Medical School salary ceiling.

(n) Pursuant to the Compensation Policy, NPI was calculated annually by "finding the difference between the income resulting from BSG Member OR-TEACHING activity and Member expenses" during the academic year. "Member expenses" included all direct and allocated expenses incurred by or on behalf of the Member involved plus a Departmental Charge equal to a percentage of Net Receipts attributable to the Member's OR-TEACHING activities during the academic year.

(o) If a physician generated NPI in excess of the Harvard salary cap, an amount equal to 25% of the physician's total salary less any qualified pension amounts would be credited to the FRBP. If any NPI remained, certain pension plan contributions would be deducted, and 50% of the remainder would be credited to the UDC.

(p) For the year 1997, compensation was deferred into either the FRBP or the UDC, or

both Plans, for 16 out of BSG's 241 employees.

(q)     For the year 1998, compensation was deferred into either the FRBP or the UDC, or both Plans, for 14 out of BSG's 274 employees.

(r)     For the year 1999, compensation was deferred into either the FRBP or the UDC, or both Plans, for 15 out of BSG's 324 employees.

(s)     All of the employees for whom compensation was deferred, as noted in paragraphs 16-18, were BSG physicians and full-time members of the Harvard Medical School faculty whose NPI exceeded the Harvard salary cap.

(t)     The BWPO (BSG's successor) terminated Dr. Alexander on April 13, 2001, effective at the close of business on July 13, 2001. The BWPO also notified Dr. Alexander on April 13, 2001 that the practice deficit assessed to Dr. Alexander would be offset by amounts in his UDC and FRBP accounts.

(u)     On or about April 23, 2001, the BWPO offset the practice deficit that had been assessed to Dr. Alexander by reducing Dr. Alexander's UDC account by $251,887.16 and his FRBP account by $190,000.

(v)     The average compensation of employees who received contributions to the UDC plan account during fiscal year 1997 was $503,730.

(w)     The average compensation of employees who received contributions to the UDC plan account during fiscal year 1998 was $581,320.

(x)     The average compensation of employees who received contributions to the UDC plan account during fiscal year 1999 was $483,073.

(y)     The average compensation of employees who received contributions to the FRBP plan account during fiscal year 1997 was $434,840.

(z) The average compensation of employees who received contributions to the FRBP plan account during fiscal year 1998 was $476,024.

(aa) The average compensation of employees who received contributions to the FRBP plan account during fiscal year 1999 was $418,059.

(bb) The average compensation of all Brigham Surgical Group Foundation, Inc. ("BSG") employees for fiscal year 1997 was $83,403.

(cc) The average compensation of all BSG employees for fiscal year 1998 was $80,491.

(dd) The average compensation of all BSG employees for fiscal year 1999 was $74,376.

(ee) During fiscal year 1997, fourteen (14) BSG employees contributed to the UDC plan account, comprising 5.8% of the total employee population. The names of those employees are as follows: David H. Adams, MD; Eben Alexander, III, MD; Sary F. Aranki, MD; Peter M. Black, MD, PhD; David C. Brooks, MD; Lawrence H. Cohn, MD; John J. Collins, Jr., MD; Gregory S. Couper, MD; Magruder C. Donaldson, MD; Francis D. Moore, Jr., MD; Dennis P. Orgill, MD; Robert J. Rizzo, MD; Philip E. Stieg, MD; and David J. Sugarbaker, MD.

(ff) During the fiscal year 1998, nine (9) BSG employees contributed to the UDC plan account, comprising 3.3% of the total employee population. The names of those employees are as follows: David H. Adams, MD; Sary F. Aranki, MD; Lawrence H. Cohn, MD; Gregory S. Couper, MD; Magruder C. Donaldson, MD; Francis D. Moore, Jr., MD; Julian J. Pribaz, MD; Robert J. Rizzo, MD; and David J. Sugarbaker, MD.

(gg) During the fiscal year 1999, ten (10) BSG employees contributed to a UDC account, comprising 3.1% of the total employee population. The names of those employees are as follows: David H. Adams, MD; Sary F. Aranki, MD; Lawrence H. Cohn, MD; Gregory S. Couper, MD; Magruder C. Donaldson, MD; Elof Eriksson, MD, PhD; Robert J. Rizzo, MD;

David J. Sugarbaker, MD; Scott J. Swanson, MD; and Eric J. Woodward, MD.

