```
                                    Volume:    I
                                    Pages:     1 to 102
                                    Exhibits:  1 & 2


              UNITED STATES DISTRICT COURT
                DISTRICT OF MASSACHUSETTS

* * * * * * * * * * * * * * * * * * *
EBEN ALEXANDER, III, M.D.,
                     Plaintiff,
     vs.                              Civil Action
                                      No. 04-10738-MLW
BRIGHAM AND WOMEN'S PHYSICIANS
ORGANIZATION, INC., successor to
Brigham Surgical Group Foundation,
Inc., BOSTON NEUROSURGICAL FOUNDATION,
INC., BRIGHAM SURGICAL GROUP FOUNDATION,
INC. DEFERRED COMPENSATION PLAN,
BRIGHAM SURGICAL GROUP FOUNDATION, INC.
FACULTY RETIREMENT BENEFIT PLAN, COMMITTEE ON
COMPENSATION OF THE BRIGHAM SURGICAL GROUP
FOUNDATION, INC., and PETER BLACK, M.D.,
                     Defendants.
* * * * * * * * * * * * * * * * * * *


          DEPOSITION OF NORMAN PHILIP STEIN, a
witness called on behalf of the Defendants, taken
pursuant to the applicable provisions of the Federal
Rules of Civil Procedure before Cynthia A. Powers,
Shorthand Reporter and Notary Public in and for the
Commonwealth of Massachusetts, at the law offices of
Littler Mendelson, P.C., One International Place, Suite
2700, Boston, Massachusetts, on Tuesday, August 22,
2006, commencing at 10:06 a.m.



                      * * * * *


                 KACZYNSKI REPORTING
              72 CHANDLER STREET, SUITE 3
              BOSTON, MASSACHUSETTS 02116
                    (617) 426-6060
```

```
                                                              2

 1    APPEARANCES:

 2         NYSTROM BECKMAN & PARIS LLP
           Colleen C. Cook, Esquire
 3         10 St. James Avenue, 16th Floor
           Boston, Massachusetts 02116
 4         (617) 778-9100
           Representing the Plaintiff
 5
           LITTLER MENDELSON, P.C.
 6         David C. Casey, Esquire
           One International Place, Suite 2700
 7         Boston, Massachusetts 02110
           (617) 378-6000
 8         Representing the Defendants

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

1  automobile manufacturer. They were concerned that one
2  of their dealerships wanted to convert a 49 percent
3  employee stock ownership plan into a 100 percent
4  employee-owned stock ownership plan. They had to get
5  their consent. They were concerned about various ERISA
6  issues. They asked me to write an opinion which they
7  hoped might fend off a lawsuit, and then if there were a
8  lawsuit, they wanted to use my services in the lawsuit
9  as an expert.
10            The other was a very large mutual fund
11 company had a dispute with an employee who they had
12 fired who had accused them of various fiduciary
13 violations of ERISA, and I was going to give my opinion
14 about whether, in fact, there had been fiduciary
15 violations of ERISA.
16     Q.   Did either of those matters have anything
17 to do with top-hat plans?
18     A.   No.
19     Q.   What did you do to prepare for your
20 deposition?
21     A.   I met with Colleen. I reread the
22 documents in the case. I looked at some of the cases
23 and a few articles on top-heavy plans or that involve
24 top-heavy plans. I looked through Lexis and looked very

10

1  briefly at articles that had anything to do with top-hat
2  plans. You're talking about the preparation immediately
3  before the deposition since it was scheduled?
4      Q.   I'm talking about preparation in the
5  broadest sense that leads to any or all of your
6  testimony today.
7      A.   Well, in the broadest sense, I suppose,
8  I've talked in general terms about some of the issues
9  involved in top-heavy plans that were raised in this
10 case without talking about who the parties were with
11 friends who deal with ERISA issues.
12     Q.   Practicing lawyers?
13     A.   One was a professor and one was somebody
14 who practices law.
