**EXHIBIT A**

Stephen Sadowski

Page 1

```
 1                    Volume:  I
 2                    Pages:  1 to 84
 3         UNITED STATES DISTRICT COURT
 4           DISTRICT OF MASSACHUSETTS
 5                    C.A. NO. 04-10738-MLW
 6    ------------------------------------------
 7    EBEN ALEXANDER, III, M.D.,
 8                    Plaintiff,
 9    vs.
10    BRIGHAM AND WOMEN'S PHYSICIANS ORGANIZATION,
11    INC., successor to BRIGHAM SURGICAL GROUP
12    FOUNDATION, INC. BOSTON NEUROSURGICAL FOUNDATION,
13    INC. DEFERRED COMPENSATION PLAN, BRIGHAM
14    SURGICAL GROUP FOUNDATION, INC. FACULTY RETIREMENT
15    BENEFIT PLAN COMMITTEE ON COMPENSATION OF THE
16    BRIGHAM SURGICAL GROUP FOUNDATION, INC., and
17    PETER BLACK, M.D.,
18                    Defendants.
19    ------------------------------------------
20          DEPOSITION OF STEPHEN SADOWSKI
21       Wednesday, September 13, 2006; 2:06 p.m.
22             Nystrom Beckman & Paris, LLP
23          10 St. James Avenue, Boston, MA
24        Court Reporter:  Kathryn L. Santo
```

Stephen Sadowski

Page 10

1  salary guidelines document that you reviewed?
2      A.  I'm sorry?
3      Q.  What do you recall about the Harvard
4  salary guidelines document that you reviewed?  What
5  is it in substance?
6      A.  It was -- to the best of my recollection,
7  it was a statement of Harvard Medical School's
8  salary guidelines for faculty.  I believe it was
9  dated in the late '90s, to the best of my
10 recollection.
11     Q.  And was it a one-page document, or was it
12 a thick document?
13     A.  No.  It was a several-page document, I
14 think.  Five or six pages.
15     Q.  Have you reviewed -- have you completed
16 your answer, to the best of your knowledge?
17     A.  To the best of my knowledge, I have.
18     Q.  Okay.  Have you reviewed the expert
19 report of Professor Stein?
20     A.  I have not.
21     Q.  Could you please just briefly take me
22 through your education and employment background?
23     A.  Certainly.  To the best of my
24 recollection, I graduated from Clark University in

Page 11

1  Worcester, Mass. with a bachelor of arts in 1982.
2  I have a graduate certificate of special studies in
3  administration and management from Harvard
4  extension, and I have a masters in business
5  administration from Boston University where I
6  graduated in 1988.  My -- that's my educational
7  history.
8      Q.  What was your undergraduate degree in?
9      A.  My undergraduate degree was dual major in
10 psychology and philosophy.
11     Q.  Okay.  What did you do after you got your
12 MBA at BU?
13     A.  Let's see.  To the best of my
14 recollection, I went to work at New England Medical
15 Center for approximately three years as the
16 administrator of the Department of Ophthalmology.
17 And subsequent to that, I believe it was June of
18 1991 when I joined ECG, and I have worked there
19 since.
20     Q.  What are your duties and responsibilities
21 at ECG?
22     A.  In general description?  I have
23 responsibility for marketing and selling work, for
24 performing work, for supervising and developing my

Page 12

1  professional staff, and for the oversight of the
2  day-to-day activities of my office, which has
3  administrative infrastructure as well.
4      Q.  And are you a supervisor of employees of
5  the professional staff?
6      A.  Yes, I am.
7      Q.  And how many people do you supervise?
8      A.  To the best of my knowledge,
9  approximately ten.
10     Q.  And how many folks are in ECG's Boston
11 office altogether?
12     A.  Approximately 12 professional staff.  And
13 to the best of my knowledge, I would say
14 approximately six or seven administrative,
15 nonprofessional staff.
16     Q.  Do you have any top-hat plans in place
17 for any of the employees at ECG?
18     A.  To the best of my knowledge, we do not.
19     Q.  As far as your consulting work that you
20 perform in your role at ECG, can you just give me a
21 brief and general description of what you do?
22     A.  Certainly.  My practice is focused
23 principally with academic medical centers where I
24 assist clients on a broad range of issues related

Page 13

1  to the organization management and financing of the
2  activities of faculty at the medical school or
3  teaching hospital.  The nature of that work tends
4  to be on performance improvement.
5      Q.  Have you ever been consulted to structure
6  a compensation program from scratch?
7      A.  Yes, I have.  To the best of my
8  knowledge, I've done it a number of times.
9      Q.  So is it fair to say that your role
10 consists of structuring compensation programs and
11 improving performance at places in which a
12 compensation program is already in place?
13         MS. HUBBARD:  Objection.
14     A.  Could you repeat the question?
15     Q.  I'm just trying to get a sense of whether
16 you, as a consultant, go into these academic
17 medical centers and set up the compensation
18 programs or there's one already in place and you
19 work to improve it or both?
20     A.  To the best my knowledge or description,
21 I'd say both.  Most often, there is a compensation
22 program of some type in place, but certainly, on
23 occasion, there are circumstances that create the
24 need for new compensation programs that I have been

