UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| EBEN ALEXANDER, III, M.D. | )<br>)<br>) |
| Plaintiff, | ) Case No. 04-10738 MLW<br>) |
| v. | )<br>) |
| BRIGHAM AND WOMEN'S PHYSICIANS ORGANIZATION, INC., successor to Brigham Surgical Group Foundation, Inc., BOSTON NEUROSURGICAL FOUNDATION INC., BRIGHAM SURGICAL GROUP FOUNDATION, INC. DEFERRED COMPENSATION PLAN, BRIGHAM SURGICAL GROUP FOUNDATION, INC. FACULTY RETIREMENT BENEFIT PLAN, COMMITTEE ON COMPENSATION OF THE BRIGHAM SURGICAL GROUP FOUNDATION, INC., and PETER BLACK, M.D. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |
| Defendants. | ) |

## DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION IN LIMINE TO EXCLUDE THE TESTIMONY OF STEPHEN SADOWSKI

In this case, the Court must determine why the Brigham Surgical Group Foundation, Inc. ("BSG") created and maintained the Unfunded Deferred Compensation Plan ("UDC") and the Faculty Retirement Benefit Plan ("FRBP"). Dr. John Mannick, the former President of BSG, will testify directly about his decision to introduce these plans as part of a new, performance-based compensation system for BSG's surgeons. As he will explain, the plans enabled the BSG to overcome challenges in recruiting and retaining profitable surgeons that are unique to the academic medical setting.

With fifteen years' experience in designing physician compensation programs that

enhance academic medical centers' financial and operational performance in the context of market and regulatory constraints, Stephen Sadowski can help the Court better understand exactly those challenges. In this, Mr. Sadowski will provide context for Dr. Mannick's testimony and reinforce his characterization of the purposes served by the UDC and FRBP.

## FACTUAL BACKGROUND

Mr. Sadowski is a principal at ECG Management Consultants, Inc., a firm that provides strategic and management consulting services to healthcare providers, particularly academic medical centers. Prior to joining ECG in 1991, Mr. Sadowski was a medical group administrator at Tufts-New England Medical Center.

Plaintiff deposed Mr. Sadowski on September 13, 2006. His deposition testimony demonstrates the relevance and reliability of his anticipated testimony at trial.[1] Specifically, Mr. Sadowski testified as follows:

1. He has helped academic medical centers design physician compensation programs "from scratch" on several occasions. Sadowski Dep. at 13:5-8.

2. Highly compensated physicians at academic medical centers often seek ways to maximize their retirement funding due to IRS limitations on the amount of compensation that can be contributed to qualified plans. Sadowski Dep. at 22:9-14.

3. Academic medical centers implement deferred compensation plans as a means to (1) create retirement savings opportunities otherwise constrained by the market and regulation and, thus, are used to (2) recruit and retain highly valued physicians. Sadowski Dep. at 25:12-24, 37:9-22.

4. Highly compensated physicians likely can exert influence over the design

---

[1] Relevant excerpts from Mr. Sadowski's deposition are attached as Exhibit 1.

and operation of a deferred compensation plan through their group's governance structure.  Sadowski Dap. at 59:20-60:13.

5.  Though used, top hat plans are not <u>prevalent</u> in academic medicine, and therefore provide a distinct advantage for BSG in recruiting faculty members.  Sadowski Dep. at 68:21-69:3.

6.  Academic medical centers face multiple limits on physician compensation, including NIH caps and non-profit compensation limits.  Sadowski Dep. at 39:1-7.

7.  Mr. Sadowski has advised other clients with physician salary caps similar to the Harvard salary cap.  Sadowski Dep. at 40:1-8.

## LEGAL ARGUMENT

Under Rule 702 of the Federal Rules of Evidence, expert testimony is appropriate if "scientific, technical <u>or other specialized knowledge</u> will assist the trier of fact to understand the evidence or to determine a fact in issue." (emphasis added).  Mr. Sadowski's proffered testimony satisfies this standard.  As explained below, Mr. Sadowski's experience and expertise designing physician compensation programs at academic medical centers will assist the Court in determining the purposes underlying the BSG's implementation of the UDC and FRBP.

