Stephen Sadowski

1

```
 1                         Volume:  I
 2                         Pages:  1 to 84
 3              UNITED STATES DISTRICT COURT
 4              DISTRICT OF MASSACHUSETTS
 5                         C.A. NO. 04-10738-MLW
 6   ------------------------------------------------
 7   EBEN ALEXANDER, III, M.D.,
 8                    Plaintiff,
 9   vs.
10   BRIGHAM AND WOMEN'S PHYSICIANS ORGANIZATION,
11   INC., successor to BRIGHAM SURGICAL GROUP
12   FOUNDATION, INC. BOSTON NEUROSURGICAL FOUNDATION,
13   INC. DEFERRED COMPENSATION PLAN, BRIGHAM
14   SURGICAL GROUP FOUNDATION, INC. FACULTY RETIREMENT
15   BENEFIT PLAN COMMITTEE ON COMPENSATION OF THE
16   BRIGHAM SURGICAL GROUP FOUNDATION, INC., and
17   PETER BLACK, M.D.,
18                    Defendants.
19   ------------------------------------------------
20            DEPOSITION OF STEPHEN SADOWSKI
21       Wednesday, September 13, 2006; 2:06 p.m.
22              Nystrom Beckman & Paris, LLP
23              10 St. James Avenue, Boston, MA
24         Court Reporter:  Kathryn L. Santo
```

JONES REPORTING COMPANY
617-451-8900

Stephen Sadowski

13

1  to the organization management and financing of the
2  activities of faculty at the medical school or
3  teaching hospital. The nature of that work tends
4  to be on performance improvement.
5       Q.   Have you ever been consulted to structure
6  a compensation program from scratch?
7       A.   Yes, I have. To the best of my
8  knowledge, I've done it a number of times.
9       Q.   So is it fair to say that your role
10 consists of structuring compensation programs and
11 improving performance at places in which a
12 compensation program is already in place?
13           MS. HUBBARD:   Objection.
14      A.   Could you repeat the question?
15      Q.   I'm just trying to get a sense of whether
16 you, as a consultant, go into these academic
17 medical centers and set up the compensation
18 programs or there's one already in place and you
19 work to improve it or both?
20      A.   To the best my knowledge or description,
21 I'd say both. Most often, there is a compensation
22 program of some type in place, but certainly, on
23 occasion, there are circumstances that create the
24 need for new compensation programs that I have been

1  wage and physicians who receive, by comparison,
2  substantially greater compensation.  And again,
3  based on my experience and understanding of IRS
4  requirements under qualified programs, those tests
5  will often limit the amount of compensation that
6  can be devoted to the retirement program.
7        In addition, there are statutory caps as
8  well on the magnitude of funds that can be devoted
9  to retirement.  And so oftentimes, at least in
10 those circumstances, highly compensated physicians
11 are looking for opportunities to optimize the
12 amount of their contribution or their company's
13 contribution in the group practice to their
14 retirement program, as an example.
15     Q.   Did you say the physicians were looking
16 to optimize the amount of contributions to their
17 retirement programs?
18     A.   In -- sometimes.  Oftentimes, that's the
19 case.  I would say it depends on the nature of the
20 specialty.  Often, physicians, by specialty, vary
21 in the degree of -- or in the magnitude of
22 compensation -- are eligible to earn or what the
23 market will pay.
24     Q.   Okay.  So going with your example -- and

Stephen Sadowski

25

1    Q.    The IRS limitations.

2    A.    Yes. I'm not familiar with why the BSG
3 may have -- what drove them to develop a deferred
4 compensation program or what put them in place. I
5 could speculate on why they put one in place, but I
6 don't have -- I'm not sure.

7    Q.    You have no personal knowledge as to the
8 genesis of the UDC or the FRBP?

9    A.    Not -- no, no personal knowledge.

10   Q.    Do you have an opinion as to the purpose
11 of these plans?

12   A.    I -- yes. I have an opinion on the
13 purpose. My assumption is that those plans -- that
14 plan was put into place to create retirement
15 savings opportunities that were otherwise
16 constrained by the market and then regulation --
17 regulation rather than the market; that, two, they
18 were likely put into place as a vehicle for
19 recruitment so that group could offer an enhanced
20 compensation opportunity.

