*Document Electronically Filed*

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                                    )
EBEN ALEXANDER, III, M.D.                           )
                                                    )
        Plaintiff,                          )     Case No. 04-10738 MLW
                                                    )
        v.                                  )
                                                    )
BRIGHAM AND WOMEN'S PHYSICIANS                      )
ORGANIZATION, INC., successor to                    )
Brigham Surgical Group Foundation, Inc.,            )
BOSTON NEUROSURGICAL FOUNDATION                     )
INC., BRIGHAM SURGICAL GROUP                        )
FOUNDATION, INC. DEFERRED                           )
COMPENSATION PLAN, BRIGHAM                          )
SURGICAL GROUP FOUNDATION, INC.                     )
FACULTY RETIREMENT BENEFIT                          )
PLAN, COMMITTEE ON COMPENSATION                     )
OF THE BRIGHAM SURGICAL GROUP                       )
FOUNDATION, INC., and                               )
PETER BLACK, M.D.                                   )
                                                    )
        Defendants.                         )
_____ )

## DEFENDANTS' PROPOSED FINDINGS OF FACT AND RULINGS OF LAW

        Defendants Brigham and Women's Physicians Organization, Inc., Boston
Neurosurgical Foundation, Inc., Brigham Surgical Group Foundation, Inc. Deferred
Compensation Plan, Brigham Surgical Group Foundation, Inc. Faculty Benefit
Retirement Plan, Committee on Compensation of the Brigham Surgical Group
Foundation, Inc. and Peter Black (collectively, "defendants" or "BSG") submit these
Proposed Findings of Fact based on the anticipated testimony and other evidence that will
be presented during the October 19, 2006 trial in this matter.

## PROPOSED FINDINGS OF FACT[1]

I.    **THE CORPORATE STRUCTURE AND REPRESENTATIVE SYSTEM OF BSG**

1.    Brigham Surgical Group Foundation, Inc. ("BSG" or the "Group") was created in the mid-1970s as "a non-profit charitable corporation incorporated under the laws of Massachusetts for the purpose of educating medical students and surgical residents, carrying on a program of research in surgery and related fields and maintaining the Department of Surgery at the Brigham and Women's Hospital, a teaching hospital, so as to perform the surgical and surgical teaching functions of said hospital and certain of the surgical teaching functions of the Harvard Medical School." Corporate Bylaws of The Brigham Surgical Group Foundation, Inc. ("Bylaws"). Dr. John Mannick, then Chief of Surgery at the Peter Bent Brigham Hospital, became President of BSG upon its founding. Anticipated testimony of John Mannick, M.D. ("Mannick Testimony").

2.    BSG was a membership corporation. *See* Bylaws, Article II. The Members of BSG were surgeons who served as Instructors, Assistant Professors, Associate Professors, or Professors at Harvard Medical School. Bylaws, Article III, ¶ 1. All Members were on the medical staff of the Brigham and Women's Hospital. *Id.*

3.    All Members of BSG had the opportunity to vote to elect members of the Board of Directors of BSG. Bylaws, Article III, ¶ 3; Deposition of Eben Alexander, III, M.D. ("Alexander Dep.") at 25: 9-12. All Members of BSG also could run for election to the Board of Directors. Alexander Dep. at 25:17-20. The Board of Directors was responsible for managing the business of BSG. Bylaws, Article III, ¶ 1.

---

[1] Defendants have included citations below to anticipated testimony and evidence at trial. If the Court so desires, defendants will supplement these proposed findings of fact with greater specificity at the conclusion of trial.

4.     BSG's Board of Directors was comprised of a minimum of seven (7) directors, including the President of BSG and three (3) "Outside Directors." Bylaws, Article III, ¶ 3. To qualify as an Outside Director, a person could not be an officer or employee of BSG or any other organization controlled by, or under common control with, BSG. *Id.* The President, and the members of the Board of Directors who were not Outside Directors, were physicians. *Id.*

5.     The President of BSG selected six (6) members of the Board of Directors to serve on the Executive Committee of the Board of Directors. Bylaws, Article III, ¶ 12. The Executive Committee generally had the power to exercise all the powers of the Board of Directors, to the extent permitted by law. *Id.* All of the members of the Executive Committee were physicians. *Id.*

6.     BSG also had a Committee on Compensation. Bylaws, Article III, ¶ 12. It was comprised of the President of BSG and three Outside Directors. *Id.* In addition, a Member served as a non-voting member. *Id.* The Committee on Compensation had final authority within BSG with regard to all compensation arrangements, including deferred compensation arrangements, between BSG and the officers, directors and employees of BSG. *Id.*

## II.     THE PURPOSE AND EFFECT OF THE UDC AND FRBP

7.     In the 1970s, BSG implemented a new physician compensation policy (the "Policy") designed to provide appropriate incentives for both clinical work (performing surgeries) and academic work (teaching, research and publications). Mannick Testimony; BSG Professional Staff Compensation Policy (the "Policy").

