**EXHIBIT B**

Case 1:04-cv-10738-MLW   Document 77-3   Filed 10/10/2006   Page 1 of 8

## EXPERT REPORT OF NORMAN P. STEIN

### Introduction

I have been asked for my expert opinion concerning whether the Faculty Retirement Benefit Plan ("FRBP") and the Unfunded Deferred Compensation Plan ("UDC") of the Brigham Surgical Group Foundation, Inc. ("the Foundation") qualify as "top hat" plans under ERISA.

### Background

I am the Douglas Arant Professor of Law at the University of Alabama School of Law and was Director of the University of Alabama Pension Counseling Clinic from 1995 through 2004. I joined the University of Alabama School of Law faculty in 1984. I have been a visiting professor at several other universities since 1987, including the University of Texas at Austin, Indiana University (Bloomington), and the University of California at Davis.

I received my J.D. in 1978 from Duke University, where I was elected to the Order of the Coif. Following law school, I was an associate with the Washington, D.C. firm of Arnold & Porter until 1980. From 1980 to 1981, I was a law clerk for the Honorable Gerald Bard Tjoflat of the United States Court of Appeals for the Fifth Circuit. After my clerkship, I practiced law in Atlanta until 1984.

I have regularly taught J.D. classes in federal income tax, labor, business, and employees benefits, including Federal Taxation I and II; Employee Benefits; Employee Benefits Clinic (though the Pension Counseling Clinic); Corporate Tax; Business Organizations; and Labor Law. I also have taught classes in deferred compensation and tax accounting in the University's LL.M. program in taxation.

I am a member of the advisory panel of the BNA Pension Reporter, have served

as counsel to the American Association of Retired Persons in pension cases, was a consultant to the General Accounting Office, taught in the IRS General Counsel's continuing education program, and have been chair of the Employee Benefit Section of the Association of American Law Schools and the Teaching Employee Benefits Subcommittee of the American Bar Association, and co-chair of the ABA TIPS Employee Benefits Committee. I am a charter Fellow of the American College of Employee Benefits Counsel and was elected as a fellow of the National Academy of Social Insurance. I have also served as a member of the General Accounting Office Panel of Experts on retirement security issues and was appointed by Secretary of Labor Alexis Hermann to the Department of Labor's Advisory Counsel on Employee Welfare and Employee Pension Plans (generally referred to as the ERISA Advisory Counsel) for a three-year term. In addition, I have been president of the University of Alabama Faculty Senate and am currently treasurer of the Society of American Law Teachers.

I have published over twenty articles and book chapters, three books and numerous book supplements on ERISA related topics. I also have been a lecturer, moderator, and on panels throughout the country to discuss ERISA related topics sponsored by a myriad of organizations, including the Ford Foundation, American Law Institute, American Bar Association, Pension Rights Center, the United States Department of Labor, Pension Benefit Guaranty Corporation, and Administration on Aging. In addition, I have testified before Congress and administrative agencies on pension issues on several occasions as listed on my curriculum vitae, which is attached to this report.

In short, I am familiar with ERISA's statutory language, legislative history and intent, as well as the treatment of the statute by the executive, legislative, and judicial

2

branches of government.

**Opinions**

Based on my experience outlined above, and the documents that I have reviewed in connection with this matter, I am of the following opinions:

1. In the years leading up to Congressional passage of ERISA, a cabinet-level taskforce appointed by President Kennedy and the Senate Labor Committee (after a series of hearings) each identified serious problems with private sector pension plans. These problems included: (i) inadequate disclosure of the details of employee benefit plans to plan participants; (ii) forfeiture of plan benefits by participants despite long years of employment; (iii) failure of plan sponsors and plan administrators to conform to high standards of fiduciary behavior; and, (iv) failure of plan sponsors to fund plans adequately. Congress enacted ERISA to address, among others, these problems. ERISA's substantive requirements apply generally to all private-sector retirement plans, which are plans that result in the deferral of income.

2. Congress included exceptions to ERISA's requirements. One of these exceptions provides that certain deferred compensation plans for a select group of management or highly compensated employees, often colloquially referred to as "top-hat plans," were subject to ERISA's disclosure and reporting requirements but were exempt from other ERISA provisions, including its fiduciary rules and its minimum vesting standards. Moreover, the Department of Labor, by regulation, has substantially limited the reporting and disclosure obligations of top-hat plans.

