UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____

|  |  |  |
|---|---|---|
| EBEN ALEXANDER, III, M.D. | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 04-10738-MLW |
| | ) | |
| v. | ) | |
| | ) | |
| BRIGHAM AND WOMEN'S PHYSICIANS | ) | |
| ORGANIZATION, INC., successor to | ) | |
| Brigham Surgical Group Foundation, Inc., | ) | |
| BOSTON NEUROSURGICAL FOUNDATION | ) | |
| INC., BRIGHAM SURGICAL GROUP | ) | |
| FOUNDATION, INC. DEFERRED | ) | |
| COMPENSATION PLAN, BRIGHAM | ) | |
| SURGICAL GROUP FOUNDATION, INC. | ) | |
| FACULTY RETIREMENT BENEFIT | ) | |
| PLAN, COMMITTEE ON COMPENSATION | ) | |
| OF THE BRIGHAM SURGICAL GROUP | ) | |
| FOUNDATION, INC., and | ) | |
| PETER BLACK, M.D. | ) | |
| | ) | |
| Defendants. | ) | |

_____)

## PLAINTIFF'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

Respectfully submitted,

EBEN ALEXANDER, III, M.D.

By his attorneys,

Michael Paris (BBO #556791)
Colleen C. Cook (BBO#636359)
NYSTROM BECKMAN & PARIS LLP
10 St. James Avenue, 16th Floor
Boston, Massachusetts 02116
(617) 778-9100
(617) 778-9110 (fax)

Dated: October 10, 2006

## TABLE OF CONTENTS

ANTICIPATED FINDINGS OF FACT ........................................................................ 1

The BSG Compensation Scheme ............................................................................ 1

The BSG Deferred Compensation Plans:  the UDC and FRBP ................................ 2

Eligibility to Participate in the UDC and FRBP ..................................................... 3

The Hospital's Setoff from Dr. Alexander's UDC and FRBP Accounts ................... 4

Additional Relevant Facts Concerning BSG Employees for 1997-1999 ................... 4

Dr. Alexander's Lack of Bargaining Power ............................................................ 7

The Primary Purpose of the Plans Was to Comply with Harvard's Ceiling............... 9

CONCLUSIONS OF LAW ...................................................................................... 10

A.      Burden of Proof .......................................................................................... 10

B.      Exemptions from ERISA Are Narrowly Construed ....................................... 10

C.      The Top Hat Exemption ............................................................................... 10

(1)      Top Hat Plans Must Be Maintained for a "Select Group" ............................. 10

(a)      The UDC and FRBP Covered All Surgeons and Not a Select Group ............. 12

(b)      The Language of the UDC and FRBP Demonstrates that the Plans are Not Limited to a Select Group ............................................................................. 14

(c)      The Plan Members Were Not All Highly Compensated .................................. 16

(2)      The Underlying Policy Reason for the Top Hat Exception Is That a Plan's Participant Has Bargaining Power to Negotiate the Terms of His Plan ....................... 16

(a)      Dr. Alexander Lacked Bargaining Power to Negotiate the Terms of the UDC and FRBP 18

(3)      The Primary Purpose of the UDC and FRBP Was To Comply with Haravard's Salary Limitation, Not Provide Deferred Compensation ........................................... 19

C.      Damages and Award of Attorneys' Fees ....................................................... 20

Plaintiff, Dr. Eben Alexander, respectfully submits the following proposed findings of fact and conclusions of law in connection with the trial scheduled for October 19, 2006. Dr. Alexander respectfully reserves his right to amend and/or supplement these proposed findings and conclusions depending upon the evidence at trial in accordance with LR 16.5(F).

## ANTICIPATED FINDINGS OF FACT[1]

### The BSG Compensation Scheme

1.      Dr. Alexander was hired in 1988 as a neurosurgeon by the Brigham Surgical Group Foundation, Inc. ("BSG"). As of January 2001, Brigham & Women's Physician's Organization ("BWPO") became the successor in interest to the BSG and Dr. Alexander's employer until he was terminated on April 13, 2001.

2.      BSG was a non-profit, tax-exempt corporation organized to carry out the purposes of Harvard Medical School relating to the education and training of undergraduates in the field of surgery and to teach surgery to surgical residents, by acting as and conducting the Department of Surgery at the Brigham and Women's Hospital.

3.      Like all BSG surgeons, Dr. Alexander's compensation was determined in accordance with BSG's Professional Staff Compensation Policy ("Compensation Policy").

4.      The stated objective of the BSG Compensation Policy was "[t]o provide a system of compensation that will enable the acquisition and retention of a professional staff of national and international stature and assure a balanced program of care, teaching and research."

5.      Compensation paid to members of BSG's professional staff was subject to the limitations set forth in the Harvard System of Titles, Appointments and Compensation

---

[1] See Agreed Statement of Facts for Cross Summary Judgment Motions filed April 8, 2005 and the section entitled "The Facts Established by Pleadings or by Stipulations or Admissions of Counsel" in the parties' Joint Pretrial Memorandum for paragraphs 1-31 of the proposed findings of fact herein.

Arrangements for the Faculty of Medicine of Harvard University.

