UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                            )
EBEN ALEXANDER, III, M.D.                   )
                                            )
            Plaintiff,                      )   Case No. 04-10738-MLW
                                            )
       v.                                   )
                                            )
BRIGHAM AND WOMEN'S PHYSICIANS              )
  ORGANIZATION, INC., successor to          )
  Brigham Surgical Group Foundation, Inc.,  )
  BOSTON NEUROSURGICAL FOUNDATION           )
  INC., BRIGHAM SURGICAL GROUP              )
  FOUNDATION, INC. DEFERRED                 )
  COMPENSATION PLAN, BRIGHAM                )
  SURGICAL GROUP FOUNDATION, INC.           )
  FACULTY RETIREMENT BENEFIT                )
  PLAN, COMMITTEE ON COMPENSATION           )
  OF THE BRIGHAM SURGICAL GROUP             )
  FOUNDATION, INC., and                     )
  PETER BLACK, M.D.                         )
                                            )
            Defendants.                     )
_____ )

## PLAINTIFF'S TRIAL BRIEF

At trial, defendants have the burden of proving that their deferred compensation plans -- the UDC and FRBP -- were valid top hat plans under ERISA. Defendants cannot sustain this burden because the anticipated evidence at trial will demonstrate that: (1) all BSG surgeons were required to participate in the UDC and FRBP and therefore the plans were not maintained for a "select group of management or highly compensated employees"; (2) Plaintiff, Dr. Eben Alexander, had no ability to negotiate the design and operation of his deferred compensation plans; and, (3) the UDC and FRBP were maintained *primarily* for the purpose of complying with Harvard Medical School's salary ceiling and not for the purpose of providing deferred compensation. Based on this anticipated evidence, the Court must find that the UDC and FRBP

are not valid top hat plans under ERISA. As such, defendants had no right to offset the practice deficit assessed to Dr. Alexander with funds from his UDC and FRBP accounts, as the funds in those accounts were fully vested. Accordingly, Dr. Alexander is entitled to return of his funds, plus interest, costs, and attorneys' fees.

## I.      The Plans Were Not Restricted to a "Select Group"

As fully briefed in Plaintiff's Motion for Summary Judgment, the cases of Demery and Darden control the "select group" analysis. As discussed in those cases, a plan that covers more than 15% of employees will not be deemed a valid top hat plan. See Demery v. Extebank Deferred Comp. Plan (B), 216 F.3d 283, 289 (2d Cir. 2000) (15.34% of workforce covered by plan was "upper limit" for valid top hat plan); Darden v. Nationwide Mut. Ins. Co., 717 F. Supp. 388, 396-97 (E.D.N.C. 1989) (18.7%, or one-fifth, of workforce covered by plan too large for top hat status), *aff'd,* 922 F.2d 203 (4th Cir. 1991), *rev'd on other grounds*, 503 U.S. 318 (1992). Notably, in Demery, the Second Circuit focused specifically on the percentage of employees to whom the deferred compensation plan was *offered* (15.34%) as opposed to those who actually participated in the deferred compensation plan (7 to 10%) in determining the "select group." Demery, 216 F.3d at 28.

Moreover, as the Darden court explained in detail, all surgeons who *may become eligible* for contributions to the UDC and FRBP must be counted in determining the select group in accordance with ERISA's definition of "participant." Darden, 717 F. Supp. at 396. See also Simpson v. Ernst & Young, 879 F. Supp. 802, 816 (S.D.Ohio 1994), citing 29 U.S.C. § 1002(7) ("term 'participant' means any employee or former employee of an employer…who is or *may become eligible* to receive a benefit of any type from an employee benefit plan …").

A recent case, Guiragoss v. Khoury, 2006 WL 2347396 *7 (E.D.Va. 2006), tracks the

Second Circuit's analysis in Demery and focused on the number of employees invited to join the plan, as opposed to who actually joined, in determining the "select group." Khoury, 2006 WL 2347396 at *7 n.14 ("the analysis should focus on the percentage of the workforce invited to participate in a potential top hat plan, rather than on the percentage of the workforce that actually enrolled"). The court in Khoury also stated, "Not surprisingly, if all employees are eligible to participate, the plan cannot qualify as a top hat plan, notwithstanding the number that actually enroll." Khoury, 2006 WL 2347396 at *7. In addition, "the deferred compensation plan participants must all be 'high level' employees, either 'management' or 'highly compensated.'" In re The IT Group, Inc., 305 B.R. 402, 410 (D. Del. 2004).

In this case, the evidence will show that the plans were not restricted to a "select group of management or highly compensated employees" within the meaning of 29 U.S.C. §§ 1051(2), 1081(a)(3) and 1101(a)(1) for a number of reasons, including:

- there is no dispute that the Compensation Policy applied to all surgeons and that all surgeons were required to participate in the UDC and FRBP as part of the BSG compensation structure;

- the sheer number of surgeons subject to the UDC and FRBP in comparison to the total BSG employee population was approximately 30% from 1997 to 1999, which far exceeds the permissible limit (15.34%) established by Demery;

- the language of the plans shows that all surgeons were eligible to participate in the UDC and FRBP. The FRBP even uses the term "Participant" without defining that term and thus can only be logically construed to refer to ERISA's definition of "Participant," which includes anyone who *may become eligible* for benefits. In other words, all surgeons are counted for purposes of eligibility, even if they do not receive a contribution in a particular year; and,

- not all surgeons who were covered by the plans were highly compensated in comparison to the BSG employee population at large.

