# Exhibit D

Case 1:04-cv-10738-MLW   Document 81-5   Filed 10/17/2006   Page 1 of 7

 **BRIGHAM AND WOMEN'S HOSPITAL**

 **HARVARD MEDICAL SCHOOL**

75 Francis Street
Boston, Massachusetts 02115
Tel: 617 732-8181, Fax: 617 734-8353

**Department of Surgery**

October 1, 2004

**BY HAND**

Michael Paris, Esq.
Nystrom Beckman & Paris
10 St. James Avenue, 16th Floor
Boston, MA 02116

Re:   *Eben Alexander, III, M.D.*

Dear Mr. Paris,

As you know, on September 29, 2004, we conducted a hearing on behalf of the Brigham and Women's Physician's Organization ("BWPO") Compensation Committee to address Dr. Alexander's complaints regarding the reduction of his financial interest in the Unfunded Deferred Compensation Plan ("UDC") and the Faculty Benefit Retirement Plan ("FRBP") (collectively the "Plans") by application of his accumulated practice deficit. The hearing followed my August 2, 2004 letter in which the Plans upheld on appeal the decision to deny Dr. Alexander's claim but exercised discretion under section 4.02 of the UDC and section 6.01 of the FRBP to conduct a hearing to fully complete our review. A true and accurate copy of my August 2, 2004 letter is attached hereto as Exhibit 1.

At the outset, I note that subsequent to my August 2, 2004 letter, counsel for the Plans, Gregory Keating, sought information from you concerning what if any information or issues remained outstanding. As I understand it, counsel subsequently had discussions with you, provided you with information responsive to your inquiries and summarized his efforts to provide you with information and documentation in a letter dated September 21, 2004. A true and accurate copy of that letter is attached as Exhibit 2. On September 28, 2004, the day before the hearing, you sent a letter in which you identified three issues for consideration. A true and accurate copy of your letter is attached as Exhibit 3. Mr. Keating responded to your letter later that day. A true and accurate copy of his letter is attached as Exhibit 4. We agreed at the hearing that the record on this administrative review would include not only the transcript of the hearing, but also all correspondence between the parties and their counsel from April 12, 2004 until the present. In evaluating and assessing this claim for benefits, we have carefully considered all of these documents,

PARTNERS. HealthCare System Member

Michael Paris, Esq.
October 1, 2004
Page 2

as well as information presented at the hearing and information made available to us by the BWPO.

At the hearing, and as reflected in your letter of September 28, 2004, you identified three arguments which comprise Dr. Alexander's challenge to the denial of his claim. They are as follows:

1. The BWPO had no right to set off amounts charged to Dr. Alexander as BNF shared expenses because the Plans provide that only amounts due BSG may be set off;

2. Assuming that the BWPO had the right to set off BNF shared expenses against Dr. Alexander's UDC and FRBP accounts, the calculation of the set-off is inaccurate and the BWPO has not clearly and convincingly explained its methodology or produced adequate supporting documentation;

3. Dr. Alexander's UDC and FRBP accounts should not have been reduced in violation of ERISA's vesting requirements because neither the UDC nor the FRBP satisfy ERISA's top-hat exemption.

This letter addresses each of Dr. Alexander's arguments and constitutes the Plans' decision, pursuant to sections 2.05 and 4.02 of the UDC, and 3.03 and 6.01(b) of the FRBP, affirming the denial of his claim.

**FACTUAL BACKGROUND**

Brigham Surgical Group Foundation, Inc. ("BSG") hired Dr. Alexander in 1988. At that time, and as a condition of his employment, Dr. Alexander signed an Employment Agreement in which he agreed to "perform such professional services as are usual in the Department of Surgery . . . and any other duties of a professional nature assigned to [him] by the Surgeon-in-Chief of the Brigham and Women's Hospital, or the Chief of the Division to which [he] is assigned." Pursuant to this Employment Agreement, Dr. Alexander was employed at will.

Shortly thereafter, Dr. Alexander was invited to participate in two unfunded deferred compensation plans sponsored and maintained by BSG for a select group of highly compensated employees: the UDC and FRBP. Both plans contained a broad set-off provision which allowed BSG to set off any amounts due from a participant to BSG, including any current or prior practice deficits. The plan documents, and thus notice of this provision, were provided to Dr. Alexander when his participation in the plans commenced.

