UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS


EBEN ALEXANDER, III, M.D.         )
                                  )
          v.                      )    C.A. No. 04-10738-MLW
                                  )
BRIGHAM AND WOMEN'S PHYSICIANS     )
 ORGANIZATION, INC., et al.       )


MEMORANDUM AND ORDER


WOLF, D.J.                                    December 26, 2006

I. SUMMARY

        Plaintiff Eben Alexander, III is a neurosurgeon.  He was a

member of the defendant Brigham Surgical Group Foundation ("BSG")

from 1988 until his employment was terminated in 2001 by BSG's

successor, defendant Brigham & Women's Physicians Organization,

Inc. ("BWPO").[1]

        BSG maintained two unfunded deferred compensation plans for

its surgeons who were, like Alexander, also members of the Harvard

Medical School Faculty.  These were the Faculty Retirement Benefit

Plan (the "FRBP") and the Unfunded Deferred Compensation Plan (the

"UDC").  Alexander and other BSG surgeons who were affiliated with

the Harvard Medical School were required to contribute to the FRBP

and UDC if their "Net Practice Income" ("NPI") for a particular

year exceeded the salary cap for Harvard Medical School faculty.

The plans provided that the accounts of such surgeons in the FRBP

_____

        [1]BWPO became the successor to BSG in January, 2001, shortly
before Alexander was terminated.  These defendants are referred
to collectively as BSG in this Memorandum.

and UDC would be reduced to offset any "practice deficit" the surgeon experienced in a subsequent year.

In some years Alexander generated NPI and, therefore, contributed to the FRBP and UDC.  In other years he experienced a practice deficit.  When Alexander was terminated by BSG he was informed that his accounts in the FRBP and UDC had been reduced to offset his accumulated practice deficit.

In 2004, Alexander filed this suit alleging that in reducing his FRBP and UDC accounts BSG, and other defendants involved with the FRBP and UDC, violated various state laws and the Employment Retirement Income Security Act ("ERISA"), 29 U.S.C. §1001 et seq. Counts I-VIII, which alleged various state law claims, were dismissed.  The parties then represented that a decision on Counts IX and X would, as a practical matter, resolve this case.

In Count IX Alexander alleges that the reduction of his FRBP and UDC accounts violates ERISA's vesting requirements and in Count X he alleges a related violation of ERISA's fiduciary responsibility provisions.  In response, BSG asserts that the FRBP and UDC are "top hat" plans, as to which ERISA's vesting and fiduciary responsibility provisions do not apply.

The court denied the parties' cross-motions for summary judgment on the issue of whether the FRBP and UDC were top hat plans.  A non-jury trial on this issue was conducted in October, 2006.

For the reasons described in detail in this Memorandum, BSG has proven that the FRBP and the UDC were each top hat plans. Therefore, the vesting and fiduciary responsibility provisions of ERISA do not apply to them. Thus, it was permissible for BSG to reduce Alexander's accounts in those plans to offset his practice deficit. Accordingly, BSG is entitled to judgment on Counts IX and X.

Based on the parties' representations, the court understands that the remaining counts, XI, XII, and XIII, will be voluntarily dismissed. The parties are being ordered to confer and inform the court, by January 12, 2006, whether those counts should be dismissed, which will render judgment complete and appealable.

II. FACTS

The following facts have either been agreed upon by the parties or proven by a preponderance of the credible evidence.

Alexander is a neurosurgeon. In 1988, he accepted an invitation to become a member of BSG.

BSG is a non-profit, tax-exempt organization established pursuant to 26 U.S.C. §501(c)(3). Members of BSG were virtually all members of the faculty of the Harvard Medical School, another non-profit, tax-exempt §501(c)(3) corporation.

BSG had several purposes. Its members had various academic ranks and taught surgery to students of the Harvard Medical School. They also constituted the Department of Surgery at the Brigham &

Women's Hospital, where they conducted surgery and trained surgical residents.

In order to maintain its non-profit, tax exempt status, a §501(c)(3) corporation must place reasonable limits on the income of those it compensates in order to assure that its earnings do not "inure to the benefit of private individuals." 26 C.F.R. §1.501(c)(3)-1(c)(2). Therefore, the Harvard Medical School imposed an annual cap on the maximum compensation that could be received by a faculty member and BSG adhered to that cap.