(hh)     During the fiscal year 1997, twenty-one (21) BSG employees contributed to an FRBP account, comprising 8.7% of the total employee population.  The names of those employees are as follows:  David H. Adams, MD; Eben Alexander, III, MD; Sary F. Aranki, MD; Stanley Ashley, MD; Richard Bartlett, MD; Peter M. Black, MD, PhD; David C. Brooks, MD; Lawrence H. Cohn, MD; John J. Collins, Jr., MD; Gregory S. Couper, MD; Magruder C. Donaldson, MD; Charles A. Hergrueter, MD; Francis D. Moore, Jr., MD; Dennis P. Orgill, MD; Jerome P. Richie, MD; Robert J. Rizzo, MD; Samuel I. Singer, MD; Philip E. Stieg, MD; David J. Sugarbaker, MD; Anthony D. Whittemore, MD; and Michael J. Zinner, MD.

(ii)     During the fiscal year 1998, seventeen (17) BSG employees contributed to an FRBP account, comprising 6.2% of the total employee population.  The names of those employees are as follows:  David H. Adams, MD; Eben Alexander, III, MD; Sary F. Aranki, MD; Richard Bartlett, MD; Peter M. Black, MD, PhD; David C. Brooks, MD; Lawrence H. Cohn, MD; John J. Collins, Jr., MD; Gregory S. Couper, MD; Magruder C. Donaldson, MD; Francis D. Moore, Jr., MD; Dennis P. Orgill, MD; Julian J. Pribaz, MD; Jerome P. Richie, MD; Robert J. Rizzo, MD; Sugarbaker, MD; and Michael J. Zinner, MD.

(jj)     During the fiscal year 1999, sixteen (16) BSG employees contributed to an FRBP account, comprising 4.9% of the total employee population.  The names of those employees are as follows:  David H. Adams, MD; Sary F. Aranki, MD; Peter M. Black, MD, PhD; Lawrence H. Cohn, MD; Gregory S. Couper, MD; Magruder C. Donaldson, MD; Elof Eriksson, MD, PhD; Carolyn M. Kaelin, MD; Francis D. Moore, Jr., MD; Dennis P. Orgill, MD; Jerome P. Richie, MD; Robert J. Rizzo, MD; David J. Sugarbaker, MD; Scott J. Swanson, MD; Anthony D. Whittemore, MD; and Eric J. Woodward, MD.

**(3)** **Contested Issues of Fact**

(a) Whether the UDC and FRBP were maintained for a "select group of management or highly compensated employees"?

(b) Whether the UDC and FRBP were maintained primarily for the purpose of providing deferred compensation?

(c) Whether the BSG surgeons, including Dr. Alexander, by virtue of their position or compensation level, had the ability to affect or substantially influence, through negotiation or otherwise, the design and operation of their deferred compensation plans?

**(4)** **Jurisdictional Questions**

None at this time.

**(5)** **Questions Raised by Pending Motions**

None at this time.

**(6)** **Issues of Law**

**Plaintiff**

The issue of law to be decided by the Court at trial is whether the UDC and/or FRBP qualify as "top hat" plans under ERISA. Plaintiff will demonstrate at trial that under the extant authority, the plans were offered to too large a group who lacked bargaining power. See e.g., Demery v. Extebank Deferred Comp. Plan (B), 216 F.3d 283, 289 (2d Cir. 2000) (15.34% of workforce covered by plan was "upper limit" for valid top hat plan); Darden v. Nationwide Mut. Ins. Co., 717 F. Supp. 388, 396-97 (E.D.N.C. 1989) (18.7%, or one-fifth, of workforce covered by plan too large for top hat status), *aff'd,* 922 F.2d 203 (4th Cir. 1991), *rev'd on other grounds*, 503 U.S. 318 (1992); Guiragos v. Khoury, 2006 WL 2347396 *10 (E.D.Va. 2006) (plan failed to meet "top hat" requirements where plan was not offered to select group and plaintiff lacked

power to negotiate).

### Defendants

#### A. "Primary Purpose" Under ERISA Refers to the Benefits Provided by a Plan.

The Department of Labor has explained that, "the term primarily, as used in the phrase 'primarily for the purpose of providing deferred compensation for a select group of management or highly compensated employees[,]' refers to the purpose of the plan (*i.e. the benefits provided*)." Dep't of Labor Opinion Letter 90-14A, 1990 ERISA LEXIS 12 (emphasis added). Thus, to determine whether a plan is maintained primarily for the purpose of providing deferred compensation for a select group of management or highly compensated employees, courts examine (1) how the plan is administered, and (2) what benefits are provided. *Id.*; *see also Violette v. Ajilon Finance*, 2005 WL 2416986, at * 5 (D.N.J. 2005); *Virta v. DeSantis Enterp., Inc.*, 1996 WL 663970, at * 3 (N.D.N.Y. 1996) ("the issue at hand is . . . whether the plan was *administered in a manner* designed to provide benefits for a select group of management or highly compensated employees.") (emphasis added).