15     Q.   The name of the professor?
16     A.   Dana Muir.
17     Q.   I'm sorry?
18     A.   M U I R.
19     Q.   The lawyer?
20     A.   Mark Machiz.
21     Q.   Spell his last name, please.
22     A.   M A C H I Z.
23     Q.   Where is Muir located?
24     A.   She's in Michigan.

1    A.    Part of the things that I was interested
2  in that search was the way different courts ruled. That
3  was one of the things I was interested in.
4    Q.    And you found three cases that you can
5  remember by name in which courts voided top-hat plans;
6  correct?
7    A.    Yeah, mm-hmm.
8    MS. COOK:  Just take one quick second
9  with him.
10    (Counsel conferred with witness)
11  BY MR. CASEY:
12    Q.    Do you remember any other cases that you
13  found that ruled against top-hat plans in any fashion?
14    A.    I believe there were some others, but I
15  really can't remember. I wasn't that interested --
16    Q.    I'm not asking what you were interest in.
17  If you can just answer my questions, I'll get you out of
18  here sooner. Just listen to the question, answer it.
19    THE WITNESS:  Repeat it.
20    (Record read)
21    A.    Can I ask for a clarification of the
22  question?
23    Q.    Sure.
24    A.    Are you asking whether I remember details

1    is that correct?
2            MS. COOK:  Objection.
3        A.   But I can answer.  Again, I have to ask
4    for a clarification.  There are three cases that I, you
5    know, can remember in particular the sort of a fog of a
6    lot of, several other cases I looked at and I, you know,
7    either there wasn't enough analysis for the case to
8    really register, or it may just be part of a fog.  As I
9    said, I didn't sit down and really look at the cases in
10   detail before I, you know, the last few days.
11       Q.   Can you identify by name any judicial
12   decisions other than Darden, Khoury, and Carrabba that
13   ruled against the validity of top-hat plans for reasons
14   other than having to do with whether they were funded or
15   unfunded?
16       A.   No, I can't give you any of the other
17   names.
18       Q.   What court decided Khoury?
19            MS. COOK:  Objection.
20       A.   It was a district court.  I want to say,
21   I want to say -- my recollection is it was in
22   Pennsylvania, but I'm not sure.
23       Q.   What year?
24       A.   I think it was, I think it was this year.

```
 1    consideration was a top-heavy plan.
 2         Q.    A top-hat plan?
 3         A.    A top-hat plan.
 4         Q.    A valid top-hat plan?
 5         A.    Yeah.
 6         Q.    So did I understand your testimony to be
 7    that of all of the DOL decisions that you have reviewed,
 8    you have never found one that voided a top-hat plan; is
 9    that correct?
10         A.    That's correct.
11               MR. CASEY:  I'd like to have marked as
12    Exhibit No. 1 a multi-page document which contains the
13    two-page plaintiff's expert disclosure statement by
14    Ms. Cook and the expert report with attachments of
15    Norman P. Stein.
16               (Marked Exhibit 1; Plaintiff's Expert
17                Disclosure and Expert Report of Norman P.
18                Stein)
19         Q.    Do you recognize Exhibit No. 1, Professor
20    Stein?
21         A.    Yes.
22         Q.    Could you turn to page two of your
23    report?
24         A.    Mm-hmm.
```

```
 1        Q.    When did you write this article?
 2        A.    I think within the last year.  It's
 3   available online.
 4        Q.    How do I find it?
 5        A.    If you Google my name and Adams and
 6   Reese, I think you would be able to find it.  If you go
 7   to the Adams and Reese web site, they have newsletters.
 8        Q.    What, broadly speaking, did you say, if
 9   anything, about the bone fides and determining the bona
10   fides of top hat in that article?
11        A.    As I mentioned, it dealt with the tax
12   treatment of nondeferred qualified plans, so it would
13   have involved the tax treatment of top-hat plans, but
14   the article was not about top-hat plans as opposed to
15   other nonqualified deferred compensation plans.