4 (Pages 10 to 13)

Stephen Sadowski

Page 14

1  involved in.
2      Q.  Can you give me an example of when you've
3  gone in and worked with no compensation program in
4  place and you've designed it from scratch?
5      A.  Certainly.  Again, in general
6  description, to the best of my knowledge, an
7  academic medical center client that separately
8  incorporated their faculty practice plan, which, in
9  essence, required the termination of employment of
10 roughly 200 faculty, and as we developed the new
11 corporation for the faculty physicians, we
12 developed a compensation program for them as well,
13 as an example.
14     Q.  Okay.  We'll come back to your current
15 work.  But I just want to go back into -- reach
16 back into your past employment and get a sense of
17 what your duties were when you were at New England
18 Medical Center.
19     A.  Certainly.
20     Q.  What were they?
21     A.  As a department administrative for the
22 ophthalmology department.
23     Q.  That was your only role there; right?
24     A.  That was my only role.

Page 15

1      Q.  Okay.  Yes.
2      A.  To the -- again, to the best of my
3  memory, I provided management support to the
4  chairman of the department; and was responsible for
5  the day-to-day management of the finances of the
6  department; the oversight of the billing
7  activities, professional fee billing activities of
8  the department; oversight of the ambulatory clinic
9  and its associated staff; as well as a variety of
10 administrative support activities associated with
11 the research and teaching programs of the
12 department.  Again, it's all to the best of my
13 memory.
14     Q.  Did you have any involvement in the
15 compensation plan while you were at New England
16 Medical Center for the staff there?
17         MS. HUBBARD:  Objection.
18     A.  For the faculty physicians?
19     Q.  Yes.
20     A.  That's -- to the best of my memory, yes,
21 some involvement in compensation plans, the
22 distribution of compensation.
23     Q.  What was --
24     A.  The accounting for it, principally the

Page 16

1  accounting for it.
2      Q.  Okay.  Anything beyond accounting?
3      A.  To the best of my memory, I was involved
4  in the development of a particular specific
5  compensation plan for the chairman of the
6  department when that chairman stepped down from
7  that role but remained with the department.
8      Q.  So that was an individualized plan?
9      A.  Yes.  That's an accurate
10 characterization.
11     Q.  Did you have any involvement in -- well,
12 let's take that individualized plan.  Was there any
13 deferred compensation plan in connection with that?
14     A.  Not to the best of my knowledge.
15     Q.  Did you have any involvement at New
16 England Medical Center with the faculty physicians
17 deferred compensation plans?
18         MS. HUBBARD:  Objection.
19     A.  Not to the best of my knowledge.
20     Q.  Did you have any involvement while at New
21 England Medical Center with the faculty -- with any
22 top-hat plans that may have been in place?
23     A.  Not to the best of my knowledge.
24         MS. COOK:  We might as well mark this as

Page 17

1  the first exhibit.
2         (Document marked as Sadowski
3         Exhibit 1 for identification)
4      Q.  Mr. Sadowski, I'm handing a document
5  that's been marked as Exhibit 1, and it's entitled,
6  "Defendants' Rule 26(a)(2) Expert Disclosure."  Do
7  you recognize this document?
8      A.  (No verbal response)
9      Q.  I can --
10     A.  Yes, I do.
11     Q.  Okay.
12     A.  It looks familiar.
13     Q.  Okay.  And a few pages into the document,
14 is that your CV?
15     A.  Yes, it is.
16     Q.  Okay.  And in that first paragraph, it
17 mentions that your several years in operations
18 rules with health maintenance organizations?
19     A.  Yes.  That's correct.
20     Q.  What is that referring to?
21     A.  During my business -- while in business
22 school from -- to the best of my recollection, it
23 was 1986, '87 approximately I worked for Harvard
24 Community Health Plan as an operations analyst.

5 (Pages 14 to 17)

Stephen Sadowski

Page 22
1  wage and physicians who receive, by comparison,
2  substantially greater compensation. And again,
3  based on my experience and understanding of IRS
4  requirements under qualified programs, those tests
5  will often limit the amount of compensation that
6  can be devoted to the retirement program.
7       In addition, there are statutory caps as
8  well on the magnitude of funds that can be devoted
9  to retirement. And so oftentimes, at least in
10 those circumstances, highly compensated physicians
11 are looking for opportunities to optimize the
12 amount of their contribution or their company's
13 contribution in the group practice to their
14 retirement program, as an example.
15    Q.  Did you say the physicians were looking
16 to optimize the amount of contributions to their
17 retirement programs?
18    A.  In -- sometimes. Oftentimes, that's the
19 case. I would say it depends on the nature of the
20 specialty. Often, physicians, by specialty, vary
21 in the degree of -- or in the magnitude of
22 compensation -- are eligible to earn or what the
23 market will pay.
24    Q.  Okay. So going with your example -- and