### A.  Mr. Sadowski's Testimony is Relevant.

To determine whether proffered expert testimony will assist the trier of fact, the Court must determine (1) whether the proposed testimony is "relevant and fits the facts of the case; and (2) whether the witness's opinions are based on "specialized skill, knowledge or experience."  <u>United States v. Shay</u>, 57 F.3d 126, 133 (1st Cir. 1995).  The testimony need not be based on first-hand knowledge of the facts to be admissible, so

long as it has a "reliable basis in [the expert's] knowledge and experience of his discipline." <u>Daubert v. Merrell Dow Pharmaceuticals, Inc.</u>, 509 U.S. 579, 592 (1993). Mr. Sadowski's proffered testimony meets both criteria.

First, Mr. Sadowski's proffered testimony will shed light on a central issue at trial: why the BSG chose to implement top hat plans as part of its physician compensation program, and the purposes served by those plans.  More specifically, Mr. Sadowski will testify regarding the unique challenges academic medical centers face in compensating physicians, including (1) IRS limitations on highly compensated physicians' ability to save for retirement; (2) the need to support their multiple non-profit missions; (3) various restrictions on compensation imposed by status as non-profit organizations and other sources; and (4) the challenges of recruiting and retaining talented physicians and competing with other academic and nonacademic medical centers for same.  He also will explain how deferred compensation plans offer a solution to these challenges.  This testimony will provide important context for and reinforce Dr. Mannick's testimony about the BSG's decision to implement the UDC and FRBP.  As such, it will help the Court better understand why BSG decided to implement top hat plans, as opposed to other types of fringe benefits, particularly if, as plaintiff claims, all it cared to do was circumvent the Harvard salary cap.  In this, Mr. Sadowski's testimony is relevant and should be allowed.  <u>See</u>, <u>e.g.</u>, <u>U.S. v. Garcia Morales</u>, 382 F.3d 12, 19 (1st Cir. 2004) (affirming admission of expert testimony that provided context for subsequent evidence).

Second, Mr. Sadowski's testimony is based on his extensive experience in helping academic medical centers with the very challenge that BSG faced:  how best to

compensate physicians within the academic medical setting. In his fifteen years as a consultant at ECG, he has advised many of the country's most prestigious academic medical centers to design and improve their physician compensation program. As a result, Mr. Sadowski is intimately familiar with the market and regulatory challenges that affect a center's ability to accomplish these goals. In many instances, he has recommended that an academic medical center implement a top hat plan, and understands the purposes furthered by such plans within this unique environment. As a result, Mr. Sadowski's testimony has a reliable basis.[2]

### B. Plaintiff Misconstrues Mr. Sadowski's Testimony.

Plaintiff quotes Mr. Sadowski as testifying that his opinion concerning the purposes of the UDC and FRBP was "speculation" only. In doing so, plaintiff fails to note that Mr. Sadowski immediately corrected himself, explaining "that is my opinion based on both my experience and review of documents." Sadowski Dep. at 29: 3-8. Thus, an entire section of plaintiff's motion in limine characterizing Mr. Sadowski's testimony as speculative is misleading.

In fact, Mr. Sadowski provided well-reasoned testimony concerning the purposes of the UDC and FRBP, and his basis for same. He explained,

> I have an opinion on the purpose. My assumption is that those plans – that plan was put into place to create retirement savings opportunities that were otherwise constrained by the market and then regulation . . . that, two they were likely put into place as a vehicle for recruitment so that group could offer an enhanced compensation opportunity. And my opinion would also be that they were

---

[2] Plaintiff's argument that Mr. Sadowski's testimony should be excluded because he is not an expert on the legal bona fides of a top hat plan is a red herring. Defendants have proffered Mr. Sadowski as an expert concerning why academic medical centers implement such plans, not the legal or technical criteria for same. In fact, such expert testimony is not warranted in this matter. See Defendants' Motion in Limine to Exclude the Testimony of Norman Stein.

>likely put into place [as] a retention vehicle to – in an effort
>to bond employed physicians to the group.

Sadowski Dep. at 25: 12-24.  He likewise testified that his opinion is based on his experience in assisting other academic medical centers with the same compensation challenges that BSG faced and his review of relevant documents and deposition testimony in this case.  Plaintiff's attempt to misconstrue Mr. Sadowski's testimony as "speculation" is unwarranted and inapposite.[3]  What is more, Mr. Sadowski is not being offered to provide percipient knowledge regarding the thinking of those who introduced the UDC or the FRBP.  Rather, he will describe both the context in which, as well as the reasons why, such plans generally are employed in academic medical settings.