21        And my opinion would also be that they
22 were likely put into place a retention vehicle
23 to -- in an effort to bond employed physicians to
24 the group. Again, that's all speculative on my

Stephen Sadowski

29

1       (Brief recess taken from
2       2:47 p.m to 2:54 p.m.)
3       A.   I just wanted to take the opportunity to
4  clarify -- if that's okay -- my testimony from
5  before.  That when I referred to speculating on
6  this, that is my opinion based on both my
7  experience and review of the documents that I
8  referenced earlier.
9       Q.   And I think that you already testified
10 that your experience -- you have no experience with
11 Harvard; is that right?
12           MS. HUBBARD:  Objection.
13      A.   No experience with Harvard as it relates
14 to compensation program or compensation guidelines,
15 which is what I believe the question was.
16      Q.   Well, you have no personal experience
17 with consulting for Harvard; right?
18      A.   Not for Harvard Medical School.  I do
19 currently have an engagement with Partners Health
20 System, which is an affiliate of Harvard.
21      Q.   Right.  And does your engagement with
22 Partners consist of examining deferred compensation
23 plans for them?
24      A.   It does not.

Stephen Sadowski

37

1  Q.   I'm trying to understand that.

2  A.   Again, it's based on my experience and
3  review of the documents, but that's my opinion.

4  Q.   No. I understand it's your opinion. I'm
5  just -- I'm trying to understand why and how you
6  are able to reach the opinion that it's the primary
7  purpose, as opposed to the other purposes that
8  you've given me today.

9  A.   The reason I would say it's the -- I
10 believe it's the primary purpose, again, is based
11 on my experience, first of all, with why such plans
12 are put into place. And as I believe I mentioned
13 earlier, we often put those -- these types of plans
14 into place because we have constraints on our
15 retirement programs. So a nonqualified
16 compensation program provides a retirement
17 opportunity that wouldn't otherwise exist so that
18 fosters the ability to recruit.

19       That's why I have seen clients seek out
20 these types of programs. And so it is not a leap
21 for me to believe that Boston Surgical -- that
22 Brigham Surgical Group would do the same.

23       In reviewing the documents, the structure
24 and description of the plans were such that it's

39

1  One of the caveats that I would put on that are --
2  is a not-for-profit corporation. We have
3  limitations on magnitudes of compensation. We have
4  a need to fund other missions. It would give us
5  business imperatives to limit compensation. There
6  are other constraints on compensation like National
7  Institute of Health caps on research salaries.
8      Q.  In your experience -- have you finished
9  your answer?
10     A.  Yes.
11     Q.  Okay. In your experience as consultant
12 to numerous academic medical centers, have you come
13 across situations where there is a salary cap in
14 place?
15     A.  Yes. There are -- let me be cautious
16 here. Salary guidelines are in place typically at
17 a number of institutions.
18     Q.  Well, Harvard has a salary sealing;
19 right?
20     A.  They do. It's as described -- from what
21 I looked at in the document, what's described as
22 salary guidelines appears to be, based on review of
23 the document, a formulaic cap with exception
24 procedures.

Stephen Sadowski

40

1  Q. And have you come across such a formulaic
2  cap with exception procedures in your experience at
3  other academic medical centers?
4  A. Yes. I believe, to the best of my
5  knowledge, that there are such constraints within
6  the SUNI system in New York, as an example. I
7  would add to this that nearly most academic medical
8  centers are nonprofit organizations.
9  Q. What significance does that have?
10 A. So they are subject to concerns about
11 unreasonable levels of compensation. So whether
12 they are formulaic caps or policies and procedures
13 in place that act as caps to ensure their
14 compensation doesn't exceed certain limits, they
15 intend to be a practical reality.
16 Q. And what, in your experience given this
17 practical reality, is the solution to paying these
18 doctors market level?
19         MS. HUBBARD: Objection. Doctors at --
20         MS. COOK: Well, in his experience. I
21 mean, he's not specifying any particular academic
22 medical center.
23 Q. So in your experience as a consultant,
24 when you are faced with the practical reality of