8.     Dr. Mannick decided to implement a new physician compensation policy

in response to concerns about BSG's financial condition. Previously, physician compensation was determined subjectively, and physicians had little incentive to generate clinical productivity or manage expenses. Dr. Mannick strove to implement a system that would provide appropriate incentives for the physicians' clinical work and academic work, while also generating sufficient revenue to support the Group's charitable missions. Mannick Testimony.

9.      Through the Policy, BSG sought to reward physicians for clinical productivity by basing physician compensation on the amount of net practice income ("NPI") generated by each surgeon's practice.[2] Mannick Testimony.

10.     The Policy also sought to encourage academic work. It did so by incorporating the Harvard Medical School's faculty salary guidelines. As members of the Harvard Medical School faculty, BSG's surgeons were bound by Harvard's faculty salary guidelines, which included a salary cap (the "Cap"). Under BSG's Policy, Members could earn a salary up to the Cap for their academic rank. To earn more salary, the Member had to be promoted in rank, which was based solely on academic work and publications. Thus, the salary structure under the Cap provided an incentive for academic work. Mannick Testimony.

11.     During this process, Dr. Mannick and BSG determined that it needed a vehicle to (1) provide its most highly compensated and profitable surgeons with a means to supplement their retirement funding and, as such, to (2) recruit and retain talented physicians. This decision arose, in part, from a prominent cardiac surgeon's threats to

---

[2] Pursuant to the Policy, NPI was calculated annually by finding the difference between the revenue resulting from a Member's clinical activity and his expenses (which included all direct and allocated expenses incurred by or on behalf of a Member) during the academic year. *See* Professional Staff Compensation Policy.

leave BSG.  Mannick Testimony.

12.    Accordingly, BSG, in consultation with legal counsel, created the Unfunded Deferred Compensation Plan ("UDC"), which specifically created a vehicle for providing tax-deferred compensation to the most highly productive and highly valued physicians.  Mannick Testimony.

13.    The FRBP was created in response to the Tax Reform Act of 1986, which limited the amount of contributions that individuals could make to qualified plans.  As a result of those changes to the tax code, BSG needed another vehicle to allow its most highly compensated physicians to defer that portion of their compensation that they otherwise could have contributed to the Group's 403(b) qualified plan.  Thus, the BSG created the FRBP to replace its 403(b) qualified plan for its most highly compensated and profitable surgeons.  Its purpose was to allow those physicians to defer compensation to supplement their retirement funding.  Mannick Testimony.

14.    In designing the UDC and FRBP, BSG specifically sought to reward its most profitable surgeons with a deferred compensation program that would encourage them to stay at BSG.  BSG decided to implement unfunded deferred compensation plans for this purpose because the participants' contributions would be subject to the Group's general creditors, thereby aligning the participants' financial interests with the Group's.[3] The plans were particularly appealing to physicians because their ability to accumulate wealth and save for retirement was otherwise constrained:  IRS limits restricted the amount of money that highly compensated physicians could contribute to qualified retirement plans and, unlike physicians in private practice, academic medical center

---

[3] Because the assets of the plans were "unfunded," and departure of key surgeons could destroy the Group, participating physicians would be reluctant to leave the Group before retirement and thereby put their deferred compensation at risk.

physicians have no "equity" in their practice and cannot cash out upon retirement. Mannick Testimony; Anticipated testimony of Stephen Sadowski ("Sadowski Testimony").

15.    BSG offered other benefits to its surgeons, such as its Faculty Educational Benefit Plan, through which the Group paid the college tuition of Members' children.  In some cases, the amount of tuition that the Group paid on behalf of a Member in a given year, combined with the Member's salary, exceeded the Cap for that Member's rank. This demonstrates that there were other means, specifically, a range of other "benefits" that BSG could have used and, in some instances, did to "exceed" the Cap.  Mannick Testimony; Faculty Educational Benefit Plan.