3. The Department of Labor has explained that, in its view, the rationale for the top-hat exception was that certain employees do not require all of the protections afforded by ERISA because they have the ability to affect or substantially influence,

3

through negotiation or otherwise, the design and operation of their deferred compensation and therefore did not need ERISA's substantive rights and protections. See DOL Advisory Opinion Letter 90-14A. In my view, the Department of Labor's explanation for the top-hat plan exception is an accurate reflection of Congressional intent and one that is widely shared by the pension community.

4. A necessary condition for a plan to be a "top-hat" plan is that the employees who participate in the plan have the ability to negotiate for adequate security of benefits and other protections. Neither the UDC nor the FRBP provide employees with such opportunity. A potential physician employee of the Foundation is presented with a contract under which he agrees that his pay will be set by a compensation policy. The compensation policy is established by a committee of directors of the Foundation, who (under an agreement that the Foundation entered with the IRS in settlement of a tax dispute) must be outside directors of the Foundation who represent the public interest. There does not appear to be any opportunity for physicians to negotiate with the Committee on the terms of their deferred compensation. Moreover, because the amount of annual take-home compensation must conform to limits set by Harvard Medical School, there does not appear to be any opportunity for physicians to negotiate a different mix of take-home and deferred compensation. The physicians thus lack the ability to negotiate to shape the terms of their deferred compensation.

5. In effect, a physician who is offered a position on the Harvard medical faculty through the Foundation must sign a contract of adhesion in order to accept that position and that contract permanently ties him to a deferred compensation program whose provisions, restrictions, and limitations are not subject to negotiation. Further, it is my understanding that many physician employees begin service at Harvard at relatively early

4

stages in their post-training medical careers and are unlikely to retain experienced ERISA counsel to review the terms of the deferred compensation plan and compensation policies of the BSG, which terms are not easily accessible to laypersons or lawyers without substantial experience with Title I of ERISA.

6. A plan is exempt from ERISA fiduciary, funding, and vesting provisions if it is "maintained by an employer primarily for the purpose of providing deferred compensation." The UDC and FRBP appear to be maintained not primarily for the purpose of providing deferred compensation, but for mediating the various compensation restrictions imposed by Harvard on the annual compensation of its professors and the fluctuating annual finances of a medical practice at the Brigham & Women's Hospital. In years in which a physician's net practice income exceeds Harvard compensation limits, contributions are made into the UDC and FRBP. And in years in which net practice income falls below the level in prior years, contributions are not made and the physician must repay the practice. Moreover, the compensation policy permits the UDC assets to be used to pay current salary when usual compensation falls below the Harvard ceiling. The FRBP can also be offset to repay the BSG for loans, including home loans secured by a mortgage. Thus, the UDC and FRBP were not designed primarily to provide deferred compensation, but rather to balance the fluctuating finances of a medical practice with the requirements of Harvard's limits on current annual compensation.

7. It is my opinion that in order to determine the number of participants in the UDC and FRBP, you must include any employee or former employee who may in the future receive benefits under a deferred compensation plan because the ERISA definition of "participant" includes anyone who may become eligible to receive such benefits. Thus, every physician is a participant in each plan, regardless of whether they receive an

5

allocation in a particular year. The percentage of participants in the FRBP and UDC is approximately 30% of the BSG's total workforce. It is my opinion that participation of approximately 30% of a firm's employees in a plan is inconsistent with its characterization as a top hat plan, even if only a relatively small percentage of the participants receive an allocation in any particular year.

**Data and Documents Considered in Forming Opinions**

In addition to the ERISA statutory scheme and various case law on top hat plans, I have reviewed the following documents in reaching my conclusions:

 a. The Brigham Surgical Group Foundation, Inc. Professional Staff Compensation Policy (revised 5/16/96);

 b. The Deferred Compensation Plan of the Brigham Surgical Group Foundation, Inc. (adopted June 22, 1982);

 c. The Faculty Retirement Benefit Plan of the Brigham Surgical Group Foundation, Inc. (adopted July 1, 1989 and amended 7/29/91);

 d. Complaint dated April 12, 2004 (with exhibits);

 e. Facsimile from Gregory Keating to Michael Paris dated December 15, 2004; and,

 f. Facsimile from David Casey to Colleen Cook dated March 14, 2005.

**Compensation**

I am being compensated at the rate of $200.00 per hour, plus expenses.

**Other Expert Testimony**

None.

_____
Norman P. Stein

Dated: May 19, 2006