6.     Under the Compensation Policy, BSG surgeons received two salary components: (i) "OR-TEACHING" for billable and operative related services and (ii) "NON-OR TEACHING" for activities that are non-billable.  The surgeons' OR-TEACHING salary was "based on their OR-TEACHING salary for the previous Academic Year (AY) plus 0-50% of any net practice surplus for such prior year but within [Harvard] ceiling, as determined by the Surgeon-in-Chief."

7.     A practice surplus was calculated on each surgeon's net practice income "by finding the difference between the income resulting from Member OR-TEACHING activity and Member expenses during the [academic year]."  Pursuant to the Compensation Policy, Dr. Alexander was therefore eligible to receive a salary plus a percentage equal to as much as 50% of any surplus within an academic year.  A practice deficit resulted when a surgeon's net practice income (total income less expenses) exceeded a surgeon's salary for a particular year.

**The BSG Deferred Compensation Plans:  the UDC and FRBP**

8.     Integral to BSG's compensation scheme were two unfunded deferred compensation plans for its employees: the Unfunded Deferred Compensation Plan ("UDC") and the Faculty Retirement Benefit Plan ("FRBP").

9.     The UDC and FRBP were deferred compensation vehicles for BSG surgeons who generated a net practice income ("NPI") in excess of Harvard Medical School's salary cap.  As such, they served as a valuable means of recruiting and retaining talented physicians.

10.     Notably, contributions to the UDC and FRBP were mandatory pursuant to the BSG Compensation Policy if a surgeon's net practice income exceeded the Harvard salary cap. If a physician generated NPI in excess of the Harvard salary cap, an amount equal to 25% of the

2

physician's total salary less any qualified pension amounts would be credited to the FRBP.  If

any NPI remained, certain pension plan contributions would be deducted, and 50% of the

remainder would be credited to the UDC.

11.    Consistent with the Compensation Policy, section 2.01 of the UDC entitled

"Amount Credited" provides that "[i]f the total compensation of an Employee established by the

Committee exceeds the maximum permissible amount of compensation payable currently in cash

or fringe benefits under the limitations imposed by Harvard Medical School, 50% of the excess .

. . shall be credited by the Employer to a deferred compensation liability account payable to such

Employee."

12.    Likewise, Section 3.01 of the FRBP entitled "Benefits" provides, "the Employer

shall credit to each Participant an amount equal to 25% of the Participant's compensation for the

Plan Year, reduced by [certain other contributions]…"

**Eligibility to Participate in the UDC and FRBP**

13.    Pursuant to both the UDC and FRBP, all BSG surgeons who are full-time faculty

of Harvard Medical School may become eligible for participation in the plans.  Specifically,

Section 1.02 of the UDC provides that the following BSG employees are covered by the UDC:

> The "Employees" are surgeons who are members of the full-time faculty of the Harvard Medical
> School and are employed by the Employer to perform and teach surgery in the clinical setting of
> the Brigham and Women's Hospital by collaborating with students and residents in the practice
> of surgery, in research, and in the development of theory.  The Employees are paid by the
> Employer which (with few exceptions) is their only source of earned income and which is
> required to observe certain limitations imposed by the Harvard Medical School on total
> compensation which may be earned by members of its full-time faculty.

14.    Likewise, Section 2.01 of the FRBP defines "Eligibility" as follows: "Participants

hereunder shall all be employees of the Employer who are members of the full-time faculty of

the Harvard Medical School; provided, that the Committee on Compensation of the Employer

(the "Committee") may limit participation in order to fulfill the intent set forth in Section 5.02."

15.    From 1997 through 1999, BSG professional staff principally included surgeons, almost all of whom were members of the full-time faculty of the Harvard Medical School.  In contrast, from 1997 through 1999, BSG non-professional staff principally included non physician staff such as:  billing specialists, billing supervisors, coders, reimbursement managers, billing managers, accountant, financial analysts, and managers, human resource personnel, physician assistants, division administrator, RN/nurse practitioners, research assistants, information systems personnel, and administrators.

## The Hospital's Setoff from Dr. Alexander's UDC and FRBP Accounts

16.    After thirteen years of employment, BWPO (BSG's successor) terminated Dr. Alexander on April 13, 2001 without cause.  That same day, the BWPO notified Dr. Alexander that it intended to offset a practice deficit assessed to Dr. Alexander against monies held in his UDC and FRBP accounts:

> As you are aware, both the FRBP and UDC plans provide that upon termination of a faculty member's employment with BSG, the amounts owed to the faculty member under these deferred compensation plans will be offset by the amount of the member's practice deficit.  Accordingly, as of April 20, 2001, the BWPO as successor to the BSG, will reduce your FRBP plan by $177,187.22 and your UDC plan by the remaining existing practice deficit of $264,699.94.

17.    Ten days later, on April 23, 2001, the BWPO instructed the plan administrator to reduce Dr. Alexander's FRBP account by $190,000 and his UDC account by $251,887.16 and pay the combined amount of $441,887.16 to the BWPO, over Dr. Alexander's protest.

## Additional Relevant Facts Concerning BSG Employees for 1997-1999

18.    In 1997, BSG employed 241 total employees, which consisted of 157 non-professional staff and 84 professional staff.  In 1998, BSG employed 274 total employees, which consisted of 180 non-professional staff and 94 professional staff.  In 1999, BSG employed 324

total employees, which consisted of 224 non-professional staff and 100 professional staff.