For all of these reasons, and as set forth more fully in Plaintiff's Motion for Summary Judgment and supporting papers, the UDC and FRBP were not maintained for a "select group."

## II.     Dr. Alexander Lacked Bargaining Power

The court in <u>Khoury</u> elucidated that a critical step in the top hat analysis is determining whether the employee covered by the plan had bargaining power with respect to negotiating the terms of the plan:

> A third requirement [for a valid top hat plan], provided by DOL advisory opinions, is that the select group consist of individuals who are in the position to protect their own interests. This requirement helps ensure that ERISA's underlying objectives of ERISA are not undermined by the plan's exemption from specific ERISA requirements. Top hat plans were conceived as a way to free deferred compensation agreements for certain executives from the burden of ERISA regulation. The assumption underlying the top hat exemption from ERISA is simply that top-level executives are in a favorable bargaining position to negotiate the terms of an agreement and, therefore, do not need a comprehensive regulatory scheme, like ERISA, to protect their interests.

<u>Khoury</u>, 2006 WL 2347396 at *7 (plaintiff "had no influence on the terms of the agreement and never consulted an attorney prior to signing the agreement. [Plaintiff] is precisely the type of employee that ERISA's substantive provisions are intended to protect and [defendant] cannot be permitted to use top hat designation to shield it from liability").

The Department of Labor advisory opinion letter routinely cited by courts in analyzing the validity of a top hat plan explains that the rationale behind the top hat exemption is that employees covered by such a plan have the ability to influence their employer and do not require the usual protections afforded by ERISA:

> It is the view of the Department that in providing relief for "top-hat" plans from the broad remedial provisions of ERISA, Congress recognized that certain individuals, by virtue of their position or compensation level, have the ability to affect or substantially influence, through negotiation or otherwise, the design and operation of their deferred compensation plan, taking into consideration any risks attendant thereto, and, therefore, would not need the substantive rights and protections of Title I.

DOL Advisory Op. No. 90-14A.

At trial, the evidence will show Dr. Alexander had no power to negotiate the terms of the

UDC and FRBP.  Indeed, this is evident from the Compensation Policy itself which requires all surgeons to participate in the UDC and FRBP.  Dr. Alexander will testify that he did not feel as if he had the power to change the workings of the BSG.  Instead, he felt as if the workings of the BSG were mandated by the President and others at the uppermost levels of management.  Dr. Eric Woodard, a former BSG surgeon, is expected to corroborate Dr. Alexander's testimony on this point.   Moreover, and significantly, because the amount of annual take-home compensation must conform to limits set by Harvard University, there is no opportunity for surgeons to negotiate a different mix of take-home and deferred compensation.

Even Dr. Mannick, BSG's former President who is expected to testify at trial on defendants' behalf, admitted in his deposition that the department of surgery was "hierarchical," junior faculty did not feel like they could change policy, and changes to the UDC and FRBP were made at the executive committee level.  Thus, by defendants' own admission, Dr. Alexander lacked bargaining power.

### III.    The Primary Purpose of the Plans Was to Comply with Harvard's Salary Cap

The DOL has stated that the *primary* purpose of a top hat plan must be to provide deferred compensation for the plan to be exempt from ERISA's vesting requirements:

> [T]he term 'primarily,' as used in the phrase, 'primarily for the purpose of providing deferred compensation for a select group of management or highly compensated employees' in [ERISA] sections 201(2), 301(a)(3) and 401(a)(1), refers to the purpose of the plan (i.e., the benefits provided) and not the participant composition of the plan.

DOL Advisory Op. No. 90-14A.

Here, the evidence will show that the primary purpose of the UDC and FRBP was not to provide deferred compensation, but rather to comply with Harvard Medical School's limitations on salary for BSG surgeons.  In fact, Dr. Mannick testified at his deposition that Harvard's salary cap was "sacrosanct" and BSG could not simply supplement income to retain prestigious doctors

because the BSG was "bound by the Harvard regulations."

The compensation structure provided that in years in which a physician's net practice income exceeds Harvard compensation limits, contributions were made into the UDC and FRBP. And in years in which net practice income falls below the level in prior years, contributions were not made and the physician was required to repay the practice. Moreover, the Compensation Policy permitted the UDC assets to be used to pay current salary when usual compensation fell below the Harvard ceiling. The FRBP could also be offset to repay the BSG for loans, including home loans secured by a mortgage. Therefore, the UDC and FRBP were not designed primarily to provide deferred compensation, but rather to balance the fluctuating finances of a medical practice with the requirements of Harvard's limits on current annual compensation.

## **CONCLUSION**

Based on the evidence expected at trial, the UDC and FRBP do not qualify for "top hat" status, and the BWPO had no right to any of Dr. Alexander's pension funds. Accordingly, Dr. Alexander respectfully requests that the Court award him damages, attorneys' fees, costs, and prejudgment interest based on defendants' unlawful offset of funds from those plans.

Respectfully submitted,

EBEN ALEXANDER, III, M.D.

By his attorneys,

/s/ Colleen C. Cook
Michael Paris (BBO #556791)
Colleen C. Cook (BBO#636359)
NYSTROM BECKMAN & PARIS LLP
10 St. James Avenue, 16th Floor
Boston, Massachusetts  02116
(617) 778-9100

Dated: October 10, 2006

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the above document was served upon David Casey, Esq., counsel for defendants, by electronic mail and First Class mail on October 10, 2006.

/s/ Colleen C. Cook
Colleen C. Cook