In 1992, Dr. Peter Black, the Chief of Brigham and Women's Department of Neurosurgery, requested that each of the four neurosurgeons employed by BSG join in an

Michael Paris, Esq.
October 1, 2004
Page 3

affiliation with Boston Neurosurgical Foundation (BNF), a neurosurgery group associated with Children's Hospital. Dr. Black's business reasons for doing so included (1) creating the opportunity for BSG surgeons to practice at Children's Hospital; (2) strengthening BSG and growing its revenues through joint-marketing efforts with BNF and Children's Hospital; and (3) reducing BSG's overhead by sharing certain administrative expenses with BNF, especially academic costs including residency expenses and other costs which are part of both departments' academic mission. All of the BSG physicians, including Dr. Alexander, agreed to this affiliation with the BNF. Further, BSG and Dr. Alexander benefited from this arrangement. For Dr. Alexander's part, he enjoyed net practice income surpluses which were deposited into his UDC and FRBP accounts for several years following this joint venture.

Unfortunately, Dr. Alexander's practice revenue declined each year from 1997 until his termination in 2001. The BWPO exercised its right to terminate Dr. Alexander following two complaints to the Hospital concerning issues of sexual harassment which were investigated by Human Resources. While the BSG's decision to impose the set-offs was based on Dr. Alexander's significant deficits, the termination certainly eliminated any possibility that BSG might recover the deficits from future practice surpluses rather than from Dr. Alexander's FRBP and UDC account balances.

### SUBSEQUENT ADMINISTRATIVE HISTORY, THE APPEAL AND HEARING

When Dr. Alexander raised questions about these set-offs, the Plans' representatives engaged in a series of meetings with and produced substantial documentation to Dr. Alexander, his predecessor counsel and his accountant in an effort to explain the bases of these actions. Meetings and informational exchanges occurred from 2001 until 2003. A final meeting was held in June, 2003, after which the Plans provided Dr. Alexander with additional information. The Plans then heard nothing from Dr. Alexander until suit was filed in April, 2004.

On April 12, 2004, Dr. Alexander notified Brigham and Women's Physicians Organization, Inc. ("BWPO") of his claim for benefits under the UDC and the FRBP. After it was denied, Dr. Alexander requested a review of the denial pursuant to section 4.02 of the UDC and section 6.01 of the FRBP. The BWPO Committee on Compensation, acting as the Plan Administrator, appointed Michael O'Connell and me to review the denial of Dr. Alexander's claim for benefits. We complete that process by this final determination.

In all, Dr. Alexander has failed to identify or produce any documentation, or advance a specific argument, showing that the calculation of his practice deficit was incorrect or improper. Rather, and as explained below, the record reveals that his practice deficits resulted from a dramatic decrease in his practice income and not, as he seems to claim, from any illegitimate or invidious scheme which increased his expenses.

Michael Paris, Esq.
October 1, 2004
Page 4

## DR. ALEXANDER'S THREE ISSUES

### Set-off of BNF Expenses

The UDC and FRBP both contain broad language which allows BSG (and BWPO, as its successor), to set off amounts owed to it by participants against their account balances, including but not limited to current and prior practice deficit amounts. See UDC at § 2.05; FRBP at § 3.03. In turn, the BSG Professional Staff Compensation Policy provides that a member's practice deficit shall be determined by "finding the difference between the income resulting from Member OR-TEACHING activity and Member expenses" which include "all direct and allocated expenses incurred by or on behalf of the Member," such as "all office expenses, including secretarial and paramedical salaries and their associated fringe benefits, office and medical supplies, and other usual medical office expenses." The Compensation Policy thus allows BSG to allocate legitimate business expenses among its members in calculating their practice deficit. Upon careful consideration, we find that (1) Dr. Black's decision to invoice BNF costs to BSG was a legitimate business decision within his discretion as Chief of Neurosurgery; (2) that whether through execution of sharing agreements or his continued employment Dr. Alexander understood and accepted these costs as part of the calculations that determined his practice surplus or deficit; and (3) the methods used to allocate these costs within BSG were proper. Thus, we conclude that BSG properly and accurately set off amounts charged to Dr. Alexander as BNF expenses.

### Calculation of Set-off Amounts

We have reviewed the calculation of Dr. Alexander's practice deficit and subsequent set-off amount. We are satisfied that the calculations are accurate and derive from BSG's financial statements for all relevant years. These financial statements were subject to independent audit and received an "unqualified opinion" each year. The process leading to this end was as follows. First, BSG expenses, including BNF expenses, were booked and accounted for monthly by various members of the BSG accounting staff. BSG's financial statements were then reviewed by the accounting staff quarterly, and sent to each of the physicians, including Dr. Alexander, for their consideration. Finally, and as noted, independent accounting firms audited BSG's financial statements, including its business expenses, annually. After reviewing the relevant documents that have been provided to Dr. Alexander, as well as the accounting processes which resulted in the financial statements used to calculate his practice deficit, we have found nothing which suggests that Dr. Alexander's practice deficit was calculated inaccurately or improperly.