However, the salary cap presented a challenge to BSG's efforts to recruit and retain excellent surgeons, who could earn far more than the maximum Harvard Medical School salary if they worked elsewhere. This dilemma came into sharp focus when one of its most prominent surgeons, Dr. L.C.,[2] threatened to leave BSG for a more lucrative position.

Motivated by a desire both to adhere to the Harvard Medical School salary cap, and to provide the financial incentives necessary to recruit and retain excellent surgeons, BSG established two unfunded deferred compensation plans to which the most profitable surgeons each year would contribute – the FRBP and the UDC. Compensation was deferred to the UDC and/or FRBP only if a physician was employed by the BSG, a member of the full-time

---

[2] To protect the financial privacy of the doctors referenced, whose full names have been submitted to the court under seal, the doctors are referred to in this Memorandum by their initials.

faculty of the Harvard Medical School, and generated an NPI in excess of the Harvard Medical School salary cap. If a physician generated an NPI that would raise his salary higher than this limit, BSG would reduce his salary by 25% and credit that amount to the FRBP. If any NPI remained, BSG would credit 50% of that remainder to the UDC. This was the only mechanism through which a physician could deposit money into a FRBP or UDC account.  Money could not be withdrawn from these accounts until a member retired or died.

While motivated by the Harvard Medical School salary cap and the desire to recruit and retain excellent surgeons, the FRBP and the UDC were established and maintained primarily for the purpose of providing deferred compensation for a select group of BSG's most highly compensated members.[3] These plans supplemented rather than

_____

[3]The FRBP states that:

The primary purpose of the Plan is to provide an opportunity to earn an incentive retirement contribution of 25% of a Participant's compensation (determined without regard to tax code limits on qualified plan contributions), offset for qualified plan and employer 403(b) contributions from any source.

Trial Exhibit 4, FRBP, §1.01.

Similarly, the UDC provides that:

If the total compensation of an Employee established by the Committee [on Compensation] exceeds the maximum permissible amount of compensation payable currently in cash or fringe benefits under the limitations imposed by Harvard Medical School, 50% of the excess (but not more than the maximum permissible amount of deferred

substituted for other qualified retirement plans for which all BSG employees were eligible.

The FRBP and UDC were intended to be ERISA top hat plans, which would, among other things, be exempt from the vesting and fiduciary responsibility requirements of ERISA. The plans each gave BSG the right to reduce a member's FRBP and UDC accounts by the amount of his or her practice deficit for a particular year. A practice deficit occurred when the expenses attributed to a surgeon's practice exceeded the income that practice generated for the year.

Alexander received a description of the pertinent provisions of the FRBP and UDC when he joined BSG in 1988. Thus, he was put on notice that any deferred compensation that he earned would be reduced by any practice deficit he subsequently experienced. Alexander did not, however, have the opportunity or ability to decline to contribute to the FRBP or UDC if he earned enough to do so. Nor did he alone have the ability to negotiate modifications

---

compensation under said limitations) shall be credited by the Employer to a deferred compensation liability account payable to such Employee.

Trial Exhibit 3, UDC, §2.01.

Therefore, the terms of the Plans indicate, expressly or implicitly, that their primary purpose was to provide deferred compensation. The testimony of Dr. John Mannick, the President of BSG when the plans were established, provided added, credible evidence that their primary purpose was to provide deferred compensation for the highest earning surgeons.

to either plan.  Rather, if Alexander wanted to be a member of BSG and of the Harvard Medical School faculty, he had to accept the terms of those plans.

In certain years, Alexander generated NPI, which resulted in amounts being credited to his accounts in the FRBP and UDC.  In other years, Alexander experienced a practice deficit.

On April 13, 2001, Alexander was notified by BSG that his employment was terminated.  On April 23, 2001, his FRBP account was reduced by $190,000.00 and his UDC account was reduced by $251,887.16 to offset his practice deficit.

As explained earlier, Alexander now asserts that neither the FRBP nor the UDC was a top hat plan exempt from ERISA's vesting and fiduciary responsibility provisions.  Therefore, he contends that BSG was not entitled to reduce the amounts of deferred compensation attributed to him for certain years because of his practice deficits in other years.