#### B. A Bona Fide Top Hat Plan Can Have "Multiple Broad Purposes."

As a matter of law, a *bona fide* top hat plan can serve more than one purpose. Such plans typically further an employer's interest in retaining or rewarding valuable employees. *See, e.g., Eastman Kodak v. STWP*, 2006 U.S. Dist. LEXIS 16079 (5th Cir. 2006); *Demery v. Extebank Deferred Compensation Plan,* 216 F.3d 283 (2d Cir. 2000); *see also Garratt v. Knowles*, 245 F.3d 941, 946 n.4 (7th Cir. 2001) ("In terms of design, the difference between a top hat plan and an excess benefit plan is, in most circumstances, that the top hat plan *can have multiple broad purposes*, while an excess benefit plan has the sole purpose of avoiding the limitations imposed by § 415 of the Internal Revenue Code."); *Isko v. Engelhard Corp.,* 367 F. Supp. 2d 702, 708-09

(D.N.J. 2005) (same); *In re Battram*, 214 B.R. 621, 625 (Bankr. C.D. Cal. 1997) ("a top hat plan need only be primarily for the purpose of providing deferred compensation, not exclusively for that purpose.").

      **C.**    **Top Hat Plan Participants Generally Are Able to Influence the Design or Operation of Their Deferred Compensation Plans, But the Employer Need Not Show that They Have Done So.**

The Department of Labor has noted that management or highly compensated employees typically are "in a strong bargaining position relative to their employers," thus, they do not need ERISA's substantive protections. *See* Dep't of Labor Opinion Letter 90-14A, 1990 LEXIS 12 (May 8, 1990). The DOL advisory speaks broadly in terms of these employees' "<u>ability</u> to affect . . . through negotiation or otherwise . . . the design and operation" of such plans. Dep't of Labor Opinion Letter 92-13A n.1, 1992 ERISA LEXIS 14 (May 19, 1992) (emphasis added); *see also Duggan v. Hobbs*, 99 F.3d 307, 312-13 (9th Cir. 1996) (same). It says nothing about <u>requiring</u> plan administrators to show that the affected employees actually wielded such power, or did so to any specific end. *See Demery*, 216 F.3d at 290 (focus is on the "absence of bargaining power").

      **D.**    **Only Those Employees Who Become Eligible to Participate in a Plan Count as "Participants."**

To determine whether a top hat plan satisfies the "select group" criteria, courts examine the percentage of the total workforce that participated in the plan. *See, e.g., Demery*, 216 F.3d at 287-88; *Gallione v. Flaherty*, 70 F.3d 724, 728 (2d Cir. 1995); *Belka*, 571 F. Supp. at 1252-53; *In re the IT Group, Inc.*, 205 B.R. at 411. All courts but one count as "participants" only those employees who satisfied all plan eligibility criteria, or who actually participated in a plan, in determining whether it satisfies the "select group" requirement. *See, e.g., Duggan*, 99 F.3d at 310 (only employees who received benefits under plan included in top hat analysis); *Gallione*,

70 F.3d at 728 (only employees eligible to participate in plan included in top hat analysis); *Carrabba v. Randall's Food Markets, Inc.*, 38 F. Supp. 2d 468, 473 (N.D. Tex. 1999) (court considered only those employees to whom participation in the plan was available "***in actual operation of the plan***") (emphasis added); *Belka*, 571 F. Supp. at 1252 (only employees party to deferred compensation agreement and entitled to receive benefits thereunder included in top hat analysis); *In re Battram*, 214 B.R. at 625; *cf.* Dep't of Labor Opinion Letter 90-14A, 1990 ERISA LEXIS 12 (top hat plan must "limit[] ***participation*** to a select group of management or highly compensated employees") (emphasis added).

This approach comports with that used by the Internal Revenue Service in the qualified plan context. The I.R.S. includes as "participants" only those employees who have satisfied all eligibility criteria, or who are actively participating in a plan, in assessing a plan's annual coverage test under I.R.C. § 410(b), and the minimum participation test under I.R.C. § 401(a)(26).