16        Q.    So you've never written anything about
17   the analytical framework for determining whether or not
18   a top-hat plan is bona fide; correct?
19        A.    That's right.
20        Q.    And you've never made any kind of study
21   of the analytical framework for determining whether or
22   not top-hat plans are bona fide?
23        A.    Written studies?
24        Q.    Any kind of study.
```

1      A.      I would say no formal study. I'll
2 mention that I've been thinking about writing on it, but
3 that's partly -- well.
4      Q.      Would you look at page four of your
5 report, paragraph numbered four. The first sentence
6 states, and I quote, "A necessary condition for a plan
7 to be a 'top-hat' plan is that the employees who
8 participate in the plan have the ability to negotiate
9 for adequate security of benefits and other
10 protections." Have I read that accurately?
11     A.      Yes, you have.
12     Q.      On what authority, and I want you to be
13 precise and inclusive, do you rely for that statement?
14     A.      An opinion of the Department of Labor,
15 the fact that a number of cases have talked about
16 that -- this is, I think, Department of Labor Opinion
17 90-14A -- the number of cases which have referred
18 favorably to that language. And though I don't believe
19 I had read the case at the time I wrote this, the Khoury
20 case talks very specifically about the importance of the
21 ability to negotiate. It also conforms to my general
22 understanding of why Congress would have created an
23 exclusion in ERISA Title I for these types of plans,
24 but, you know, the -- and to a much lesser extent, when

1   I was in practice, I guess the time I worked on a, most
2   extensively on a top-hat plan, there was considerable
3   negotiation between the employer and the employee and,
4   you know, I had to redraft based on those negotiations,
5   but that's much to a much lesser extent. I don't rely
6   that much on that as --
7           Q.   So if I understand your testimony
8   correctly, the entire authority for the first sentence
9   in paragraph 4 of Exhibit 1 is, first, Department of
10  Labor opinion advisory letter 90-14A; number two, some
11  judicial decisions that have referred favorably to the
12  language of 90-14A; number three, the Khoury decision;
13  and number four, your experience on one occasion in
14  private practice negotiating with an employee on behalf
15  of an employer when drafting a putative top-hat plan; is
16  that correct?
17          MS. COOK:   Objection.
18      A.  Can I answer?
19      Q.  Yes.
20          MS. COOK:   Mm-hmm.
21      A.  Not completely.  I want to, I want to
22  clarify two things.  One is the instance when I was in
23  practice.  I wouldn't say that that justifies this
24  sentence, which says "a necessary condition."  That was

1  one experience which I don't think would support in
2  itself this statement.  But the other thing I want to
3  say is I have a fair amount of experience with the
4  statute as a whole.  I'm probably one of the few living
5  people who actually, you know, have read virtually every
6  committee report and hearing about that that went on in
7  ERISA, and you know, I've spent a lot of time in policy
8  work working with both employer and employee groups over
9  the years, and I've had extensive contact with the major
10 authors of ERISA.  I have a strong sense from sort of my
11 general understanding of the statute and why it was
12 enacted and the history of its enactment that makes me
13 think that what the labor department wrote is as good an
14 explanation of why Congress would have exempted top-hat
15 plans from certain ERISA protections.
16            So there would be something -- I think in
17 the clarification I wanted to indicate both that I think
18 giving that example was not really responsive, but that
19 also I think my general understanding of the reasons a
20 statute was enacted and what happened with, you know,
21 since the statute was enacted, the way people have
22 thought about the statute, including people who have,
23 you know, who are very involved in creating it, all of
24 that I think encaps -- you know, when I read the labor

1  department opinion for the first time, which was, I
2  mean, many years ago, you know, it just struck me that,
3  yes, that that's as good an explanation as I could think
4  of for the exemption for these kinds of plans.