Page 23
1  I believe you said that there were two challenges
2  that you used as examples; the IRS limitation and
3  statutory caps?
4     A.  Yes.
5     Q.  Okay. So how would you use or would you
6  use a top-hat plan in these circumstances?
7     A.  In those circumstances, it would provide
8  an opportunity for that group practice to enhance
9  their fringe benefit program by providing an
10 opportunity for the more highly compensated
11 physicians to increase their retirement savings,
12 their retirement opportunities.
13    Q.  You're familiar with the compensation
14 program that was in place at Harvard Medical School
15 and the BSG? Do you know what I mean by the "BSG"?
16       MS. HUBBARD: Objection.
17    A.  Yes. I know it as the Brigham Surgical
18 Group.
19    Q.  Right.
20    A.  I have read the documents -- is the
21 degree of my familiarity.
22       MS. HUBBARD: Just to clarify, are you
23 asking about the professional staff compensation
24 policy specifically?

Page 24
1       MS. COOK: Just generally. I mean --
2     Q.  Let me strike that and ask a better
3  question. My question should have been: Do you
4  have any personal knowledge about the compensation
5  structure at the BSG outside of this case?
6     A.  I do not.
7     Q.  Okay.
8     A.  To the best of my knowledge.
9     Q.  And so your familiarity with the
10 compensation structure at the BSG is based on your
11 review of the documents in this case?
12    A.  It's -- yes.
13    Q.  Is that fair to say?
14    A.  To the best of my knowledge, that's fair.
15    Q.  Now, based on your review of the
16 documents in this case, are the two challenges that
17 you mentioned present for the BSG?
18       MS. HUBBARD: Objection.
19    A.  The two challenges -- I'm not sure what
20 you mean by the "challenge."
21    Q.  Well, you said that two challenges --
22 challenges arise as they relate to retirement
23 benefits. And then you gave a couple of examples.
24    A.  Yes.

Page 25
1     Q.  The IRS limitations.
2     A.  Yes. I'm not familiar with why the BSG
3  may have -- what drove them to develop a deferred
4  compensation program or what put them in place. I
5  could speculate on why they put one in place, but I
6  don't have -- I'm not sure.
7     Q.  You have no personal knowledge as to the
8  genesis of the UDC or the FRBP?
9     A.  Not -- no, no personal knowledge.
10    Q.  Do you have an opinion as to the purpose
11 of these plans?
12    A.  I -- yes. I have an opinion on the
13 purpose. My assumption is that those plans -- that
14 plan was put into place to create retirement
15 savings opportunities that were otherwise
16 constrained by the market and then regulation --
17 regulation rather than the market; that, two, they
18 were likely put into place as a vehicle for
19 recruitment so that group could offer an enhanced
20 compensation opportunity.
21       And my opinion would also be that they
22 were likely put into place a retention vehicle
23 to -- in an effort to bond employed physicians to
24 the group. Again, that's all speculative on my

7 (Pages 22 to 25)

Stephen Sadowski

Page 26

1  part. But I would guess that that would be the
2  reason -- some of the reasons more likely drove the
3  development to the plan.
4      Q.  Well, I'm a little confused. I'm trying
5  to ascertain whether part of your expert testimony
6  is the purpose of these plans.
7      A.  Part of my expert testimony is -- yes --
8  about the purpose of these plans, I believe.
9  That's why I'm --
10     Q.  Okay. But I thought that you just
11 testified that these were just assumptions and
12 speculation?
13     A.  Yes, because I have no knowledge why the
14 Boston -- Brigham Surgical Group put their plan
15 into place. I can only speculate as to why they
16 may have put this plan into place, based on my
17 experience elsewhere.
18     Q.  Okay. And is it also speculation as to
19 the three purposes you just gave me?
20     A.  Yes. I would speculate that those are --
21 the three purposes I gave you, I'm speculating, are
22 reasons they may have put that plan into place.
23         MS. HUBBARD: Colleen, can we take a
24 break here? I'd like to just confer with the

Page 27

1  witness for just a moment.
2          MS. COOK: I'd rather just finish up on
3  this little section.
4          MS. HUBBARD: I think we're not in the
5  middle of a question right here.
6          MS. COOK: Let me just ask a couple of
7  follow-up questions.
8          (Pause)
9      Q.  Do you intend to offer testimony at the
10 trial in this action concerning the purpose of
11 these plans as you just laid out? And you gave me
12 three factors -- three reasons.
13     A.  Yes. To the best of my knowledge, that's
14 my understanding.
15     Q.  What is the basis of your testimony?
16     A.  My experience with the use of those plans
17 by group practices, practice plans at academic
18 medical centers.
19     Q.  Okay. But you're speaking generally;
20 right?
21     A.  Yes.
22     Q.  When you referred to those plans in your
23 answer just now, you're not talking about the use
24 of the UDC and the FRBP?