### C. The Harvard Salary Cap is Immaterial.

Plaintiff's argument that Mr. Sadowski does not qualify as an expert because he has no first-hand experience with the Harvard salary cap lacks merit.[4]  This case is not about the Harvard salary cap.  As Dr. Mannick will testify, he implemented the UDC for two principal reasons:  (1) to provide dramatically enhanced retirement funding for physicians whose ability to save money was otherwise limited and (2) to recruit and retain talented physicians.  He did not implement the UDC because of the Harvard salary

---

[3] At most, Mr. Sadowski admitted that he did not have personal knowledge concerning the decision to implement the UDC and FRBP.  This is not the grounds to exclude expert testimony.  Daubert, 509 U.S. at 592 (usual requirement of firsthand knowledge is "relaxed" for expert witnesses).

[4] Plaintiff's argument concerning Mr. Sadowski's inability to testify about the specific "bargaining power" of the BSG surgeons similarly lacks merit.  Defendants have not proffered Mr. Sadowski as an expert on that topic, nor is it determinative in this case.  As the Department of Labor explained in its advisory, top hat participants often have the ability to "affect, through negotiation or otherwise, the design and operation of their deferred compensation plans."  Dep't of Labor Opinion Letter 90-14A, 1990 ERISA LEXIS 12.  Defendants' trial exhibits and Dr. Mannick's testimony will demonstrate that the BSG surgeons had, and exercised, such ability.

cap, and Plaintiff offers no evidence to rebut this simple fact.[5]

Moreover, the Harvard salary cap is not unique. As Mr. Sadowski testified at deposition, most academic medical centers maintain some type of physician compensation guidelines. He has personal experience advising at least one academic medical center with a cap similar to Harvard's. Mr. Sadowski has also advised academic medical center clients concerning compensation limits they all face by virtue of their non-profit status.[6] As a result, Mr. Sadowski is well-qualified to testify about the context in which the BSG developed its physician compensation program in general, and the top hat plans under review in particular.

---

[5] In fact, BSG did not create the UDC until several years after Harvard Medical School implemented the Harvard salary cap.

[6] Like most academic medical center practices, the BSG compared its physician salaries to the Association of American Medical Colleges annual survey to ensure that the group did not jeopardize its non-profit status by paying excessive physician salaries (i.e., above the 80% percentile in the survey). Thus, to avoid challenges to their 501(c)(3) status, and to avoid the appearance of greed, the Group likely would not have paid its surgeons about that limit even if the Harvard salary cap did not exist.

## CONCLUSION

For the foregoing reasons, defendants respectfully request that the Court deny plaintiff's motion in limine to exclude the testimony of Stephen Sadowski.

                        Respectfully submitted,

                        BRIGHAM AND WOMEN'S PHYSICIANS ORGANIZATION, INC., BOSTON NEUROSURGICAL FOUNDATION INC., BRIGHAM SURGICAL GROUP FOUNDATION, INC. DEFERRED COMPENSATION PLAN, BRIGHAM SURGICAL GROUP FOUNDATION, INC. FACULTY RETIREMENT BENEFIT PLAN, COMMITTEE ON COMPENSATION OF THE BRIGHAM SURGICAL GROUP FOUNDATION, INC., and PETER BLACK, M.D.,

                        By their attorneys,

                        /s/ David C. Casey
                        David C. Casey (BBO No. 077260)
                        Gregory C. Keating (BBO No. 564523)
                        Laurie Drew Hubbard (BBO No. 651109)
                        LITTLER MENDELSON, PC
                        One International Place, Suite 2700
                        Boston, MA 02110
                        (617) 378-6000

Dated: October 10, 2006

- 9 -

## CERTIFICATE OF SERVICE

I hereby certify that on this 10th day of October, 2006, a true and accurate copy of the foregoing Defendants' Opposition to Plaintiff's Motion in Limine to Exclude the Testimony of Stephen Sadowski, filed through the ECF system, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing.

/s/ David C. Casey

Firmwide:81555798.1 047950.1002