59

1  specific, and I want to --
2      Q.   Let's break it down.
3      A.   -- make sure I'm responsive.
4      Q.   You're talking about top-hat plans --
5      A.   Correct.
6      Q.   -- right?  Let's just say --
7      A.   Deferred compensation programs, but sure,
8  top-hat plans.
9      Q.   Let's call it a top-hat plan.
10     A.   Okay.
11     Q.   And is that a group plan, or is that an
12 individual plan?
13     A.   It is a group plan.
14     Q.   Okay. And with respect to the terms of
15 that group plan, is it your understanding that the
16 people that would be covered by that plan have
17 bargaining power with respect to negotiating the
18 terms of that plan?
19          MS. HUBBARD:  Objection.
20     A.   I -- I would -- I'm sorry.  I guess I
21 don't like the term "bargaining power."  They would
22 exert influence -- they would certainly be able to
23 exert influence as the -- presumably over the
24 nature, design of the plan.

Stephen Sadowski

60

1   Q.   And how would they do that?

2   A.   As -- in a circumstance where it's
3   management, as managers with responsibility for the
4   compensation program, they would do it. And
5   circumstances where it's highly compensated
6   employees, they would presumably do it by virtue of
7   stature and concerns about the threat of departure
8   and termination.

9        However, you know, if there's --
10  depending on the nature of the government's
11  structure, the degree to which those groups can or
12  cannot influence the construct of the plan is real
13  or not real.

14  Q.   So if I boil it down, you're saying it
15  basically depends on the governing structure?

16  A.   I believe it depends on the governing
17  structure.

18  Q.   But you don't know anything about the
19  BSG's governing structure; right?

20  A.   I do not.

21  Q.   Have you published anything on top-hat
22  plans?

23  A.   I have not, and I don't believe, to the
24  best of my recollection, that I referenced them in

Stephen Sadowski

68

1  nonqualified deferred compensation plans is to
2  provide highly compensated physicians with a means
3  to supplement their retirement funds and to
4  maximize after-tax compensation." Do you see that?
5      A.   Mm-hmm.  I do.
6      Q.   What do you mean by that statement?
7           MS. HUBBARD:  Objection.
8      A.   When you say what do I mean by that
9  statement --
10     Q.   Well, let me ask you this:  What's the
11 basis for this statement?
12     A.   Again, in my experience where clients
13 have their existing or adopted nonqualified
14 retirement, nonqualified deferred compensation
15 programs, it is most often as a means supplement
16 retirement funds.
17     Q.   Okay.  And you say a principle reason is
18 to do that; is that right?
19     A.   Yes.
20     Q.   What are other reasons?
21     A.   Other reasons would be to provide a
22 vehicle.  Nonqualified plans, to my knowledge, as
23 an example, are prevalent in business generally,
24 but they are not prevalent in health care or

69

1  academic medicine by comparison. So it does offer
2  a distinctive advantage when recruiting a faculty
3  member to have that enhanced retirement
4  opportunity.
5      Q.   And by "nonqualified plan," you mean a
6  top-hat plan?
7      A.   Sure.
8      Q.   Okay.
9      A.   A second reason is, I think, to foster
10 retention, since that deferred compensation program
11 is most often an asset of the corporation. So it
12 becomes of interest to the faculty to ensure that
13 that corporation is a going concern so that it can
14 foster its retention in that matter.
15     Q.   In your opinion, are these all reasons
16 for -- purposes for the UDC and the FRBP?
17          MS. HUBBARD: Objection.
18     A.   In my opinion, they are purposes that
19 would appear to me were likely factored into the
20 thinking of -- it seems clearer to me from what
21 I've read that it was perhaps maybe a bit more
22 focused on retention than ; although, it seems that
23 was likely an important point, too but retention
24 seems to be.