16.    BSG also maintained a 401(a) qualified pension plan for its employees and, until 1986, a 403(b) plan.  Professional Staff Compensation Policy, ¶ 4; Mannick Testimony.  The IRS anti-discrimination rules and contribution limits, however, restricted how much money, and what percentage of income, BSG's most highly paid physicians could contribute to those plans.  Sadowski Testimony.

17.    Under the Policy, Members were eligible to participate in the UDC and FRBP only if they generated net practice income above the Harvard salary cap for their academic rank.  Professional Staff Compensation Policy, ¶ 5.  More specifically, the Policy worked, in relevant part, as follows:

>    If a Member generated NPI in excess of his salary, he would receive an
>    incentive bonus that would bring his total cash compensation up to the Harvard
>    cap for his rank, and a 401(a) qualified plan contribution would be made on that
>    bonus.

If the Member generated NPI after exceeding this bonus and qualified pension plan contributions, up to 25% of the Member's total salary would be credited to the Faculty Benefit Retirement Plan on behalf of that Member. That amount could be reduced, though, at the Member's request, if the group gave the Member any special research grants. (Compensation Policy, ¶ 5).

If the Member generated NPI in excess of his maximum FRBP contributions, 401(a) pension plan contributions on the non-clinical portion of the Member's salary would be deducted. If any NPI remained after that, an amount up to 50% of the excess (not to exceed 75% of the Member's base salary) would be contributed to an eligible Member's account as an Unfunded Deferred Compensation allocation. (Compensation Policy, ¶ 6).

Any excess NPI accrued to the Group. (Compensation Policy, ¶ 7).

18.    Several factors affect the amount of NPI that a surgeon can generate, including especially (1) his area of specialty and the rate at which such surgical procedures are reimbursed and (2) his seniority, reputation and experience. Mannick Testimony; Alexander Dep. at 38:23 – 41:15. For example, cardiac and neurosurgeons tend to be more profitable than general surgeons because they are reimbursed at a higher rate. Mannick Testimony; Alexander Dep. at 35:18 – 36:13.

19.    A member could receive his FRBP or UDC contributions only upon retirement or death. UDC, §§ 3.01 – 3.03; FRBP, §§ 3.05-3.07. In certain circumstances, Members who participated in the plans and left the Group before retirement were permitted to receive a payout of their UDC and FRBP at the discretion of the Group only. Mannick Testimony. These arrangements were not the norm, however, and required the

approval of the President of BSG.  Mannick Testimony; UDC, § 3.02; FRBP, § 3.06.

III.    THE ABILITY OF BSG'S MEMBERS TO AFFECT THE TERMS AND ADMINISTRATION OF THE UDC AND FRBP.

20.    BSG Members had the power to propose changes to the UDC and the FRBP by, for example, communicating with the Board of Directors.  Alexander Dep. at 29:6-23.  The Board of Directors could consider any such proposed changes.  Alexander Dep. at 29: 21-23.

21.    If the Board of Directors approved any such proposed changes, then such proposed changes were referred to the Executive Committee for its consideration. Bylaws.

22.    After consideration of a proposed change to the UDC or FRBP, the Executive Committee could vote to approve such change.  Any approved changes were then submitted by the Executive Committee to the Committee on Compensation for final approval.  For a proposed change to the UDC or FRBP to become final, such change needed to be approved by the Committee on Compensation.  Bylaws, Article III, ¶ 12.

23.    There were several meetings in which the Executive Committee discussed changes, which had been proposed by BSG Members, to the eligibility criteria of the UDC or FRBP.  *See* Minutes of the Executive Committee dated April 1, 1988; May 13, 1988; February 16, 1990, September 18, 1992, October 30, 1992 and December 4, 1992.

24.    In 1989 or 1990, a Member proposed revising the eligibility criteria for the UDC so that all academic ranks would be eligible to participate in the UDC.  At the time, the only Members who were eligible to participate in the UDC were those who held the rank of Associate Professor and above.  The Executive Committee considered this proposal on February 16, 1990.  The Executive Committee voted to submit this proposal

to the Committee on Compensation for approval. *See* February 16, 1990 Executive Committee Meeting Minutes.