19.    From 1997 through 1999, BSG professional staff consisted primarily of surgeons. In 1997, 78 surgeons in the BSG were members of the full-time faculty of the Harvard Medical School.  In 1998, 84 surgeons in the BSG were members of the full-time faculty of the Harvard Medical School.  In 1999, 88 surgeons in the BSG were members of the full-time faculty of the Harvard Medical School.

20.    The percentage of professional staff who were participants in the UDC and FRBP was 32.4% in 1997, 30.7% in 1998, and 27.2% in 1999.

21.    For the year 1997, compensation was deferred into either the FRBP or the UDC, or both Plans, for 16 out of BSG's 241 employees.  For the year 1998, compensation was deferred into either the FRBP or the UDC, or both Plans, for 14 out of BSG's 274 employees. For the year 1999, compensation was deferred into either the FRBP or the UDC, or both Plans, for 15 out of BSG's 324 employees.

22.    In 1999, BSG professional staff salary ranged from $22,000 to $665,109 while the nonprofessional staff salary ranged from $700 to $169,143.  In 1998, BSG professional staff compensation ranged from $28,599 to $1,397,567 while BSG non-professional staff compensation ranged from $84 to $142,058.   In 1997, BSG professional staff compensation ranged from $39,305 to $1,499,807 while BSG non-professional staff compensation ranged from $119 to $109,587.

23.    The average compensation of employees who received contributions to the UDC plan account was $503,730 during fiscal year 1997, $581,320 during fiscal year 1998, and $483,073 during fiscal year 1999.

24.    The average compensation of employees who received contributions to the FRBP

plan account was $434,840 during fiscal year 1997, $476,024 during fiscal year 1998, and $418,059 during fiscal year 1999.

25.     The average compensation of all BSG employees was $83,403 for fiscal year 1997, $80,491 for fiscal year 1998, and $74,376 for fiscal year 1999.

26.     During fiscal year 1997, fourteen (14) BSG employees received contributions to the UDC plan account, comprising 5.8% of the total employee population.  The names of those employees are as follows:  David H. Adams, MD; Eben Alexander, III, MD; Sary F. Aranki, MD; Peter M. Black, MD, PhD; David C. Brooks, MD; Lawrence H. Cohn, MD; John J. Collins, Jr., MD; Gregory S. Couper, MD; Magruder C. Donaldson, MD; Francis D. Moore, Jr., MD; Dennis P. Orgill, MD; Robert J. Rizzo, MD; Philip E. Stieg, MD; and David J. Sugarbaker, MD.

27.     During fiscal year 1998, nine (9) BSG employees received contributions to the UDC plan account, comprising 3.3% of the total employee population.  The names of those employees are as follows:  David H. Adams, MD; Sary F. Aranki, MD; Lawrence H. Cohn, MD; Gregory S. Couper, MD; Magruder C. Donaldson, MD; Francis D. Moore, Jr., MD; Julian J. Pribaz, MD; Robert J. Rizzo, MD; and David J. Sugarbaker, MD.

28.     During fiscal year 1999, ten (10) BSG employees received contributions to a UDC account, comprising 3.1% of the total employee population.  The names of those employees are as follows:  David H. Adams, MD; Sary F. Aranki, MD; Lawrence H. Cohn, MD; Gregory S. Couper, MD; Magruder C. Donaldson, MD; Elof Eriksson, MD, PhD; Robert J. Rizzo, MD; David J. Sugarbaker, MD; Scott J. Swanson, MD; and Eric J. Woodward, MD.

29.     During fiscal year 1997, twenty-one (21) BSG employees received contributions to an FRBP account, comprising 8.7% of the total employee population.  The names of those employees are as follows:  David H. Adams, MD; Eben Alexander, III, MD; Sary F. Aranki,

6

MD; Stanley Ashley, MD; Richard Bartlett, MD; Peter M. Black, MD, PhD; David C. Brooks,

MD; Lawrence H. Cohn, MD; John J. Collins, Jr., MD; Gregory S. Couper, MD; Magruder C.

Donaldson, MD; Charles A. Hergrueter, MD; Francis D. Moore, Jr., MD; Dennis P. Orgill, MD;

Jerome P. Richie, MD; Robert J. Rizzo, MD; Samuel I. Singer, MD; Philip E. Stieg, MD; David

J. Sugarbaker, MD; Anthony D. Whittemore, MD; and Michael J. Zinner, MD.

30.    During fiscal year 1998, seventeen (17) BSG employees received contributions to

an FRBP account, comprising 6.2% of the total employee population.  The names of those

employees are as follows:  David H. Adams, MD; Eben Alexander, III, MD; Sary F. Aranki,

MD; Richard Bartlett, MD; Peter M. Black, MD, PhD; David C. Brooks, MD; Lawrence H.

Cohn, MD; John J. Collins, Jr., MD; Gregory S. Couper, MD; Magruder C. Donaldson, MD;

Francis D. Moore, Jr., MD; Dennis P. Orgill, MD; Julian J. Pribaz, MD; Jerome P. Richie, MD;

Robert J. Rizzo, MD; Sugarbaker, MD; and Michael J. Zinner, MD.