The information provided to Dr. Alexander substantiates this conclusion. Specifically, Exhibit 1 to Greg Keating's September 21, 2004 letter contains Dr. Alexander's year end practice reports for fiscal years 1998 – 2000. They reflect in detail Dr. Alexander's practice income, expenses, and resulting deficit.

In addition to demonstrating the manner in which Dr. Alexander's practice deficit was calculated, these reports also reveal the steep and progressive decline in his annual practice

Michael Paris, Esq.
October 1, 2004
Page 5

income from 1998 to 2000. In fact, his net receipts fell from $1,213,463 in the 12 months ending June 30, 1996 to $627,382 in the 12 months ending June 30, 2000. In the aggregate, Dr. Alexander's net receipts were $2,000,000 less over this four year period than had they remained at 1996 levels.

Further, any suggestion that Dr. Alexander's practice deficit resulted from BNF expenses and not his declining practice income is belied by the <u>decrease</u> in BNF expenses from 1998 – 2000. This information is set forth in Exhibit 2 to Mr. Keating's September 21, 2004 letter and Exhibit 3 to my August 4, 2004 letter. The former reveals that BNF expenses attributable to Dr. Alexander <u>fell</u> from $55,631 in FY 1997 to $33,902 in FY 2000. The latter (in particular the BNF report reflecting Shared Expenses for the 12 months ending June 30, 2001) reveals that for FY 2001, BNF expenses in the aggregate <u>fell</u> from $423,092 in FY 2000 to $318,542 on FY 2001.

Lastly, throughout the claim process you have argued consistently that Dr. Alexander's $441,887 practice deficit at termination was inappropriate due to his incursion of BNF expenses through the Shared Agreement. The documents provided, however, and in particular Exhibit 2 to Mr. Keating's September 21, 2004 letter, establish that Dr. Alexander's attributable share of BNF expenses during the years in which he accumulated a practice deficit fall far short of his overall practice deficit of $441,087. In particular, the numbers reveal that his cumulative attributable share of BNF expenses was $121,000±.

For all of the foregoing reasons, we deny Dr. Alexander's claim that the set-offs to his plan contributions were improper or inaccurate.[1]

*Top Hat Plan*

As previously explained, we do not believe that information regarding the validity of the UDC and the FRBP as top hat plans is directly relevant to this administrative process. Nonetheless, we hereby provide you with data which demonstrate that both the UDC and the FRBP are valid top hat plans, and thereby exempt from ERISA's vesting requirements.

Only those employees who met certain rank and tenure requirements were considered eligible to participate in the UDC and the FRBP. Moreover, to participate employees also had to achieve a practice surplus in any given year. As you may know, the BSG froze the UDC and the Plans during the summer of 1999 and offered members such as Dr.

---

[1] During the hearing and in your correspondence, you contend that the Plans must provide you with all documentation for BNF expenses over an eight year period. The Plans respectfully decline this request for three reasons. First, having reviewed the documents provided by the Plans, we do not see any indication in the numbers to support your undeveloped and unfocused assertions that BNF expenses were irregular or that they caused a spike in Dr. Alexander's practice deficit (indeed, as noted, BNF expenses went <u>down</u> in the relevant period); second, BSG's financial statements for all years in question were reviewed favorably by its independent auditors; third, it is my understanding that Dr. Alexander has been provided with information down to the invoice level in the past yet has failed to identify a transaction or group of transactions which he questions.

Alexander the opportunity to place their accumulated practice surpluses into investments of their choosing independent of the BSG. As such, the validity of the UDC and the FRBP as "top-hat" plans is determined by reviewing participation data from 1999, not 2001. Information concerning participation in the plans in 1999 and relevant preceding years is as follows:

|      | TOTAL EMPLOYEES | PARTICIPATING EMPLOYEES | PERCENTAGE |
|------|-----------------|-------------------------|------------|
| 1999 | 324             | 14                      | 4.3%       |
| 1998 | 274             | 14                      | 5.1%       |
| 1997 | 241             | 16                      | 6.7%       |

The data reveal that the UDC and the FRBP were available to a "select group of highly compensated employees" only, and thereby constitute valid top hat plans. See, e.g., Demery v. Extebank Deferred Compensation Plan, 216 F.3d 283, 289 (2nd Cir. 2000).

In light of the information set forth above, Dr. Alexander has failed to demonstrate that the reduction of his UDC and FRBP account balances by the set-off of his practice deficit was improper or inaccurate. We therefore affirm the denial of his claim.

Sincerely,

*[signature]*

Paul Calandrella

Enclosures

cc:     Michael O'Connell, Esq.

Boston:4034.4 047950.1002