The relevant years for determining whether the FRBP and UDC constituted top hat plans are fiscal years 1997, 1998, and 1999.[4] All surgeons who were full-time faculty of the Harvard Medical School were eligible to contribute to the FRBP and the UDC.  The number of such surgeons was 78 in 1997, 84 in 1998, and 88 in 1999. In those years, BSG had many other employees, totaling (including

---

[4]All subsequent references to "years" are to fiscal years.

surgeons) 241 in 1997, 274 in 1998, and 324 in 1999.[5]

When the FRBP was established it was uncertain how many surgeons would earn enough in a particular year to contribute to it. When the UDC was established, it was anticipated that no more than 10% of BSG employees would earn enough each year to contribute to it.

In fact, in 1997, 21 BSG employees, constituting 8.7% of the total number of BSG employees, contributed to an FRBP account. These figures were 17 and 6.2% for 1998, and 16 and 4.9% for 1999.

Similarly, in 1997, 14 BSG employees, constituting 5.8% of the total number of BSG employees, contributed to a UDC account. These figures were 9 and 3.3% for 1998, and 10 and 3.1% for 1999.

In each of the relevant years, the surgeons who could theoretically have earned enough to contribute to the UDC and/or FRBP were about 30% of BSG's total workforce. More specifically, they were 32.4% of the total work force in 1997, 30.7% in 1998, and 27.2% in 1999.

There were some non-surgeons who earned more each year than some surgeons. However, those who contributed to the FRBP or UDC were necessarily both surgeons and the most highly compensated employees of BSG. The average compensation of employees who

---

[5]It appears that the total number of employees each year included some surgeons who were not full-time Harvard Medical School faculty members and, therefore, were not eligible to contribute to the FRBP or UDC: 6 in 1997, 10 in 1998, and 12 in 1999.

contributed to the UDC plan during 1997, 1998, and 1999 was $503,730, $581,320, and $483,073 respectively. The average compensation of employees who contributed to the FRBP plan during the fiscal years 1997, 1998, and 1999 was $434,840, $476,024, and $418,059 respectively. The average compensation of all BSG employees for the fiscal years 1997, 1998, and 1999 was $83,403, $80,491, and $74,376 respectively.

Therefore, the surgeons who contributed to the UDC and/or FRBP in the relevant years were part of a select group, qualitatively and quantitatively. It was, by definition, also a group of highly compensated individuals.

While surgeons could not individually decline to participate in the FRBP and UDC deferred compensation plans or negotiate their terms, the surgeons as a group both had and exercised the power to change them. Some of the high earning surgeons who deferred compensation into the FRBP and UDC plans in 1997, 1998, and 1999 were on BSG's Executive Committee and/or Board of Directors at various times. Drs. P.B., D.B., L.C., J.C., E.E., J.R., P.S. and D.S. were all contributors to the plans who served on the BSG's Executive Committee. Drs. E.E., L.C., and D.S. were contributors to the plans who served on the BSG Board of Directors during Alexander's employment at BSG. The Board of Directors could consider changes to the UDC and FRBP. If the Board of Directors

9

approved a proposed change, the proposal would be referred to the Executive Committee.  The Executive Committee could vote to approve any change, which would then be submitted to the Committee on Compensation for final approval.

Surgeons as a group exercised their power to change the plans. In about 1990, a BSG member suggested that surgeons of all academic ranks be eligible to participate in the UDC rather than only those who held the rank of Associate Professor and above.  The Executive Committee voted to submit the proposed change to the Committee on Compensation, which approved it.  In addition, the Executive Committee rejected a proposal that would have allowed neurosurgeons at the Children's Hospital and Brigham and Women's Hospital to pool their deferred compensation and have it split by all the neurosurgeons at both institutions.