**(7)** **Requested Amendments to the Pleadings**

None at this time.

**(8)** **Additional Matters to Aid in the Disposition of the Action**

None at this time.

**(9)** **Probable Length of Trial**

The parties expect the trial to last two days.

**(10)** **Witnesses to be Called at Trial**

**Plaintiff**

Plaintiff may call the following witnesses at trial:

Dr. Eben Alexander

Dr. Eric Woodard, New England Baptist Hospital, Boston, Massachusetts, 617-754-6576

(*Expert witness*) Professor Norman Stein, 1600 Forest Lake Drive, Tuscaloosa, Alabama, 205-348-1136

All witnesses listed by Defendants.

Plaintiff reserves the right to identify additional witnesses prior to trial and call rebuttal witnesses.

**Defendants**

Defendants may call the following witnesses at trial:

Dr. John Mannick, Brigham and Women's Hospital, Boston, Massachusetts, 617-723-6820

Mr. Kenneth Holmes, Massachusetts Ear and Eye Infirmary Associates, Inc., Boston, Massachusetts, 617-573-6950

Mr. Michael Jackson, Brigham and Women's Physicians Organization, Inc., Boston, Massachusetts, 617-713-2232

(*Expert Witness*) Mr. Stephen Sadowski*,* ECG Management Consultants, Inc., Boston, Massachusetts, 617-227-0100

All witnesses listed by Plaintiff.

Defendants also reserve the right to identify additional witnesses prior to trial and to call rebuttal witnesses.

**(11)   Proposed Exhibits**

Exhibit A is a preliminary list of proposed exhibits. The parties will continue to cooperate in formulating a complete exhibit list and will submit an updated proposed exhibit list prior to trial. The parties reserve their right to amend and/or supplement the exhibit list prior to trial and their right to object to any of the proposed exhibits.

**(12)   Objections to the Evidence**

**Plaintiff**

A.   On July 19, 2006, defendants produced for the first time different versions of the UDC and FRBP and contended that the versions previously submitted to the Court by stipulation

- 16 -

were not the versions in effect from 1997 through 1999.  Plaintiff objects to the use of the versions of plans recently produced by defendants on several grounds, including: (i) the parties previously stipulated to the applicable versions of the UDC and FRBP and have relied upon those versions throughout this entire litigation; (ii) the production of the "new" versions is untimely; (iii) there is no evidence that the "new" versions were implemented; and (iv) the "new" versions are inconsistent with other documentary evidence produced by defendants, including, by way of example, the Affidavit of Kenneth Holmes dated December 16, 2005.

      B.     Plaintiff objects to the testimony of defendants' expert witness, Mr. Stephen Sadowski, on relevancy grounds to the extent that Mr. Sadowski's proffered testimony is too broad and vague, and not specific to the circumstances which existed at the BSG and Harvard Medical School during the relevant time period.  Plaintiff also objects to Mr. Sadowski's qualifications to testify as an expert in this matter.  Plaintiff intends to file a motion in limine to strike Mr. Sadowski's testimony.

**<u>Defendants</u>**

Defendants object to the testimony of plaintiff's proffered expert witness, Norman Stein, for two reasons.  First, Mr. Stein does not qualify as an expert with regard to top hat plans; he conceded in deposition that he has never studied or written about top hat plans.  Second, expert testimony concerning the law is neither appropriate nor warranted in this matter.  Defendants plan to file a motion in limine to exclude Mr. Stein's testimony in advance of trial.

| | Respectfully submitted, |
|---|---|
| Plaintiff, | Defendants, |
| By his attorneys, | By their attorneys, |
| /s/ Colleen C. Cook | /s/ Laurie Drew Hubbard |
| Michael Paris (BBO No. 556791) | David C. Casey (BBO No. 077260) |
| Colleen C. Cook (BBO No. 636359) | Gregory C. Keating (BBO No. 564523) |
| NYSTROM BECKMAN & PARIS | Laurie Drew Hubbard (BBO No. 651109) |
| 10 St. James Avenue, 16th Floor | LITTLER MENDELSON, PC |
| Boston, MA, 02116 | One International Place |
| (617) 778-9100 | Boston, MA 02110 |
| | (617) 378-6000 |

Dated: August 30, 2006

Firmwide:81436453.1 047950.1002

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non registered participants on this 30th day of August, 2006.

/s/ Colleen C. Cook