5      Q.    There's a difference, however, between
6  congressional intent, on the one hand, and the prima
7  facie showing that's required of an employer to
8  establish a plan's bona fides, isn't there?
9         MS. COOK:  Objection.
10     A.    Yes, yeah, I agree with that.
11     Q.    Is there anything in the language of 28
12 USC Section 1051, which is the subparagraph two, which
13 as you know is the exemption from top-hat plans, that
14 addresses in any respect the ability of employees to
15 negotiate with their employers as a prerequisite for
16 determining the bone fides of a top-hat plan?
17        MS. COOK:  Objection.
18     A.    I think I could have answered that
19 question before you finished it.  No.
20     Q.    There's nothing on the face of the
21 statute that requires negotiation between employer and
22 employee in order for the top-hat plan to be valid;
23 correct?
24     A.    Yes.

1   Q.   And there's nothing in the Department of
2   Labor regulations that require that an employer
3   negotiate with an employee in order to create a valid
4   top-hat plan; correct?
5   A.   I think that's interpretation.
6   Q.   Regulation?
7   A.   Oh, regulation.  No, that's right, there
8   are no regulations on these plans.
9   Q.   And there is one Department of Labor
10  opinion advisory letter of which you're aware that
11  addresses this subject; correct?
12  A.   Yes.
13  Q.   Now, not to take much time on it because
14  it is anecdotal, but the circumstances to which you
15  referred relating to your work in private practice on
16  behalf of an employer, that was a top-hat plan that was
17  being drafted for application to one employee only;
18  correct?
19  A.   Yes.
20  MR. CASEY:  I'd like to have marked as
21  Exhibit No. 2 --
22  A.   I should say and that was, you know,
23  thirty years ago, something like that.
24  MS. COOK:  Just wait for a question.

```
 1              MR. CASEY:  I don't think so.  He'll
 2   decide.
 3         Q.    In the second sentence of paragraph four
 4   of Exhibit 2 [sic.] you state, and I quote, "Neither the
 5   UDC nor the FRBP provide employees with such
 6   opportunity."  Have I read that accurately?
 7         A.    I'm not sure where you are.
 8         Q.    Second sentence.
 9         A.    Yes.
10         Q.    Paragraph four, Exhibit 1.
11         A.    Okay, yes, mm-hmm, yes, you've read that
12   accurately.
13         Q.    There's nothing in the DOL letter
14   advisory, Exhibit No. 2, that requires that employees be
15   given an opportunity to negotiate; correct?
16         A.    Yes.
17         Q.    There's nothing in the language of ERISA
18   that requires that in order for a top-hat plan to be
19   valid that employee participants have an opportunity to
20   negotiate over its terms; correct?
21         A.    In terms of literal language of the
22   statute, yes.
23         Q.    And there's nothing in any Department of
24   Labor or any other regulations that so provide or
```

1  require; correct?

2      A.   That's correct.

3      Q.   In drafting a top-hat plan one would have
4  to make it applicable to all plan participants; correct?

5      A.   No.

6           MS. COOK:  Objection.

7      Q.   Let me put it this way.  If one were
8  drafting a top-hat plan for a group of employees of a
9  particular employer, it would not be possible to draft
10 different plans for each employee of that employer,
11 would it?

12     A.   Well, yeah, it's possible.  It's also
13 possible that the plan would have, there will be an
14 umbrella plan that would have individually negotiated
15 provisions for each participant.

16     Q.   Have you ever drafted one of those?

17     A.   No.

18     Q.   Are you aware of any plans that provide
19 individualized criteria for each employee participating
20 in a top-hat plan?

21     A.   I'm certain -- I am not going to be able
22 to give you an example, but I'm certain I've seen
23 top-hat plans that have had those features and, in fact,
24 there may be some top-hat plans that are in some of the

40

1   I believe that that would have different eligibility
2   criteria in a way, and I think it would be the same
3   plan, and I think it would satisfy the select group
4   criteria.  Not having given a lot of thought to that
5   question, but I'm not sure -- you're the lawyer.  I'm
6   not sure that this is -- I think we may be talking
7   vocabulary rather than principles here.