Page 28

1      A.  I am not.
2      Q.  Okay. So you're talking generally about
3  your experience at academic medical centers, aside
4  from Harvard?
5      A.  I believe that's a reasonable
6  characterization, yes.
7      Q.  Is it fair to say that the testimony that
8  you anticipate giving at trial is -- and the
9  three -- specifically, the three factors that you
10 just gave me as reasons for the UDC and the FRBP is
11 based on experience with institutions completely
12 unrelated to Harvard?
13     A.  Yes. That's fair.
14     Q.  Have you, in your experience, seen plans
15 like the UDC or FRBP -- I should say not like but
16 identical to the UDC or FRBP at any other academic
17 medical centers?
18     A.  I -- to the best of my knowledge, I
19 wouldn't say identical to.
20         MS. COOK: We can --
21         MS. HUBBARD: I'd like to take a break
22 now.
23         MS. COOK: -- take a break.
24         MS. COOK: Thanks.

Page 29

1          (Brief recess taken from
2           2:47 p.m to 2:54 p.m.)
3      A.  I just wanted to take the opportunity to
4  clarify -- if that's okay -- my testimony from
5  before. That when I referred to speculating on
6  this, that is my opinion based on both my
7  experience and review of the documents that I
8  referenced earlier.
9      Q.  And I think that you already testified
10 that your experience -- you have no experience with
11 Harvard; is that right?
12         MS. HUBBARD: Objection.
13     A.  No experience with Harvard as it relates
14 to compensation program or compensation guidelines,
15 which is what I believe the question was.
16     Q.  Well, you have no personal experience
17 with consulting for Harvard; right?
18     A.  Not for Harvard Medical School. I do
19 currently have an engagement with Partners Health
20 System, which is an affiliate of Harvard.
21     Q.  Right. And does your engagement with
22 Partners consist of examining deferred compensation
23 plans for them?
24     A.  It does not.

8 (Pages 26 to 29)

Stephen Sadowski

Page 50

1  A. Based on my reading of the compensation
2  policy, I would say yes. I would just -- I'm not
3  sure what it would mean to "opt out."
4  Q. Well, for example, there's no way for a
5  BSG surgeon to say, I don't want my funds to go
6  into the FRBP?
7      MS. HUBBARD: Objection. That goes
8  beyond the scope of what Mr. Sadowski's reviewed.
9  A. Yeah. I don't know why the -- because
10 the opting out would be to say, I don't want any
11 compensation.
12 Q. No. By "opting out," I mean do something
13 else with the funds.
14 A. I would -- I would agree that would be
15 highly unusual to do something like that.
16 Q. And it's not actually permissible;
17 right? -- under the compensation policy in this
18 case?
19     MS. HUBBARD: Objection.
20 A. I -- excuse me for -- it seems like a
21 funny question because I don't -- it's not -- it
22 wouldn't be normal to say that I would tell -- in
23 any circumstance that you would tell your employer,
24 Don't pay me.

Page 51

1  Q. I'm not suggesting, Don't pay me. I'm
2  suggesting the surgeon having the ability to do
3  something, other than have the funds directed to
4  these three places that are set out in the --
5  A. To circumvent the --
6  Q. -- compensation policy.
7  A. -- compensation program, to establish
8  their own compensation program?
9  Q. Essentially.
10 A. I would -- that would be highly unusual,
11 yeah. It doesn't appear to me from anything I read
12 that they would have an option --
13 Q. Right. And in fact --
14 A. -- to develop a unique compensation
15 program for themselves.
16 Q. Mr. Sadowski, do you intend to testify
17 that highly profitable physicians have significant
18 bargaining power?
19 A. Highly profitable physicians have
20 significant bargaining power? Relative to their
21 recruitment and retention?
22 Q. Actually, I'd be most interested in their
23 bargaining power relative to negotiating the terms
24 of their deferred compensation plans.

Page 52

1  A. My opinion would be that individual
2  physicians wouldn't necessarily have a strong
3  bargaining position but that a cohort of highly
4  compensated physicians would have a strong
5  bargaining position.
6  Q. And how would a cohort of highly
7  compensated physicians have strong bargaining
8  position with respect to negotiating the terms of
9  their deferred compensation plan?
10 A. Presumably, they would, by threat of
11 departure, termination.
12 Q. Is it your opinion that the BSG surgeons
13 had the ability to negotiate the terms of the UDC
14 and FRBP?
15 A. That's unclear to me from the documents
16 that I read because I'm unaware of the government's
17 mechanism of the group, have a working knowledge of
18 the government's working knowledge of the group
19 where --
20 Q. So is it fair -- sorry.
21 A. Where presumably that would happen.
22 Q. Is it fair to say then that you do not
23 intend to offer any testimony or an opinion at
24 trial concerning the bargaining power of the BSG