25.    On October 31, 1990, the Committee on Compensation approved this change to the UDC's eligibility criteria. *See* Minutes of the Committee on Compensation dated October 31, 1990.

26.    In 1992, Members proposed the following changes to the UDC and FRBP: (i) Members hired after October 31, 1992 at the rank of Instructor or Assistant Professor would not be eligible to participate in the UDC and FRBP during their first full three years of employment; (ii) Members holding the position of Instructor would no longer be eligible to participate in the UDC effective July 1, 1994; (iii) Members hired after October 31, 1992 in the position of Instructor would no longer be eligible to participate in the UDC, regardless of the length of their employment (i.e., they could not participate in the plan even after the 3-year "trial" period); and (iv) Members hired before October 31, 1992 would not be affected by these eligibility limitations for the UDC. *See* September 18, 1992 Executive Committee Meeting Minutes.

27.    On October 30, 1992, the Executive Committee preliminarily approved these proposals, pending further deliberation at the next meeting of the Executive Committee. *See* October 30, 1992 Executive Committee Meeting Minutes.

28.    On December 4, 1992, the Executive Committee voted to recommend that the Committee on Compensation adopt the following changes to the UDC and FRBP: (i) Members hired after October 31, 1992 at the rank of Instructor or Assistant Professor would not be eligible to participate in the UDC and FRBP during their first three full years of employment; and (ii) Members holding the position of Instructor would no

longer be eligible to participate in the UDC effective July 1, 1994.  *See* December 4, 1992 Executive Committee Meeting Minutes.

29.    The Committee on Compensation subsequently approved these changes to the eligibility criteria for the UDC and FRBP.  *See* November 3, 1993 Committee on Compensation Meeting Minutes.

## IV.    PHYSICIAN COMPENSATION AT ACADEMIC MEDICAL CENTERS

### A.    The Goals of Physician Compensation Programs

30.    Academic medical centers and their affiliated physician groups generally seek to design and maintain physician compensation programs that provide appropriate incentives for clinical care, on the one hand, and teaching and research, on the other. This is because academic medical centers are almost always non-profit organizations with teaching and research as their principal charitable missions.  Further, they are dependent upon the physicians who practice there to carry out these charitable missions and to generate revenue through clinical work to support them.  Sadowski Testimony.

31.    Thus, academic medical centers typically institute physician compensation programs that encourage physicians both to generate clinical revenue by seeing patients and performing procedures, while also encouraging them to spend time conducting research, publishing articles and teaching medical students, residents and fellows. Sadowski Testimony.

32.    Physician compensation programs also should enable academic medical centers to recruit and retain a roster of talented physicians to further their charitable missions, particularly because academic medical centers compete fiercely to attract and retain talented physicians.  Sadowski Testimony.

**B.     Non-qualified Deferred Compensation Plans as a Component of Physician Compensation Programs**

33.     Non-qualified deferred compensation plans have been attractive to highly compensated employees in general because IRS anti-discrimination rules and annual contribution limits restrict how much money they can contribute to traditional qualified retirement plans, such as 401(k) or 403(b) plans.  Many employers in non-healthcare industries have provided non-qualified retirement plans for their most highly compensated employees.  Similarly, a principal reason academic medical centers and physician practice groups implement non-qualified deferred compensation plans is to provide highly compensated physicians with a means to supplement their retirement funds dramatically and to maximize after-tax compensation.  Sadowski Testimony.

34.     In designing physician compensation programs, non-qualified deferred compensation plans can be an effective element in compensating physicians at academic medical centers, for two reasons:

a.   First, highly-paid academic medical center physicians often can benefit from a supplemental means of funding their retirement, both because they are significantly limited in the percentage of their income and the amount of money they can contribute to qualified retirement plans, and because they have limited means for otherwise accumulating wealth from their professional work.  As such, deferred compensation plans can enhance a medical center's means for recruiting physicians; and

b.   Second, non-qualified deferred compensation plans, such as top hat plans, can help to motivate and retain highly profitable physicians by aligning their economic interests with the group's long-term financial success.

Being subject to risk of forfeiture, unfunded deferred compensation plans not only encourage participating physicians to remain productive, they also discourage them from leaving the group before retirement. Sadowski Testimony.