31.    During fiscal year 1999, sixteen (16) BSG employees received contributions to an

FRBP account, comprising 4.9% of the total employee population.  The names of those

employees are as follows:  David H. Adams, MD; Sary F. Aranki, MD; Peter M. Black, MD,

PhD; Lawrence H. Cohn, MD; Gregory S. Couper, MD; Magruder C. Donaldson, MD; Elof

Eriksson, MD, PhD; Carolyn M. Kaelin, MD; Francis D. Moore, Jr., MD; Dennis P. Orgill, MD;

Jerome P. Richie, MD; Robert J. Rizzo, MD; David J. Sugarbaker, MD; Scott J. Swanson, MD;

Anthony D. Whittemore, MD; and Eric J. Woodward, MD.

**Dr. Alexander's Lack of Bargaining Power**

32.    Dr. Alexander had no ability to affect or substantially influence, through

negotiation or otherwise, the design and operation of his deferred compensation plans.  Indeed,

Dr. Alexander did not feel as if he had the power to change the workings of the BSG.  Instead, he

felt as if the workings of the BSG were mandated by the President and others at the uppermost levels of management.

33.    Moreover, because the amount of annual take-home compensation for BSG surgeons must conform to limits set by Harvard Medical School, there was no opportunity for Dr. Alexander to negotiate a different mix of take-home and deferred compensation.  Thus, he lacked the ability to negotiate to shape the terms of his deferred compensation.

34.    In effect, a physician who is offered a position on the Harvard medical faculty through the BSG signs a contract that permanently ties him to a deferred compensation program whose provisions, restrictions, and limitations were not subject to negotiation.

35.    Further, many physician employees begin service at Harvard at relatively early stages in their post-training medical careers and are unlikely to retain experienced ERISA counsel to review the terms of the deferred compensation plan and compensation policies of the BSG, which terms are not easily accessible to laypersons or lawyers without substantial experience with Title I of ERISA.

36.    With respect to the issue of bargaining power, Dr. John Mannick, BSG's former President who is expected to testify at trial on defendants' behalf, admitted in his deposition that, (i) "I suspect that the average instructor or assistant professor in the department let us say would not have felt like coming to me and asking to change policy; (ii) "junior faculty are often somewhat reluctant to go and propose policy changes to the chairman of the department;" (iii) "departments of surgery have always been rather hierarchical;" (iv) changes to the UDC and FRBP were made at the executive committee level; (v) proposals for those changes were made at the executive committee level; and, (vi) "what happened to practice income were standard for everyone."

**The Primary Purpose of the Plans Was to Comply with Harvard's Ceiling**

37.     The UDC and FRBP were not maintained primarily for the purpose of providing deferred compensation, but rather for mediating the various compensation restrictions imposed by Harvard on the annual compensation of its professors and the fluctuating annual finances of a medical practice at the Brigham & Women's Hospital.  In years in which a physician's net practice income exceeds Harvard compensation limits, contributions are made into the UDC and FRBP.  And in years in which net practice income falls below the level in prior years, contributions are not made and the physician must repay the practice.  Moreover, the compensation policy permits the UDC assets to be used to pay current salary when usual compensation falls below the Harvard ceiling.  The FRBP can also be offset to repay the BSG for loans, including home loans secured by a mortgage.  Thus, the UDC and FRBP were not designed primarily to provide deferred compensation, but rather to balance the fluctuating finances of a medical practice with the requirements of Harvard's limits on current annual compensation.

38.     With respect to Harvard's salary cap, BSG's former President testified in his deposition that, (i) "the Harvard Medical School ceiling was considered sacrosanct and that no surgeon was, to the best of my knowledge, allowed to have take-home pay that exceeded the Harvard Medical School ceiling for his or her academic rank at that particular year"; and, (ii) BSG could not simply supplement income to retain prestigious doctors because the BSG "felt bound by the Harvard regulations as long as we were Harvard faculty members."

## CONCLUSIONS OF LAW

**A.    Burden of Proof**

1.    "The burden of establishing that a plan fits the 'top hat' exclusion is on the party asserting that it is a 'top hat' plan."  In re The IT Group, Inc., 305 B.R. 402, 407 (D. Del. 2004); Carabba v. Randalls Food Markets, Inc., 38 F.Supp.2d 468, 470 (N.D.Tex. 1999); Virta v. DeSantis Enterprises, Inc., 1996 WL 663970 *3 (N.D.N.Y. 1996) (defendants bear burden of proof on validity of top hat plan as affirmative defense).  In this case, defendants bear the burden of proving that the UDC and FRBP are valid top hat plans.

**B.    Exemptions from ERISA Are Narrowly Construed**

2.    "[E]xemptions from ... ERISA coverage should be confined to their narrow purpose."  Guiragoss v. Khoury, 2006 WL 2347396 *6 (E.D.Va. 2006) ("it is important to note that ERISA is a remedial statute that should be liberally construed in favor of employee benefit fund participants"); Azzaro v. Harnett, 414 F. Supp. 473, 475 (S.D.N.Y. 1976) (same).  See also S. Rep. No. 93-127, reprinted in 1974 U.S.C.C.A.N. 4838, 4854 (ERISA "exemptions should be confined to their narrow purpose").