III. CONCLUSIONS OF LAW

"ERISA is landmark legislation that subjects a wide variety of employee benefit plans to complex and far-reaching rules designed to protect the integrity of those plans and the expectations of" those with an interest in them.  Barrowclough v. Kidder, Peabody & Co., Inc., 752 F.2d 923, 929 (3d Cir. 1985) overruled on other grounds by Pritzker v. Merrill Lynch, Perce, Fenner & Smith, Inc., 7 F.3d 1110 (3rd Cir. 1993).   29 U.S.C. §1053 provides that

generally contributions to an individual's pension plan "vest" at a particular time and thus become "unforfeitable." Therefore, a vested interest in a pension plan may not be reduced by an employer. As indicated earlier, Alexander asserts that his contributions to the FRBP and UDC vested before his termination and, therefore, BSG could not properly reduce his accounts in those plans to offset his practice deficit.

As the Second Circuit has explained:

> ERISA's coverage provisions, 29 U.S.C. §§ 1003, 1051, 1081, and 1101, state that ERISA shall apply to any employee benefit plan, other than listed exceptions. One of these exceptions, known as a top hat plan, is defined as: "plan which is unfunded and is maintained by an employer primarily for the purpose of providing deferred compensation for a select group of management or highly compensated employees." 29 U.S.C. §§ 1051(2), 1081(a)(3), 1101(a)(1).[6]  Top hat plans are exempt from the participation and vesting provisions of ERISA, 29 U.S.C. §§1051-1061, its funding provisions, 29 U.S.C. §§ 1081-1086, and its fiduciary responsibility provisions, 29 U.S.C. §§1101-1114, though not from its reporting and disclosure provisions, 29 U.S.C. §§1021-1031, or its administration and enforcement provisions, 29 U.S.C. §§1131-1145.

Demery v. Extebank Deferred Comp. Plan (B), 216 F.3d 283, 286-87 (2d Cir. 2000).

In this case, BSG has the burden of proving that FRBP and UDC

---

[6]As §§1051(2), 1081(a)(3), and 1101(a)(1) all include the same language defining a top hat plan, the court will refer only to §1051(2) in the following analysis.

were each top hat plans.  See In re The IT Grp., Inc., 305 B.R. 402, 407 (Bankr. D. Del. 2004); Carrabba v. Randalls Food Markets, Inc., 38 F.Supp.2d 468, 470 (N.D. Tex. 1999).  Virta v. Desantis Enterprises, Inc., 1996 WL 663970, at *3 (N.D.N.Y. 1996).  It has done so.

It is undisputed that both the FRBP and UDC were unfunded plans and provided for deferred compensation.  However, among other things, Alexander contends that the plans (1) were not maintained primarily for the purpose of providing deferred compensation and (2) were not maintained for only a select group of highly compensated employees.

More specifically, Alexander asserts that the FRBP and UDC were not top hat plans because they were created to provide incentives for excellent surgeons to join and remain with BSG while receiving annual salaries that did not exceed the Harvard Medical School cap, and did not jeopardize the §501(c)(3) status of the Harvard Medical School or BSG.  However, while these were indeed the motives for the establishment of the plans, the terms of the plans, the manner in which they required that money not be withdrawn until a surgeon died or retired, and the credible testimony of BSG's President demonstrate that their purpose and effect was to provide deferred compensation to the most profitable of BSG's surgeons.

12

The fact that a plan is "established as a means to retain valuable employees" does not disqualify it from top hat status it otherwise deserves. <u>Demery</u>, 216 F.3d at 287. This is equally true if a plan providing unfunded, deferred compensation also aids recruitment of desirable employees.

> Top hat plans are designed to provide certain employees with payments over and above the benefits provided by "qualified" employee benefit plans-i.e., plans that are eligible for favorable tax treatment, such as [the employer's] standard retirement plan. The Internal Revenue Code limits the value of benefits that may be paid under qualified plans, <u>see</u> 26 U.S.C. §§401(a)(17), 415 – hence the need for top hat plans when employers wish to provide a higher level of deferred compensation to their employees.

<u>Eastman Kodak v. STWB, Inc.</u>, 452 F.3d 215, 217 (2d Cir. 2006). A desire to recruit and retain excellent employees would be a common, rather than unusual, motive for establishing a top hat plan. For example, in <u>Prior v. Innovative Communications Corp.</u> the top hat plan "was designed to replace benefits [plaintiff] lost when he left his previous employer." 360 F. Supp. 2d 704, 708 (D.V.I. 2005). The fact that the creation of a plan was motivated by a desire to recruit and retain excellent employees does not disqualify it from receiving the top hat status it otherwise merits.