8           Q.   In preparation for your deposition or for
9   any of your work on this case, did you read the
10  deposition testimony of Dr. Mannick?
11          A.   No.
12          Q.   Or of Ken Holmes?
13          A.   No, I didn't.
14          Q.   Did you read the deposition testimony of
15  the plaintiff, Eben Alexander?
16          A.   I don't believe I did.  Did I, Colleen?
17          Q.   Did you know that Dr. Alexander had the
18  right under the bylaws of the BSG to run, if you will,
19  for election to the board of directors?
20          A.   No, but I --
21               MS. COOK:  Objection just to the form.
22          A.   Okay, no, but I would have assumed
23  that -- I'm familiar with the way medical groups
24  operate, and that wouldn't surprise me.

1    Q.    Are you aware that member physicians of
2    the BSG could vote on the composition of the board of
3    directors?
4    A.    Again, that wouldn't surprise me, but no,
5    I wasn't aware.
6    Q.    Are you aware that members of the BSG had
7    various means, formal and informal, to communicate to
8    the decision makers who control the eligibility criteria
9    for the plans at issue in this case regarding their
10   preferences for plan design and operation?
11   MS. COOK:  Objection.
12   A.    I haven't seen minutes or anything of
13   meetings, but again, I would assume that that would be
14   the case.
15   Q.    Did you know that, in fact, the
16   eligibility criteria and the operation of the plans at
17   issue in this case did change over time as a consequence
18   of amendments and revisions to the plan that were made
19   by the governing bodies as a consequence of input from
20   physicians?
21   A.    Can I ask Colleen something?
22   Q.    Nope.
23   MS. COOK:  You have to answer.
24   A.    Before I wrote my expert report, no.  I

1  is the question -- if the question is how many plans did
2  I look at and conclude that this wasn't, that this was
3  negotiated group plans, I would say I can never tell
4  that, I haven't ever been able to tell that other than I
5  think with this plan, oh, I'm sorry, you know, including
6  this plan, from the language alone.
7       Q.   So said differently, you cannot identify
8  a top-hat plan that provided in language and in facts --
9       A.   Group top-hat plan.
10      Q.   -- group top-hat plan, the opportunity
11 for plan participants to negotiate regarding its terms;
12 correct?
13           MS. COOK:   Objection.
14      A.   Repeat the question.  I think the answer
15 is yes.
16      Q.   You cannot identify a group top-hat plan
17 that in its language or in fact provided plan
18 participants with the opportunity to negotiate over its
19 terms; correct?
20      A.   Yeah, that's what I thought you said,
21 yes.
22      Q.   That's correct?
23      A.   Yes.
24      Q.   What was it about the correspondence with

80

1   A.   When I was in the men's room, I realized
2   I remembered the name of a fourth case that actually a
3   friend of mine had litigated, Hellings [PHONETIC], I
4   think it was.  It was an Alabama case.  I think that was
5   a minor issue.  I don't think it was any serious issue
6   that it was a top-heavy plan.
7         Q.   Top-hat?
8         A.   Top-hat, yeah.
9         Q.   Answer my question.
10        A.   Yeah.
11        Q.   Of the millions of top-hat plans in
12  existence in the United States, you're aware of only
13  three or four cases that have invalidated top-hat plans
14  either because of -- I'm sorry -- that have invalidated
15  top-hat plans for any reason other than the funding
16  issue; correct?
17        A.   Yes, mm-hmm.
18        Q.   And none of them have invalidated a
19  top-hat plan because of its primary purpose; correct?
20        A.   That's right.
21        Q.   So the only cases that you're aware of in
22  this country in its history that have voided any top-hat
23  plans in circumstances that are relevant to this case
24  are three or four that found that the plans were not