Page 53

1  surgeons?
2      MS. HUBBARD: Objection.
3  A. Again, I'm not certain what I would offer
4  an opinion as I -- based on what I said earlier,
5  which is that a group of highly compensated
6  physicians would have a bargaining -- "bargaining"
7  position, to use your term, to affect the design of
8  the -- of the deferred compensation program
9  potentially.
10 Q. Okay. So are you speaking generally?
11 A. You asked the question generally.
12 Q. No, I didn't. I think I asked about the
13 BSG surgeons specifically and whether you intended
14 to offer an opinion at trial concerning whether
15 they had bargaining power with respect to
16 negotiating the terms of the UDC and the FRBP. I
17 think that was pretty specific.
18 A. Yeah. That's specific. I -- I don't
19 believe I could offer testimony on their bargaining
20 power.
21 Q. What is the basis for your opinion
22 that -- your general opinion that a cohort of
23 highly compensated physicians have a bargaining
24 position?

14 (Pages 50 to 53)

Stephen Sadowski

Page 54

1  A. Their ability to terminate their own
2  employment.
3  Q. Well, what's the basis of your opinion?
4  A. I've seen circumstances elsewhere where
5  groups of highly compensated physicians have left
6  an academic practice.
7  Q. Because they were unable to negotiate the
8  terms of their deferred compensation plans?
9  A. They were unable to negotiate the terms
10 of their compensation, I would say.
11 Q. Well, what about their -- what about --
12 were these top-hat plans in the circumstances that
13 you're talking about?
14 A. No, they're not -- in the circumstance I
15 was referencing, I was not referring to a top-hat
16 plan.
17 Q. Okay. Do you --
18 A. I'm talking about the bargaining position
19 of a group being able to -- of highly compensated
20 surgeons being able -- physicians being able to
21 influence the design of a -- of their compensation
22 program.
23 Q. But there was no top-hat plan in relation
24 to the circumstance that you're describing?

Page 55

1  A. Not in relation to -- not that I'm aware
2  of in the circumstance. There may have been, but
3  not to my knowledge, in that circumstance.
4  Q. Do you have any experience in which you
5  can tell me that there was a group of highly
6  compensated physicians who exhibited bargaining
7  power with respect to negotiating the terms of
8  top-hat plans?
9  A. Nothing comes to mind at the moment.
10 Q. What about deferred compensation plans
11 generally?
12 A. Deferred compensation plans generally, I
13 would say, yes, that there are examples where
14 groups of physicians, in essence, help drive the
15 implementation of a deferred compensation program.
16 Q. But those plans were subject to all of
17 ERISA's substantive protections; right? They
18 weren't top-hat plans?
19     MS. HUBBARD: Objection.
20 Q. Do you know what I mean by that?
21 A. No. Please explain.
22 Q. Okay. You're familiar with top-hat
23 plans?
24 A. Yes.

Page 56

1  Q. Okay. What's your understanding of
2  top-hat plans?
3  A. They are opportunity under ERISA to, in
4  essence, provide, depending on their construct --
5  and there's a variety of constructs of tax-deferred
6  retirement opportunity -- that extends beyond
7  qualified plans for a select group of management or
8  highly compensated employees.
9  Q. Are you aware that an underlying
10 rationale for top-hat plans is that the folks that
11 would be covered by the plan have significant
12 bargaining power?
13     MS. HUBBARD: Objection.
14 A. I'm not sure what you mean by
15 "significant bargaining power" --
16 Q. Well, that they would be able to --
17 A. -- as a rationale for the --
18 Q. That they would be able to have the
19 ability to negotiate the terms of their deferred
20 compensation plans. That's what I mean by that.
21     MS. HUBBARD: Objection.
22 A. Not in my experience. I have individual
23 negotiations over the terms of the deferred
24 compensation plan.

Page 57

1  Q. Okay. And individual -- what do you mean
2  by that?
3  A. That in the case where a deferred
4  compensation program exists, individuals don't
5  have, to use your term, "bargaining" authority to
6  set the terms and conditions of participation in
7  that program.
8  Q. What were you referring to when you said
9  "individual negotiation"?
10 A. Its bargaining position. I assume when
11 you said "bargaining position," bargaining means
12 negotiation.
13 Q. Okay. I'm just trying to understand.
14 Are you saying that in context of the deferred
15 compensation programs that you've seen in your
16 experience, there is or isn't individual
17 negotiation? That's what I'm --
18 A. There is not.
19 Q. There's not. Okay. And are the deferred
20 compensation programs that you're referring to --
21 are those top-hat plans?
22 A. Yes. Top-hat plans is a general
23 description of --
24 Q. Of the deferred compensation programs?