## PROPOSED RULINGS OF LAW

### I.    THE PLANS ARE VALID TOP HAT PLANS UNDER ERISA.

ERISA defines a top hat plan as one "which is unfunded and is maintained by an employer primarily for the purpose of providing deferred compensation for a select group of management or highly compensated employees." 29 U.S.C. §§ 1051(2); 1081(a)(3); 1101(a)(1). Thus, to satisfy the Court that the UDC and FRBP (collectively, the "Plans") constitute *bona fide* top hat plans, defendants must establish that (1) the Plans were maintained primarily for the purpose of providing deferred compensation; (2) the participants qualified as "management or highly compensated employees;" and (3) only a select group of employees actually participated in the Plans. As explained below, I find that defendants have satisfied these criteria.

### A.    The Primary Purpose and Effect of the UDC and FRBP Was to Provide Deferred Compensation to Participants.

Construing the top hat provision in ERISA, the Department of Labor has explained that, "the term primarily, as used in the phrase 'primarily for the purpose of providing deferred compensation for a select group of management or highly compensated employees[,]' refers to the purpose of the plan (i.e., the benefits provided)." Dep't of Labor Opinion Letter 90-14A, 1990 ERISA LEXIS 12. Thus, to determine whether a plan is maintained primarily for the purpose of providing deferred compensation for a select group of management or highly compensated employees, the

Court shall examine (1) how the plan is administered; and (2) what benefits are provided. *Id.*; *see also Violette v. Ajilon Finance*, 2005 WL 2416986, at * 5 (D.N.J. 2005) ("[U]pon further scrutiny, the Court is satisfied that the 2001 Plan indeed provides deferred compensation benefits to highly compensated employees . . . Accordingly, the Court finds that the 2001 Plan meets the second part of the definition of a top hat plan."); *Virta v. DeSantis Enterp., Inc.*, 1996 WL 663970, at * 3 (N.D.N.Y. 1996) ("the issue at hand is . . . whether the plan was administered in a manner designed to provide benefits for a select group of management or highly compensated employees."). As I will now explain, the evidence shows that the UDC and FRBP were administered to provide deferred compensation to their participants.

### 1.      *Deferred Compensation Was the Only Benefit that the Plans Provided to Participants.*

As Dr. Mannick testified, in overhauling BSG's physician compensation program, he recognized that the Group needed to provide its most valuable surgeons an alternate means to accumulate wealth for retirement because their ability to save for retirement was otherwise constrained. As a result, the BSG implemented the UDC and, later, the FRBP. I find that the only benefit that the Plans provided to their participants was deferred compensation. As such, I conclude that the UDC and FRBP satisfy ERISA's requirement that a *bona fide* top hat plan be maintained primarily for the purpose of providing deferred compensation.

### 2.      *That the Plans May Have Served Other Purposes Is Immaterial.*

Plaintiff argues that the Plans do not satisfy this requirement because they served other purposes, such as providing compensation to physicians above the Harvard salary cap or recruiting and retaining valuable surgeons. I find this argument unavailing. That

- 13 -

the Plans may have furthered any other purpose for BSG is immaterial.  Courts routinely

have upheld top hat plans that were maintained to provide deferred compensation to

highly compensated employees above IRS limits, as well as those that were designed to

recruit and retain valuable employees.  In fact, the Second Circuit recently noted that,

> Top hat plans are designed to provide certain employees
> with payments over and above the benefits provided by
> "qualified" employee benefit plans - *i.e.*, plans that are
> eligible for favorable tax treatment, such as [the
> employer's] standard retirement plan.   The Internal
> Revenue Code limits the value of benefits that may be paid
> under qualified plans, *see* 26 U.S.C. §§ 401(a)(17), 415 -
> hence the need for top hat plans when employers wish to
> provide a higher level of deferred compensation to some of
> their employees.