**C.    The Top Hat Exemption**

**(1)    Top Hat Plans Must Be Maintained for a "Select Group"**

3.    A "top hat" plan is defined by ERISA as "a plan which is unfunded and is maintained by an employer primarily for the purpose of providing deferred compensation for a select group of management or highly compensated employees."  Demery v. Extebank Deferred Comp. Plan (B), 216 F.3d 283, 287 (2d Cir. 2000), citing 29 U.S.C. §§ 1051(2), 1081(a)(3), 1101(a)(1).  A top hat plan, if valid, is exempt from ERISA's participation, vesting, funding, and fiduciary provisions. Demery, 216 F.3d at 287.

4.      "To satisfy the requirement that a 'top hat' plan be restricted to a 'select group of management or highly compensated employees,' the standard must be met both quantitatively and qualitatively." In re The IT Group, Inc., 305 B.R. at 410; Demery, 216 F.3d at 288 ("select group" determination requires "fact-specific inquiry, analyzing quantitative and qualitative factors in conjunction").

5.      Quantitatively, a plan that covers more than 15% of employees will not be deemed a valid top hat plan. In re The IT Group, 305 B.R. at 410, citing Demery, 216 F.3d at 287 (holding deferred compensation plan offered to 15.34% of employees qualified for top hat status but noting "this number [15.34%] is probably at or near the upper limit of acceptable size for a 'select group'…"). See also Darden v. Nationwide Mut. Ins. Co., 717 F. Supp. 388, 396-97 (E.D.N.C. 1989) (finding that 18.7%, or one-fifth, of total workforce "too large to be considered 'select' for purposes of the top-hat exemption"), aff'd, 922 F.2d 203 (4th Cir. 1991), rev'd on other grounds, 503 U.S. 318 (1992).

6.      Qualitatively, "the deferred compensation plan participants must all be 'high level' employees, either 'management' or 'highly compensated.'" In re The IT Group, 305 B.R. at 410 (citation omitted).

7.      "Not surprisingly, if all employees are eligible to participate, the plan cannot qualify as a top hat plan, notwithstanding the number that actually enroll." Khoury, 2006 WL 2347396 at *7. See also Ridgeley A. Scott, Rabbis and Other Top Hats: The Great Escape, 43 Cath. U. L. Rev. 1, 9 (1993) ("An adequate group must be select, which means that a group cannot cover all management and highly compensated employees.").

8.      In accordance with ERISA's definition of "participant," all surgeons who *may become eligible* for contributions to the UDC and FRBP must be counted in determining the

select group.  <u>Darden</u>, 717 F.Supp. at 396.  <u>See also</u> <u>Simpson v. Ernst & Young</u>, 879 F. Supp.

802, 816 (S.D.Ohio 1994), <u>citing</u> 29 U.S.C. § 1002(7) ("term 'participant' means any employee

or former employee of an employer…who is or *may become eligible* to receive a benefit of any

type from an employee benefit plan …").  <u>Cf.</u> <u>Demery</u>, 216 F.3d at 28 (focusing specifically on

the percentage of employees to whom the deferred compensation plan was *offered* (15.34%) as

opposed to those who actually participated in the deferred compensation plan (7 to 10%) in

determining the "select group"); <u>Khoury</u>, 2006 WL 2347396*7 n.14 (top hat analysis should

focus on the percentage of the workforce invited to participate in a potential top hat plan).

        **(a)**      **The UDC and FRBP Covered All Surgeons and Not a Select Group**

9.      The UDC and FRBP are not valid top hat plans because they were not restricted

to a "select group of management or highly compensated employees."  <u>See</u> 29 U.S.C. §§ 1051(2),

1081(a)(3) and 1101(a)(1).  Instead, the plans covered virtually all surgeons employed by

BWPO, constituting approximately thirty (30) percent of all BWPO employees for the period

1997 through 1999, which is quantitatively too large to satisfy the "select group" requirement to

qualify for "top hat" status.  <u>See</u> <u>Demery</u>, 216 F.3d at 289 (15.34% of workforce covered by plan

was "upper limit" for valid top hat plan); <u>Darden</u>, 717 F. Supp. at 396-97 (18.7%, or one-fifth, of

workforce covered by plan too large for top hat status).

10.      The UDC and FRBP were mandatory components of the BSG compensation

scheme for all professional staff (<u>i.e.</u> surgeons), and therefore, coverage was not restricted to a

select group.  Specifically, the BSG Compensation Policy provided that if a surgeon had a

surplus in any given year that exceeded Harvard's ceiling on salary, then 25% of the surgeon's

salary would be credited to the FRBP account.  If there still remained a surplus after

contributions to the FRBP (and other certain contributions), then 50% of the surplus would be

credited to the surgeon's UDC account.  Pursuant to the Compensation Policy, all surgeons were required to participate in the UDC and FRBP if their net practice income exceeded Harvard's ceiling.