Alternatively, §1051(2) expressly requires only that a top hat plan be maintained "primarily" to provide deferred

13

compensation. The term "primarily" makes it clear that "top hat plan can have multiple broad purposes." Garratt v. Knowles, 245 F.3d 941, 946 n.4 (7th Cir. 2001); see also In re Battram, 214 B.R. 621, 625 (Bankr. C.D. Cal. 1997) ("a top hat plan need only be 'primarily' for the purpose of providing deferred compensation, not exclusively for that purpose."). Again, the terms of the plans, the way they operated, and the credible testimony of BSG's President persuade the court that the ultimate and primary purpose of both the FRBP and UDC was to provide deferred compensation to the highest earning BSG surgeons. The plans also served the related, subsidiary purposes of adhering to the Harvard Medical School salary cap and providing the incentives necessary to recruit and retain surgeons who could earn more than that limit elsewhere.

Alexander also argues that the FRBP was not maintained for a "select group" of "highly compensated" employees. "To determine whether the participants of an employee benefit plan are 'a select group of management or highly compensated employees,'" the district court must "conduct a fact-specific inquiry, analyzing quantitative and qualitative factors in conjunction." Demery, 216 F.3d at 288 (citing Duggan v. Hobbs, 99 F.3d 307, 312 (9th Cir. 1996)). Quantitatively, "there is no existing authority that establishes when a plan is too large to be deemed 'select.'" Id.

14

However, a top hat plan "must cover relatively few employees." In re New Valley Corporation, 89 F.3d 143, 148 (3d Cir. 1996). Qualitatively, "the plan must cover only high level employees." Id. Either highly-compensated or management-level employees are "high level." In re The IT Group, Inc., 305 B.R. at 410.

As the Second Circuit has explained, about 15% "is probably at or near the upper limit of the acceptable size for a 'select group.'" Demery, 216 F.3d at 289. Alexander contends that the BSG surgeons who were eligible and, therefore, might contribute to the FRBP and UDC constituted about 30% of all BSG employees and, therefore, were not a select group.

However, in the circumstances of this case it is not appropriate to focus on all BSG surgeons to define the group. Generally in the reported cases participation in the unfunded plan issue was optional and courts correctly focused on everyone who was invited to contribute to a purported top hat plan to determine whether they were a select group. Id. at 285; Carrabba, 38 F. Supp. 2d at 473-74; Guiragoss v. Khoury, 444 F. Supp. 2d 649, 653-54 (E.D. Va. 2006). For example, in Demery:

> The Plan was offered to assistant vice-presidents, managers, and other senior officers representing approximately 15% of the work force of Extebank. Approximately, 7-10% of Extebank employees actually participated in the Plan.

216 F.3d at 285. Similarly, in Carrabba, all salaried employees

15

were "invited to participate in the plan," but the highest paid executives were "slow to become involved." 38 F. Supp. 2d at 473-74.    In Guiragoss, the plaintiff "was not given the option of joining the Plan when she was hired," but she was invited to do so the next year and chose to enroll.    444 F. Supp. 2d at 653.

In contrast, in the instant case only the highest earning BSG surgeons were permitted to contribute to the FRBP and UDC, and they were required to do so to the extent that their NPI for a particular year exceeded the Harvard Medical School salary cap. When the UDC was established, it was expected that no more than 10% of all surgeons would contribute to an account in any year. During the relevant years, surgeons comprising no more than 8.7% of all BSG employees contributed to the FRBP in a single year and surgeons comprising no more than 5.8% of the total workforce contributed to the UDC in a single year.    As a practical matter, the plans were "maintained" only for those highest earning surgeons.    Therefore, it is appropriate to consider only them when deciding whether the plans were maintained primarily to provide deferred compensation for a select group.

As indicated earlier, about 15% has been properly deemed to be the upper limit of a "select group."    Demery, 216 F.3d at 289. 8.7% and 5.8% are well-below that upper limit.    They are also not far above the percentages of groups that have been found to be

16

select in other cases. <u>See</u> <u>Belka v. Rowe</u>, 571 F. Supp. 1249, 1252
(D. Md. 1983) (1.6-4.6%); <u>Duggan v. Hobbs</u>, 99 F.3d at 312 (4.3%);
<u>In re Battram</u>, 214 B.R. at 625 (3.1%). Therefore, the FRBP and UDC
were each maintained primarily for a "select group" within the
meaning of §1051(2).