Stephen Sadowski

Page 58

1  A.  Of deferred compensation programs but --
2  yes.
3  Q.  Well, not all deferred compensation
4  programs --
5  A.  Not all deferred --
6  Q.  -- are top-hat --
7  A.  -- compensation programs is not --
8  Q.  -- plans; right?
9  A.  That's correct. It's a broad range of
10 constructs that we can term top-hat plans.
11 Q.  Right. And is it your understanding that
12 the people that would be covered by the top-hat
13 plans possess bargaining power with respect to
14 negotiating the terms of the compensation plans,
15 deferred compensation plans?
16     MS. HUBBARD: Objection. Colleen, just
17 to clarify, are you saying bargaining power with
18 regard to their individual plans or just by virtue
19 of their position? I'm not sure it's entirely
20 clear, the context about what you're asking.
21 Q.  Do you understand what I'm asking?
22 A.  I'm not totally clear on --
23 Q.  Okay.
24 A.  I think you're trying to get something

Page 59

1  specific, and I want to --
2  Q.  Let's break it down.
3  A.  -- make sure I'm responsive.
4  Q.  You're talking about top-hat plans --
5  A.  Correct.
6  Q.  -- right? Let's just say --
7  A.  Deferred compensation programs, but sure,
8  top-hat plans.
9  Q.  Let's call it a top-hat plan.
10 A.  Okay.
11 Q.  And is that a group plan, or is that an
12 individual plan?
13 A.  It is a group plan.
14 Q.  Okay. And with respect to the terms of
15 that group plan, is it your understanding that the
16 people that would be covered by that plan have
17 bargaining power with respect to negotiating the
18 terms of that plan?
19     MS. HUBBARD: Objection.
20 A.  I -- I would -- I'm sorry. I guess I
21 don't like the term "bargaining power." They would
22 exert influence -- they would certainly be able to
23 exert influence as the -- presumably over the
24 nature, design of the plan.

Page 60

1  Q.  And how would they do that?
2  A.  As -- in a circumstance where it's
3  management, as managers with responsibility for the
4  compensation program, they would do it. And
5  circumstances where it's highly compensated
6  employees, they would presumably do it by virtue of
7  stature and concerns about the threat of departure
8  and termination.
9      However, you know, if there's --
10 depending on the nature of the government's
11 structure, the degree to which those groups can or
12 cannot influence the construct of the plan is real
13 or not real.
14 Q.  So if I boil it down, you're saying it
15 basically depends on the governing structure?
16 A.  I believe it depends on the governing
17 structure.
18 Q.  But you don't know anything about the
19 BSG's governing structure; right?
20 A.  I do not.
21 Q.  Have you published anything on top-hat
22 plans?
23 A.  I have not, and I don't believe, to the
24 best of my recollection, that I referenced them in

Page 61

1  what I have published. I may have, but I don't
2  believe so.
3  Q.  Does your CV, which is contained within
4  Exhibit No. 1, list all of your publications and
5  presentations to date?
6  A.  It does not.
7  Q.  It does not?
8  A.  It does not.
9  Q.  Do you -- can you list the missing ones
10 for me?
11 A.  I'll be --
12 Q.  Off the top of your head or you can
13 provide them to us.
14 A.  I would provide it. I'd rather to that.
15     MS. HUBBARD: We'll do that.
16 Q.  That's fine. No problem.
17 A.  Yeah. I'll be pleased to do that.
18 Q.  In your experience, have you any
19 knowledge of top-hat plans being invalidated?
20     MS. HUBBARD: Objection. Invalidated by
21 court?
22     MS. COOK: No, not necessarily by a
23 court.
24     MS. HUBBARD: I'm not sure I understand

16 (Pages 58 to 61)

Stephen Sadowski

Page 62

1  what you're asking.
2    Q.  Well, in your experience, have you ever
3  come across any challenges to the validity of a
4  top-hat plan?
5    A.  Not that I can recall.
6    Q.  Is this a first time that you've seen a
7  faculty in this case -- a faculty physician
8  challenge the validity of a top-hat plan?
9    A.  Yes, my first experience.
10   Q.  And other than your personal experience,
11 do you have any knowledge whatsoever of a top-hat
12 plan being invalidated?
13   A.  Not that I can recall.
14   Q.  Hypothetically speaking, if you were
15 consulted to go into an academic medical center and
16 structure a compensation program, what factors
17 would you consider in designing a top-hat plan?
18   A.  First, I would say that I would not
19 design the top-hat plan.  That is a -- in my
20 experience, a construct of a plan as a highly
21 technical area.  My expertise is not in the
22 designing construct of those.
23   Q.  Would it be an element of what you would
24 suggest to the academic center?

Page 63

1    A.  It is an element of something I suggest
2  they consider.
3    Q.  But you wouldn't be responsible for the
4  design of that?
5    A.  Not the design of that.
6    Q.  Just conceptually, you would --
7    A.  Conceptually, in the same --
8    Q.  -- include it in your suggestions?
9    A.  In the same manner that we might suggest
10 that we have time-off policies and
11 tuition-assistant policies and other types of
12 benefit-related policies that need to be funded or
13 financed by the business enterprise.
14   Q.  Could you take a look at, please, in
15 Exhibit No. 1 -- your expert report is attached to
16 Exhibit No. 1; is that right?
17   A.  Yes.
18   Q.  In the first paragraph of your expert
19 report, second sentence reads, "I specialize in
20 assisting academic medical center clients to
21 enhance their financial operational and
22 programmatic performance by, among other things,
23 designing appropriate compensation programs for
24 some physicians."