*Eastman Kodak v. STWP*, 2006 U.S. Dist. LEXIS 16079 (5th Cir. 2006).  Similarly, in

*Demery v. Extebank Deferred Compensation Plan*, 216 F.3d 283 (2d Cir. 2000), the

Second Circuit concluded that a supplemental pension plan qualified as a top hat plan

where it was supplemental to the employer's qualified plans and "established as a means

to retain valuable employees."  216 F.3d at 287; *see also Garratt v. Knowles*, 245 F.3d

941, 946 n.4 (7th Cir. 2001) ("In terms of design, the difference between a top hat plan

and an excess benefit plan is, in most circumstances, that the top hat plan can have

multiple broad purposes, while an excess benefit plan has the sole purpose of avoiding

the limitations imposed by § 415 of the Internal Revenue Code."); *Isko v. Engelhard

Corp.,* 367 F. Supp. 2d 702, 708-09 (D.N.J. 2005) (same); *In re Battram*, 214 B.R. 621,

625 (Bankr. C.D. Cal. 1997) ("a top hat plan need only be primarily for the purpose of

providing deferred compensation, not exclusively for that purpose.").  Thus, I conclude

that the Plans' primarily and ancillary purposes satisfy ERISA's requirements for same.

**B.    Plan Participants Had and Exercised the Ability to Affect the Terms and Administration of the Plans.**

ERISA mandates that an employer limit participation in a *bona fide* top hat plan to highly compensated or management employees.  In addressing this requirement, the Department of Labor has noted that such employees typically are "in a strong bargaining position relative to their employers," thus, they do not need ERISA's substantive protections.  *See* Dep't of Labor Opinion Letter 90-14A, 1990 ERISA LEXIS 12 (May 8, 1990) ("in providing relief for top hat plans form the broad remedial provisions of ERISA, Congress recognized that certain individuals, by virtue of their position or compensation level, have the ability to affect or substantially influence, through negotiation or otherwise, the design and operation of their deferred compensation plan").  No court has addressed the standard through which an employer satisfies this criteria.  The Department of Labor letter which gave rise to this notion spoke broadly in terms of high level employees' "ability to affect . . . through negotiation or otherwise . . . the design and operation" of such plans.  Dep't of Labor Opinion Letter 92-13A n.1, 1992 ERISA LEXIS 14 (May 19, 1992); *see also Duggan v. Hobbs*, 99 F.3d 307, 312-13 (9th Cir. 1996) (same).  It said nothing about requiring plan administrators to show that the affected employees actually wielded so-called bargaining power, or did so to any specific end.[4]  *See Demery*, 216 F.3d at 290 (focus is on the "absence of bargaining power").

I find that the participants in the UDC and FRBP had the ability to -- and did --

---

[4] In a recent decision holding that a deferred compensation plan did not qualify as a top hat plan, the United States District Court for the Eastern District of Virginia suggested that the court must consider whether the participants in an top hat plan are, "in a position to protect their own interests."  *Guiragoss v. Khoury*, 2006 WL 2347396, at * 6 (E.D. Va. Aug. 10, 2006).  The language of the statute, however, does not contain this requirement.  In any event, *Guiragoss*  is distinguishable because the plan at issue was not offered to a select group of management or highly compensated employees.  *Id.* at *9-10.  In fact, the plaintiff/participant was a sales clerk who was "expected to clean, vacuum, dust and clear trash from the store." *Id.* at * 10.

affect the design and operation of the plans.  Defendants' expert witness testified that successful physicians possess significant bargaining power vis a vis their employers because academic medical centers compete fiercely for prominent physicians, and depend on those physicians' clinical work to fund their non-profit missions.  Relatedly, Dr. Mannick testified that BSG implemented the UDC, in part, because a prominent cardiac surgeon had threatened to leave the Group.

Defendants also presented evidence that BSG modified the Plans' terms and operation at the suggestion of Members.  BSG operated through a representative system though which the physician members elected peers to the Board of Directors.  The Board of Directors, its Executive Committee and Committee on Compensation, in turn, made decisions concerning physician compensation.  Participants could discuss changes to or concerns regarding the plans with members of the Board of Directors at any time.  On several occasions, such Member concerns resulted in changes to the Plans.  As a result, I find that the physicians who qualified to participate in the UDC and FRBP had the ability to affect -- through negotiation or otherwise -- the terms and operation of the Plans.