11.    In addition to not being restricted to a select group of participants, the sheer number of participants in the UDC and FRBP exceeds the permissible limit under existing case law.  See Demery, 216 F.3d at 289.  BSG had 241 total employees for 1997, 274 for 1998, and 324 for 1999.  Of the total number of employees for 1997 through 1999, the number of surgeons who were full-time Harvard Medical School faculty was 78, 84, and 88, respectively.  Because these surgeons were eligible for - -  and in fact had to participate in - - the UDC and FRBP, the percentage of professional staff covered by the UDC and FRBP was 32.4% in 1997, 30.7% in 1998, and 27.2% in 1999.  The annual percentage of total employees covered by the UDC and FRBP from 1997 through 1999 -- close to one-third of BSG's total workforce -- far exceeded the "upper limit of acceptable size for a 'select group.'" Consequently, both the UDC and FRBP are not valid top hat plans.  Demery, 216 F.3d at 289 (15.34%); Darden, 717 F. Supp. at 397 (18.7%).  Compare Pane v. RCA Corp., 868 F.2d 631, 637 (3d Cir. 1989) (deferred compensation provided to only sixty-one (61) management employees out of a work force of over 80,000 employees, or one-tenth of one percent, constituted a select group); Belka v. Rowe Furniture Corp., 571 F. Supp. 1249, 1251 (D.Md. 1983) (deferred compensation agreements that covered only 4.6 percent of employer's work force deemed a select group); DOL Advisory Op. No. 75-64 (August 1, 1975) (plan covered select group where number of key executives and managerial employees eligible in any single year was limited to a preset number covering less than 4% of active employees).

      (b)      **The Language of the UDC and FRBP Demonstrates that**
                         **The Plans Are Not Limited to a Select Group**

12.     Straightforward language in an ERISA-regulated plan must be given its plain, ordinary, and natural meaning. Filiatrault v. Comverse Tech., Inc., 275 F.3d 131, 135 (1st Cir. 2001), citing Burnham v. Guardian Life Ins. Co., 873 F.2d 486, 489 (1st Cir. 1989). A primary purpose of ERISA is to ensure the integrity and primacy of the written plans and, therefore, the plain language of an ERISA plan must be given its literal and natural meaning. Harris v. Harvard Pilgrim Health Care, Inc., 208 F.3d 274, 279 (1st Cir. 2000) (citation and quotations omitted).

13.     "[I]t is clear that merely inserting the ERISA definition of a top hat plan into a document is insufficient if the actual plan does not satisfy the top hat requirements, although a plan's language is indicative of the employer's intent when establishing the plan and may influence the court's determination." Khoury, 2006 WL 2347396 at *7. Cf. Cogan v. Phoenix Life Ins. Co., 310 F.3d 238, 242 (1st Cir. 2002) (deciding, without analyzing, top hat plan where parties did not dispute validity).

14.     "[W]here the employer establishes the terms of a pension plan, those terms should be construed in favor of the employee." Atlas Tack Corp. v. Mahoney, 581 F.2d 1, 7 (1st Cir. 1978).

15.     The plain language of both the UDC and FRBP buttresses the fact that all surgeons are covered by the plans and the plans are not restricted to a "select group." Specifically, the terms of the UDC extend coverage to "Employees," which are defined to include "surgeons who are members of the full-time faculty of the Harvard Medical School and are employed by the Employer to perform and teach surgery in the clinical setting of the Brigham and Women's Hospital…". Similarly, the "Eligibility" section of the FRBP states that,

"Participants hereunder shall all be employees of the Employer who are members of the full-time faculty of the Harvard Medical School."

16.     The vast majority of the BSG surgeons were members of the full-time faculty of the Harvard Medical School.  Thus, the specific unambiguous language of both the UDC and FRBP plans as well as the Compensation Policy demonstrate unequivocally that all surgeons who were full-time Harvard Medical School Faculty – not a select group – were eligible to participate in the plans.  Compare Northwestern Mut. Life Ins. Co. v. Resolution Trust Corp., 848 F. Supp. 1515, 1520 (N.D.Ala. 1994) (plans established for "certain key officers" and "certain executives" were valid top hat plans); Gallione v. Flaherty, 70 F.3d 724, 726 (2d Cir. 1995) (full-time officers of hierarchical union membership were select group because only full-time officers were eligible to participate in plan and were "upper echelon of Union management"); Duggan v. Hobbs, 99 F.3d 307, 312 (9th Cir. 1996) (plaintiff constituted select group as he was sole employee covered by top hat severance agreement).  Cf. Hollingshead v. Burford Equip. Co., 747 F. Supp. 1421, 1430 (M.D.Ala. 1990) (plan under which all employees were eligible for consideration "extended coverage beyond a select group of highly compensated employees" and was not valid top hat plan).

17.     The FRBP even uses the term "Participant" without defining that term and thus can only be logically construed to refer to ERISA's definition of "Participant," which includes anyone who *may become eligible* for benefits.  In other words, all surgeons are counted for purposes of eligibility, even if they do not receive a contribution in a particular year.

18.     Based on the Compensation Policy, the mandatory nature of the deferred compensation plans, and the language of the UDC and FRBP, all surgeons *may become eligible* to participate in the plans and therefore must be counted in determining the "select group."

Every BSG surgeon is thus a participant in the UDC and FRBP for purposes of eligibility regardless of whether they received an allocation of funds in any particular year.  <u>Darden</u>, 717 F. Supp. at 396; <u>Demery</u>, 216 F.3d at 28; <u>Khoury</u>, 2006 WL 2347396 *7 n.14.