The select group in this case was, by definition, highly
compensated.   Only the highest earning BSG surgeons could
contribute to either or both plans in a particular year.   As
described earlier, the surgeons who contributed to the FRBP in
1997, 1998, and 1999 had average compensation that was always at
least $418,059 and ranged up to an average of $476,024.   The
surgeons who contributed to the UDC in 1997, 1998, and 1999, had
average annual compensation of at least $483,073, and ranged up to
an average of $581,320. In contrast, the highest annual average
compensation of all BSG employees in those years was $83,403,
about a fifth of the average annual compensation of a contributor
to the FRBP.  Therefore, the contributors to the FRBP and UDC were
highly compensated both in absolute terms and relative to the
total BSG workforce.  <u>Compare</u> <u>Demery</u>, 216 F.3d at 289 (average
salary of top hat plan participants was more than double the
average salary for all other employees).

The actual contributors to the FRBP and UDC were also a
select group qualitatively.  Although some employees of BSG who

17

were not surgeons earned more than some surgeons, only surgeons were eligible to contribute to the plans.

Moreover, as described earlier, several of the highest earning surgeons who were, therefore, contributors to the UDC and/or FRBP were also part of BSG's management, as members of its Board of Directors, its Executive Committee, or both. "Congress and the Department of Labor have determined that the management and highly compensated employees who participate in unfunded deferred compensation plans do not need the same level of protection" as other employees. <u>Barrowclough</u>, 752 F.2d at 934; <u>see also Guiragoss</u>, 444 F. Supp. 2d at 661.

The Department of Labor has stated that:

> It is the view of the Department that in providing relief for 'top-hat' plans from the broad remedial provisions of ERISA, Congress <u>recognized that certain individuals</u>, by virtue of their position or compensation level, <u>have the ability to affect or substantially influence</u>, <u>through negotiation or otherwise, the design and operation of their deferred compensation plan</u>, taking into consideration any risks attendant thereto, and, therefore, would not need the substantive rights and protections of Title I [of ERISA, which includes its vesting provisions].

DOL Opin. Letter 90-14A (emphasis added). The Department of Labor has, therefore, opined that in enacting §1051(2) Congress recognized that highly compensated employees generally have the power to protect their own interests. High compensation has, in effect, been deemed to be a bright-line proxy for bargaining power

18

which makes exemption from ERISA's vesting and fiduciary responsibility requirements, among others, appropriate.

Alexander contends that an individual must be shown to have had actual power to negotiate the terms of a plan for it to merit top hat status. This contention is supported by language in several decisions. In Prior v. Innovative Communication Corp., 360 F.Supp.2d at 714, the court stated that "[a]n important factor in determining that an unfunded plan constitutes a 'top hat' plan is whether an executive has the power to negotiate the terms of an individualized pension benefit." See also Carrabba, 38 F.Supp.2d at 478 ("The evidence does not persuade the court that any significant number of the participants in the [deferred compensation plan] individually had bargaining power...); Guiragoss, 444 F.Supp.2d at 661 ("[a] third requirement [for a valid top hat plan], provided by DOL advisory opinions, is that the select group consist of individuals who are in the position to protect their own interests . . . The assumption underlying the top hat exemption from ERISA is simply that top-level executives are in a favorable bargaining position to negotiate the terms of an agreement..."); Duggan, 99 F.3d at 313.

In some of the foregoing cases, the lack of individual bargaining power was evidence that the employee was not part of a select group. For example, in Guiragoss, the plaintiff found not

to be part of a select group was a sales clerk in a jewelry store and the only other contributor to the plan at issue was another sales clerk.  <u>See</u> 444 F. Supp. 2d at 653-54.  In contrast, in <u>Duggan</u>, the plaintiff who was found to be in a top hat plan was the only employee covered and actually "exerted influence over the design and operation" of the plan.  99 F.3d at 312-13.  Similarly, the top hat plan in <u>Prior</u> was established solely for the plaintiff as part of his employment agreement in order "to replace benefits [plaintiff] lost when he left his previous employer."  360 F. Supp. 2d at 708.  In <u>Duggan</u> and <u>Prior</u> it was, therefore, necessary to focus on the individual's bargaining power because he was the only member of the group at issue.