Page 64

1    A.  Yes.
2    Q.  Do you see where it states that?
3    A.  I do.
4    Q.  Okay.  Is there a typical model for a
5  compensation program that you would suggest to an
6  academic medical center?
7    A.  No.  There is -- there is not a typical
8  model.
9    Q.  No?  It varies by client?
10   A.  It varies by client, given the various
11 constructs of academic medical centers that differ,
12 given their different objectives.
13   Q.  So it really has to be individualized; is
14 that right?
15   A.  Otherwise, I wouldn't be in business as
16 much as I am.  Yes, that's correct.
17   Q.  Is that a yes?
18   A.  Yes.  If I could pull it off the shelf.
19   Q.  It makes it more interesting, though;
20 right?
21   A.  It absolutely does.
22   Q.  Who is involved, typically, in your
23 experience, in the design of compensation program
24 for the faculty physicians?

Page 65

1    A.  Again, that would, in my experience,
2  vary, in different circumstances, depending on the
3  culture and nature of different academic medical
4  centers.  We can have a highly participatory
5  process, in terms of the involvement of faculty and
6  the design of compensation program.
7        At one extreme to the other extreme, we
8  can have a very top-down approach to it in which
9  it's designed by a leadership team and implemented
10 and everything in the range in between.
11   Q.  You don't have any personal knowledge of
12 the way that the compensation scheme, as presented
13 in the BSG compensation policy was --
14   A.  I do not.
15   Q.  -- originated?
16   A.  I do not.  I guess, in my own
17 qualification, I would add to that is in some of
18 Dr. Mannick's testimony or in his -- to the best of
19 my memory in looking at his deposition, he did
20 comment on discussions with -- if I remember
21 correctly, discussions with the dean about putting
22 the deferred compensation program in place.  That's
23 the extent of my --
24   Q.  Do you concern yourself with whether --

17 (Pages 62 to 65)

Stephen Sadowski

Page 66
1  when you're structuring a compensation program,
2  whether the design of the deferred compensation
3  plan would qualify as a top-hat plan?
4       A.   I do not.
5       Q.   That would be for somebody else?
6       A.   That would be the technical expert on the
7  design of that nonqualified plan.
8       Q.   Can you take a look at, please,
9  Paragraph 6 of your expert report.
10      A.   Mm-hmm.
11      Q.   The first sentence reads, "Academic
12 medical centers and their affiliated physician
13 groups generally seek to design and maintain
14 physician compensation programs that provide
15 appropriate incentives for clinical care on one
16 hand and teaching and research on the other."
17      A.   Mm-hmm. Yes.
18      Q.   Can you explain to me a little bit of
19 what you mean by that statement?
20      A.   The physician compensation program at an
21 academic medical center in a group practice, the
22 practice plan is the economic construct of the
23 business enterprise because anywhere from 40 to 60
24 percent of the business's expenses of the group

Page 67
1  practice, for example, are compensation.
2           So the design of the compensation
3  program, in effect, drives the economics of the
4  business. And since the business is patient care
5  teaching and research, that compensation program
6  needs an economic model that compliments those
7  missions.
8       Q.   So is another way to say what you've put
9  here in Paragraph 6 -- and I think the idea spills
10 over to Paragraph 7, and I'm just trying to
11 summarize. Are you saying that the design of the
12 compensation program is driven by the mission --
13           MS. HUBBARD: Objection.
14      Q.   -- of the academic medical center?
15           MS. HUBBARD: Objection.
16      A.   In my opinion, it's the design of the
17 compensation program's compliment mission, effect
18 compensation program's compliment missions.
19      Q.   Compliment missions?
20      A.   Yup.
21      Q.   Can you take a look at Paragraph 9, and
22 it's the last sentence on the page. In the same
23 vein, a principle reason academic medical centers
24 and physician practice groups might implement

Page 68
1  nonqualified deferred compensation plans is to
2  provide highly compensated physicians with a means
3  to supplement their retirement funds and to
4  maximize after-tax compensation." Do you see that?
5       A.   Mm-hmm. I do.
6       Q.   What do you mean by that statement?
7            MS. HUBBARD: Objection.
8       A.   When you say what do I mean by that
9  statement --
10      Q.   Well, let me ask you this: What's the
11 basis for this statement?
12      A.   Again, in my experience where clients
13 have their existing or adopted nonqualified
14 retirement, nonqualified deferred compensation
15 programs, it is most often as a means supplement
16 retirement funds.
17      Q.   Okay. And you say a principle reason is
18 to do that; is that right?
19      A.   Yes.
20      Q.   What are other reasons?
21      A.   Other reasons would be to provide a
22 vehicle. Nonqualified plans, to my knowledge, as
23 an example, are prevalent in business generally,
24 but they are not prevalent in health care or