### C.    Select Group Criteria.

To determine whether a top hat plan satisfies the "select group" criteria, the Court must examine the percentage of the total workforce that was eligible to participate in the plan.  *See, e.g., Demery*, 216 F.3d at 287-88; *Gallione v. Flaherty*, 70 F.3d 724, 728 (2d Cir. 1995); *Belka v. Rowe Furniture Corp*, 571 F. Supp. 1249, 1252-53 (D. Md. 1983); *In re the IT Group, Inc.*, 205 B.R. at 411.  In doing so, the Court will consider only those employees who actually became eligible to participate in the Plans.  All courts, with the exception of *Darden v. Nationwide Mut. Ins. Co.*, 717 F. Supp. 388 (E.D.N.C. 1989),

count as "participants" only those employees who have satisfied plan eligibility criteria, or who actually participate in a plan, in determining whether it satisfies the "select group" requirement. *See, e.g., Duggan*, 99 F.3d at 310 (only employees who received benefits under plan included in top hat analysis); *Gallione*, 70 F.3d at 728 (only employees eligible to participate in plan included in top hat analysis); *Carrabba v. Randall's Food Markets, Inc.*, 38 F. Supp. 2d 468, 473 (N.D. Tex. 1999) (court considered only those employees to whom participation in the plan was available "in actual operation of the plan"); *Belka*, 571 F. Supp. at 1252 (only employees party to deferred compensation agreement and entitled to receive benefits thereunder included in top hat analysis); *In re Battram*, 214 B.R. at 625 (only employees who were party to plan agreement (i.e. "covered" by the plan) included in top hat analysis); *cf.* Dep't of Labor Opinion Letter 90-14A, 1990 ERISA LEXIS 12 (top hat plan must "limit[] participation to a select group of management or highly compensated employees").

As the parties have stipulated, a BSG employee had to satisfy three criteria to participate in the UDC and FRBP. He had to be (1) a surgeon, (2) a full-time member of the Harvard Medical School faculty, and (3) he had to generate NPI in excess of a certain threshold. Employees who did not satisfy all three requirements were not eligible to and did not participate in the Plans.[5]

The parties have stipulated and I so find that application of these eligibility criteria resulted in a small number of BSG employees actually participating in the Plans during the relevant time period: 7.1 % in 1997; 5.1 % in 1998; and 4.6 % in 1999. Thus, I conclude that the UDC and FRBP satisfy the "select group" criteria for top hat plans.

---

[5] In 1992, BSG revised the UDC to clarify these restrictions on participation, changing the defined term "Employees" in the plan to "Eligible Employees

*See, e.g., Demery*, 216 F.3d at 288 (select group criteria satisfied where 15.34% of the workforce was eligible to participate in the plans); *Duggan*, 99 F.3d at 312 ("employees are part of a "select group" . . . where the employer's retirement plan coverage is limited to a small percentage of the employer's total workforce."); *Belka*, 571 F. Supp. at 1252 (select group criteria satisfied where 4.6% of the workforce was eligible to participate); Dep't of Labor Opinion Letter 75-64, 1975 ERISA LEXIS 50 (August 1, 1975) (select group criteria satisfied where fewer than 4% of employees covered by plan).

### D.    Conclusion

Based on the findings of fact and rulings of law discussed above, the Court finds that the Unfunded Deferred Compensation Plan and Faculty Retirement Benefit Plan satisfy ERISA's requirements for *bona fide* top hat plans, exempt from ERISA's fiduciary duty, vesting, participation and funding requirements. *See* 29 U.S.C. §§ 1051(2); 1081(a)(3); 1101(a)(1). As a result, Counts IX – XII of the Complaint are hereby dismissed with prejudice.

Respectfully submitted,

BRIGHAM AND WOMEN'S
PHYSICIANS ORGANIZATION, INC.,
BOSTON NEUROSURGICAL
FOUNDATION INC., BRIGHAM
SURGICAL GROUP FOUNDATION,
INC. DEFERRED COMPENSATION
PLAN, BRIGHAM SURGICAL GROUP
FOUNDATION, INC. FACULTY
RETIREMENT BENEFIT PLAN,
COMMITTEE ON COMPENSATION OF
THE BRIGHAM SURGICAL GROUP
FOUNDATION, INC., and PETER
BLACK, M.D.,

By their attorneys,


/s/ David C. Casey
David C. Casey (BBO No. 077260)
Gregory C. Keating (BBO No. 564523)
Laurie Drew Hubbard (BBO No. 651109)
LITTLER MENDELSON, PC
One International Place, Suite 2700
Boston, MA 02110
 (617) 378-6000

Dated:  October 10, 2006

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 10th day of October, 2006, a true and accurate copy of the foregoing Defendants' Proposed Findings of Fact and Rulings of Law, filed through the ECF system, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing.

/s/ David C. Casey   

Firmwide:81162899.1 047950.1002