(c)     <b>The Plan Members Were Not All Highly Compensated</b>

19.     To fall within the top hat exception, a plan must cover management or highly compensated employees.  <u>In re The IT Group</u>, 305 B.R. at 410.  The UDC and FRBP covered surgeons who were not management, and therefore, all surgeons had to be "highly compensated" for the top hat exception to apply.  However, not all surgeons were highly compensated in relation to the non-professional staff.  For example, in 1999, the non-professional staff salary ranged from $700 to $169,143 while the professional staff salary ranged from $22,000 to $665,169.  In other words, some of the employees covered by the UDC and FRBP earned less than employees who were not covered by the plans.  As such, the UDC and FRBP were not restricted to a select group of management or highly compensated employees as required for top hat status.  <u>See</u> <u>Starr v. JCI Data Processing, Inc.</u>, 757 F. Supp. 390, 394 (D.N.J. 1991) (top hat exemption inapplicable where group covered by plan had salaries ranging from $12,000 to $336,000) *vacated in part on reconsideration by* 767 F. Supp. 633 (D.N.J. 1991); <u>Duggan v. Hobbs</u>, 1995 WL 150535 *4 (N.D.Cal. 1995) ("Employees appear to be highly compensated for purposes of qualifying the plan that covers them as a Top Hat plan where they earn substantially – approximately two to three times – more than employees not covered by the plan."), *aff'd* 99 F.3d 307 (9th Cir. 1996).

<b>(2)     The Underlying Policy Reason for the Top Hat Exception Is That a Plan's Participant Has Bargaining Power to Negotiate the Terms of His Plan</b>

20.     In creating the top hat exception, "Congress and the Department of Labor have determined that the management and highly compensated employees who participate in

16

unfunded deferred compensation plans do not need the same level of protection" as other workers and are therefore exempted from certain of ERISA's requirements.  <u>Barrowclough v. Kidder, Peabody & Co., Inc.</u>, 752 F.2d 923, 934 (3d Cir. 1985) (discussing statutory framework of ERISA and top hat exception) *overruled on other grounds by* <u>Pritzker v. Merrill Lynch, Perce, Fenner & Smith, Inc.</u>, 7 F.3d 1110 (1993), <u>citing</u> Reporting and Disclosure Requirements, 40 Fed. Reg. p. 34,530 (August 15, 1975) ("The class of employees with respect to whom this alternative method of compliance applies – highly compensated or management employees – generally have ready access to information concerning their rights and obligations and do not need the protections afforded them by Part 1 of Title I of the Act.") (citations omitted).

      21.    According to the Department of Labor, the rationale behind the top hat exemption is that employees covered by such a plan have the ability to influence their employer and do not require the usual protections afforded by ERISA:

> It is the view of the Department that in providing relief for "top-hat" plans from the broad remedial provisions of ERISA, Congress recognized that certain individuals, by virtue of their position or compensation level, have the ability to affect or substantially influence, through negotiation or otherwise, the design and operation of their deferred compensation plan, taking into consideration any risks attendant thereto, and, therefore, would not need the substantive rights and protections of Title I.

<u>See</u> DOL Advisory Op. No. 90-14A.

      22.    Put another way, "[a] third requirement [for a valid top hat plan], provided by DOL advisory opinions, is that the select group consist of individuals who are in the position to protect their own interests. This requirement helps ensure that ERISA's underlying objectives of ERISA are not undermined by the plan's exemption from specific ERISA requirements. Top hat plans were conceived as a way to free deferred compensation agreements for certain executives from the burden of ERISA regulation. The assumption underlying the top hat exemption from ERISA is simply that top-level executives are in a favorable bargaining position to negotiate the

terms of an agreement and, therefore, do not need a comprehensive regulatory scheme, like

ERISA, to protect their interests."  Khoury, 2006 WL 2347396 at *7.

(a)    <strong>Dr. Alexander Lacked Bargaining Power<br>to Negotiate the Terms of the UDC and FRBP</strong>

23.    Neither the UDC nor the FRBP provided Dr. Alexander with an opportunity to

negotiate for adequate security of benefits and other protections.  The Compensation Policy is

established by a committee of directors of the BSG, who (under an agreement that the BSG

entered with the IRS in settlement of a tax dispute) must be outside directors of the BSG who

represent the public interest.  There was no real opportunity for Dr. Alexander to negotiate with

the Committee on the terms of his deferred compensation.  Indeed, Dr. Alexander did not feel as

if he had the power to change the workings of the BSG.  Instead, he felt as if the workings of the

BSG were mandated by the President and others at the uppermost levels of management.

24.    Moreover, because the amount of annual take-home compensation must conform

to limits set by Harvard University, there was no opportunity for Dr. Alexander to negotiate a

different mix of take-home and deferred compensation.  The compensation structure itself

demonstrates that Dr. Alexander lacked the ability to negotiate the terms of his deferred

compensation.  In effect, a surgeon who is offered a position on the Harvard Medical School

faculty through the BSG must agree to defer compensation into the UDC and FRBP upon

realizing certain income levels.

25.    The critical policy reason underlying the top hat exception, i.e. bargaining power,

is absent in this case and thus the UDC and FRBP are not valid top hat plans.  See Khoury, 2006

WL 2347396 at *10.  Compare Duggan, 99 F.3d at 312 (plan created for one employee showed

bargaining power of that employee); Prior v. Innovative Communication Corp., 2005 WL

567458, *8 (D. VI 2005) ("An important factor in determining that an unfunded plan constitutes

18

a 'top hat' plan is whether an executive has the power to negotiate the terms of an <u>individualized</u> pension benefit.").