However to the extent, if any, that other courts have interpreted §1051(2) to require a showing that an individual such as Alexander had actual, individual bargaining power sufficient to negotiate the terms of an unfunded deferred compensation plan, this court respectfully disagrees.

Section 1051(2) is a statutory provision."'As in all statutory construction cases, [the court must] begin with the language of the statute.'" <u>Phillips v. Pembroke Real Estate, Inc.</u>, 459 F.3d 128, 139 (1st Cir. 2006) (quoting <u>Barnhart v. Sigmon Coal Co.</u>, 534 U.S. 438, 450 (2002)).  Statutory language is accorded "its ordinary meaning by reference to the specific context in which

that language is used, and the broader context of the statute as a whole. If the statutory language provides a clear answer, the inquiry ends." United States v. Roberson, 459 F.3d 39, 51 (1st Cir. 2006)(quotations and citations omitted). "[T]he congressional intendment conveyed by unclear statutory language may be discernible from its legislative history." Rolland v. Romney, 318 F.3d 42, 48 (1st Cir. 2003) (quotations and citations omitted).

Section 1051(2) makes no reference to bargaining power. Rather, it clearly states that to merit top hat status a plan must: (1) be unfunded; (2) be maintained primarily for the purposes of providing deferred compensation; and (3) such deferred compensation must be for "a select group of management or highly compensated employees." The statute could easily have stated that each of those management or highly compensated employees must have the power to negotiate the terms of the plan if Congress had intended to make such power a requirement of a top hat plan. The statute does not do so.

Moreover, the statutory language is not ambiguous. In any event, the parties have not identified any legislative history that indicates that Congress intended that highly compensated employees must individually have substantial bargaining power for a plan to achieve top hat status.

Nor does the language of §1051(2) manifest an intent to

21

require that employers demonstrate that the select group of management or highly compensated employees have sufficient bargaining power to negotiate the terms of an unfunded plan for it to merit top hat status. Again, pursuant to the usual canons of statutory construction, this may be the end of the proper inquiry. See Barnhart, 534 U.S. at 450; Phillips, 459 F.3d at 450.

The court recognizes, however, that some decisions discuss whether it has been shown that the select group collectively has such power. For example, in Demery, the Second Circuit wrote:

> Ability to negotiate is an important component of top hat plans; we have noted that top hat plans have been exempted from ERISA's substantive requirements "because Congress deemed top-level management, unlike most employees, to be capable of protecting their own pension expectations." Gallione [v. Flaherty, 70 F.3d 724, 727 (2d Cir. 1995)]. Congress approved of a lesser level of regulation for top hat plans "on the premise that the employer's top-level executives have sufficient influence within the institution to negotiate arrangements that protect against the diminution of their expected pensions." Id. at 728; see also Kemmerer v. ICI Americas Inc., 70 F.3d 281, 286 (3d Cir. 1995) ("Top hat plans ... which benefit only highly compensated executives, and largely exist as devices to defer taxes, do not require such scrutiny and are exempted from much of ERISA's regulatory scheme.").
>
> Here, the record is silent as to plaintiffs' ability to negotiate the terms of the Plan, and there is no evidence that they attempted to do so. . . . We do not think plaintiffs have proffered either direct or circumstantial evidence suggesting an absence of bargaining power sufficient to raise a question of fact on this issue.

216 F.3d at 289-90. Therefore, although not essential to its

22

decision, the Second Circuit has suggested that the actual bargaining power of the group of highly compensated individuals is relevant.

This court, however, finds that §1051(2) establishes a bright-line test that requires only proof of a select group of highly compensated or management employees, without an additional demonstration that the group actually had and exercised the power to negotiate the terms of the plan at issue.  However, this finding is not material to the conclusion that the FRBP and UDC were top hat plans because there is ample evidence that the BSG surgeons, particularly those who were the highest earners, had the ability to modify the plans and used it.