Page 69
1  academic medicine by comparison. So it does offer
2  a distinctive advantage when recruiting a faculty
3  member to have that enhanced retirement
4  opportunity.
5       Q.   And by "nonqualified plan," you mean a
6  top-hat plan?
7       A.   Sure.
8       Q.   Okay.
9       A.   A second reason is, I think, to foster
10 retention, since that deferred compensation program
11 is most often an asset of the corporation. So it
12 becomes of interest to the faculty to ensure that
13 that corporation is a going concern so that it can
14 foster its retention in that matter.
15      Q.   In your opinion, are these all reasons
16 for -- purposes for the UDC and the FRBP?
17           MS. HUBBARD: Objection.
18      A.   In my opinion, they are purposes that
19 would appear to me were likely factored into the
20 thinking of -- it seems clearer to me from what
21 I've read that it was perhaps maybe a bit more
22 focused on retention than ; although, it seems that
23 was likely an important point, too but retention
24 seems to be.

18 (Pages 66 to 69)

Stephen Sadowski

Page 70
1  Q. Okay. So what, in your opinion, are
2  the -- have we listed all of the purposes, in your
3  opinion, for the UDC and the FRBP? Let me give you
4  what you just gave me.
5  A. Sure.
6  Q. Okay. Supplement retirement funds?
7  A. Mm-hmm.
8  Q. vehicle?
9  A. Yes.
10 Q. Foster retention?
11 A. Yes.
12 Q. Anything else?
13 A. Those would be my opinion as to principle
14 reasons for --
15 Q. Okay. And the among those three --
16 A. -- the UDC.
17 Q. And the FRBP?
18 A. Sure.
19 Q. Okay. And amongst those three, which in
20 your opinion would be the primary purpose for the
21 UDC and the FRBP?
22     MS. HUBBARD: Objection.
23 A. I'm not real comfortable saying that
24 there's a primary purpose because these are

Page 71
1  interrelated purposes. They don't -- they're not
2  mutually exclusive. However, I would believe that
3  the primary purpose was probably supplemental
4  retirement.
5  Q. And what do you --
6  A. But generally, I think they're all
7  interrelated.
8  Q. Okay. What do you base that on that it
9  was probably supplemental retirement?
10 A. I base that on my experience, where that
11 is most often the case and some of the
12 depositions -- some of the materials in the
13 deposition I read.
14 Q. What are you referencing from the
15 depositions?
16 A. The fact that we -- BSG developed and
17 modified the deferred compensation program, in
18 part, in response to changes in regulatory
19 environment in order to -- as I remember, to the
20 best of my recollection as it was described, in
21 order to keep folks whole and provide additional
22 retirement opportunity.
23 Q. Which deposition are you referring to?
24 A. I believe it was Dr. Mannick's. Again,

Page 72
1  that's to the best of my recollection.
2      MS. HUBBARD: Colleen, can we take a
3  short break when we're at a good breaking point?
4      MS. COOK: Yeah. We sure can, but I'm
5  probably almost done.
6      MS. HUBBARD: Oh, okay. That's fine
7  then.
8      MS. COOK: I mean, we can take a break
9  because then I can just -- take five minutes, and I
10 can assess and probably finish up faster.
11     MS. HUBBARD: Sure.
12     MS. COOK: Do you want to do it now?
13     MS. HUBBARD: Sure. That sounds great.
14     (Brief recess taken)
15 BY MS. COOK:
16 Q. Mr. Sadowski, we've touched on your
17 experience with top-hat plans throughout the course
18 of this deposition.
19     Can you tell me what is the extent of
20 your experience with top-hat plans, aside from
21 recommending them to academic medical centers and
22 your consultation?
23 A. Sure. My experience is generally in that
24 regard.

Page 73
1  Q. Okay.
2  A. As well as in acknowledging the
3  realities -- factoring in the realities of the plan
4  into a compensation program design, if there's an
5  existing one in place.
6  Q. Would you be involved in the negotiation
7  of a top-hat plan?
8  A. Not the specific negotiation of a top-hat
9  plan.
10 Q. Anything else that you can think of
11 relating to your experience with top-hat plans that
12 we haven't discussed already today?
13 A. Generally, I don't believe so.
14     MS. COOK: Could you mark that, please.
15     (Document marked as Sadowski
16     Exhibit 2 for identification)
17 Q. Mr. Sadowski, if you could please take a
18 look at this document. Do you recognize this
19 document?
20 A. I do not.
21 Q. Can I direct your attention, please, to
22 Page No. 4, the bottom paragraph. It says,
23 "Mr. Sadowski, who advises both academic medical
24 centers and individuals, physicians on compensation

19 (Pages 70 to 73)