### (3) The Primary Purpose of the UDC and FRBP Was To Comply with Harvard's Salary Limitation, Not Provide Deferred Compensation

26.     The DOL also has stated that the *primary* purpose of a top hat plan must be to provide deferred compensation for the plan to be exempt from ERISA's vesting requirements: "[T]he term 'primarily,' as used in the phrase, 'primarily for the purpose of providing deferred compensation for a select group of management or highly compensated employees' in [ERISA] sections 201(2), 301(a)(3) and 401(a)(1), refers to the purpose of the plan (i.e., the benefits provided) and not the participant composition of the plan."  DOL Advisory Op. No. 90-14A.

27.     The primary purpose of the BWPO pension plans was not to provide deferred compensation but rather to comply with Harvard Medical School's limitations on salary for BWPO's surgeons.

28.     More specifically, the UDC and FRBP were maintained to satisfy the various compensation restrictions imposed by Harvard University regarding the annual compensation of its faculty and the fluctuating finances of a related medical practice at the Brigham and Women's Hospital, and not primarily for the purpose of providing deferred compensation.  In years in which a surgeon's net practice income exceeds Harvard compensation limits, contributions are made into the UDC and FRBP.  In years in which net practice income falls below the level in prior years, contributions are not made and a surgeon, in theory, must repay the practice.  The Compensation Policy permits only modest annual adjustments in current annual compensation to repay deficits, but the FRBP and UDC each include provisions for offsets against such deficits, even before termination of employment.  Moreover, the Compensation Policy permits the UDC assets to be used to pay current salary when usual compensation falls below the Harvard ceiling.

19

The FRBP can also be offset to repay the BSG for loans, including home loans secured by a mortgage.  Thus, the UDC and FRBP were not designed primarily to provide deferred compensation, but rather to balance the see-sawing finances of a medical practice with the requirements of Harvard's limits on current annual compensation.

29.    Likewise, it is apparent that the Compensation Policy was structured to protect BSG's status as a public charity under IRC § 501(c)(3) by limiting the amount of compensation paid to its faculty members.  See IRC § 4958 and Treasury Regulation 53.4958-1.

**C.    Damages and Award of Attorneys' Fees**

30.    ERISA's vesting requirements provide that all benefits under a plan are non-forfeitable after completion of seven years of service.  See 29 U.S.C. § 1053(a)(2)(B).  Dr. Alexander worked for the BSG for 13 years.

31.    Because the deferred compensation plans do not qualify for "top hat" status, BWPO had no right to any of Dr. Alexander's pension funds.  Accordingly, Dr. Alexander is entitled to repayment of the amount taken from his deferred compensation plans.

32.    In addition, a prevailing party may receive attorneys' fees under ERISA for meritorious claims.  Cook v. Liberty Life Assurance Co. of Boston, 334 F.3d 122, 123 (1st Cir. 2003); 29 U.S.C. §1132(g).  There is a five factor balancing test in determining whether attorneys' fees are warranted:  "(i) the degree of culpability or bad faith attributable to the losing party; (ii) the depth of the losing party's pocket, i.e., his or her capacity to pay an award; (iii) the extent (if at all) to which such an award would deter other persons acting under similar circumstances; (iv) the benefit (if any) that the successful suit confers on plan participants or beneficiaries generally; and (v) the relative merit of the parties' position." Cottrill v. Sparrow, Johnson & Ursillo, Inc., 100 F.3d 220, 225 (1st Cir. 1996).  These factors, however, are not

considered exclusive and none are deemed dispositive.  <u>Twomey v. Delta Airlines Pilots Pension Plan</u>, 328 F.3d 27, 33 (1st Cir. 2003), <u>citing</u> <u>Gray v. New England Tel. and Tel. Co.</u>, 792 F.2d 251 (1st Cir. 1986).

33.    The circumstances of this case warrant an attorneys' fee award.  BSG structured the plans and is entirely responsible for their invalidity as top hat plans.  Moreover, BWPO has the ability to pay for Dr. Alexander's fees, and given its reputation, such an award would deter other types of institutions from implementing invalid top hat plans.  A fee award is also warranted here because of the potential benefit to other physicians whose deficits may have been improperly setoff under the plans.  Balancing these factors, Dr. Alexander is entitled to his attorneys' fees.

34.    In sum, Dr. Alexander is entitled to repayment of $190,000 to his FRBP account, $251,887.16 to his UDC account, attorneys' fees, costs, and prejudgment interest from April 23, 2001.  <u>See</u> <u>Cottrill</u>, 100 F.3d at 224 (affirming accrual date for prejudgment interest as date on which defendants offset benefits from participant's account).

Respectfully submitted,

EBEN ALEXANDER, III, M.D.

By his attorneys,

/s/ Colleen C. Cook
Michael Paris (BBO #556791)
Colleen C. Cook (BBO#636359)
NYSTROM BECKMAN & PARIS LLP
10 St. James Avenue, 16th Floor
Boston, Massachusetts  02116
(617) 778-9100
(617) 778-9110 (fax)

Dated: October 10, 2006

### CERTIFICATE OF SERVICE

I hereby certify that a true copy of the above document was served upon David Casey, Esq., counsel for defendants, by electronic mail and First Class mail on October 10, 2006.

/s/ Colleen C. Cook
Colleen C. Cook