As described earlier, the FRBP was established as a result of the threat that a very profitable surgeon would leave BSG for a more lucrative position.  This indicates that successful surgeons have both options and bargaining power.  More significantly, the highest earning surgeons were represented on BSG's Board of Directors and Executive Committee.  BSG surgeons proposed that the UDC be revised to include those at the lower Harvard academic ranks and that proposal was adopted.  Therefore, the defendants have demonstrated that BSG surgeons generally, and its highest earning surgeons particularly, as a group had the power to influence the terms and operation of the plans.

23

The conclusion that the FRBP and UDC were top hat plans is not altered by the fact that 29 U.S.C. §1002(7) defines a "participant" as "any employee or former employee . . . who is or may become eligible to receive a benefit . . . ." Alexander argues that virtually all BSG surgeons were eligible to participate in the FRBP and UDC and theoretically might have generated sufficient NPI to do so. Therefore, Alexander asserts that because such surgeons composed about 30% of BSG's workforce, they did not constitute a select group. In essence, Alexander asks this court to follow the district court in <u>Darden v. Nationwide Mut. Ins. Co.</u>, 717 F. Supp. 388, 396 (E.D.N.C. 1989) <u>rev'd on other grounds</u>, 503 U.S. 318 (1992), and apply the §1002(7) definition of participant for the purpose of determining whether the FRBP and UDC were maintained only for a select group.

It is not, however, appropriate to do so. Once again, "'in all statutory construction cases, [the court must] begin with the language of the statute.'" <u>Phillips</u>, 459 F.3d at 139 (quoting <u>Barnhart</u>, 534 U.S. at 450). In defining a top hat plan, §1051(2) does not use the term "participant." Nor has any legislative history been cited to suggest that Congress intended that the §1002(7) definition of participant be applied for the purposes of §1051(2) analysis.

Moreover, in <u>Firestone Tire & Rubber Co. v. Bruch</u>, 489 U.S.

24

101, 117-18 (1989), the Supreme Court limited the statutory definition of "participant" to those with a "colorable claim" that they will be eligible for benefits in the future.  While the surgeons on the Harvard Medical School faculty constituted about 30% of the BSG workforce in the relevant years, no more than 8.79% of BSG employees earned enough in any year to contribute to an FRBP account and no more than 5.8% earned enough in any year to contribute to a UDC account.  While there may have been some difference in the individuals who generated sufficient NPI in each of those three years, the court does not find that enough of them had a colorable claim to FRBP or UDC benefits to eliminate top hat status for the plans even if, contrary to the court's conclusion, the §1002(7) definition of "participant" must be utilized in the analysis.

In view of the foregoing, the defendants have proven that FRBP and UDC were each, during the relevant period, a top hat plan.  This conclusion is consistent with the purposes of ERISA. As explained earlier, ERISA seeks in part to "protect the integrity of [ ] plans and the expectations" of those with an interest in them.  Barrowclough, 752 F.2d at 929.  Alexander was given notice at the outset of his employment that if he generated NPI in a particular year a contribution would be made to the UDC and/or FRBP, and that his account in each of those plans would be

25

reduced appropriately if he had a practice deficit in any subsequent year. This decision that the FRBP and UDC were top hat plans and, therefore, Alexander did not have a vested, irreducible interest in his accounts in the plans, gives integrity to the expectations that Alexander and BSG had at the outset of their association.

As top hat plans, the FRBP and UDC were exempt from the vesting provisions of ERISA, 29 U.S.C. §§1051-1061. See Demery, 216 F.3d at 286-87. As top hat plans, they were also exempt from the fiduciary responsibility provisions of ERISA, 29 U.S.C. §§1101-1114. Id.; In re New Valley Corporation, 89 F.3d at 149. Therefore, BSG is entitled to judgment on Counts IX and X of the complaint.


IV.  ORDER

In view of the foregoing, it is hereby ORDERED that:

1.  Judgment shall enter for defendants on Counts IX and X.

2.  Counsel shall confer and, by January 12, 2007, inform the court whether Counts XI, XII, and XIII may be dismissed.



_/s/ MARK L. WOLF_____
UNITED STATES DISTRICT JUDGE